1  Scott A. McMillan, CBN 212506
   Lauren Hanley-Brady, CBN 299644
2  The McMillan Law Firm, APC
   4670 Nebo Drive, Suite 200
3  La Mesa, CA 91941-5230
   Tel (619) 464-1500 x 14 // Fax (619) 828-7399
4  email: scott@mcmillanlaw.us

5
   Attorneys for Counterclaimant and Defendant, The McMillan Law Firm, APC
6

7

8

9                    UNITED STATES DISTRICT COURT

10               SOUTHERN DISTRICT OF CALIFORNIA

11  L. LEE BRIGHTWELL, an individual,     Case No.  16-cv-01696-W-NLS

12        Plaintiff,                       SECOND AMENDED
                                           COUNTERCLAIM FOR DAMAGES,
13  v.                                     EQUITABLE RELIEF,
                                           DECLARATORY RELIEF,
14                                         FORECLOSURE OF A
                                           POSSESSORY LIEN; AND TO
15  THE MCMILLAN LAW FIRM, APC,            IMPRESS AND FORECLOSE UPON
    a professional corporation, SCOTT A.   A CHARGING LIEN.
16  MCMILLAN, an individual,
    MICHELLE D. VOLK, an individual,
17  and DOES 1 through 25, inclusive,
    Defendants.
18

19

20  THE MCMILLAN LAW FIRM, APC,
    a California Professional Corporation,
21
          Counterclaimant,
22
          v.
23

24  L. LEE BRIGHTWELL, an individual;
25        Counterdefendant,

26

27       Counterclaimant The McMillan Law Firm, APC (Counterclaimant or
28

1   "TMLF"), for its Counterclaim against Counterdefendants LINDA LEE

2   BRIGHTWELL (Counterdefendant or "Brightwell"), alleges as follows:

3                                    **PARTIES**

4        1.   Counterclaimant The McMillan Law Firm, APC, is a California

5   Professional Corporation registered with the State Bar of California as a law

6   corporation, with its principal place of business in the City of La Mesa, County of

7   San Diego, State of California.

8        2.   Counterdefendant L. Lee Brightwell, was at all times relevant in this

9   complaint, and is now, a natural person residing in Hawaii.

10                       **JURISDICTION AND VENUE**

11       3.   This Court has original jurisdiction over this action pursuant to 28 U.S.C.

12  §1332, because this civil action has an amount in controversy in excess of $75,000,

13  exclusive of interest and costs, and is between citizens of different states.  Further,

14  this Counterclaim raises a Federal Question, allowing jurisdiction pursuant to 28

15  U.S.C. §1331.

16       4.   Counterclaimant is informed and believes, and based thereon alleges, that

17  Counterdefendant's obligations and liabilities arose in the State of California,

18  County of San Diego, and within the jurisdiction of this Court.

19       5.   Services were performed by Counterclaimant, and a contract for legal

20  services was entered into between Counterclaimant and Counterdefendant

21  Brightwell, in the State of California, County of San Diego, within the jurisdiction

22  of this Court.

23               **FACTS COMMON TO ALL COUNTERCLAIMS**

24       6.   The counterclaims arise from the parties interactions following

25  Counterclaimant's agreement to provide legal services to Counterdefendant in an

26  action against R.F. Logistics LLC and Brian O'Donnell, and to defend

27  Counterdefendant in a crosscomplaint brought by R.F. Logistics LLC and Brian

28  O'Donnell.  Counterdefendant alleged in her action, among other things, that Brian

---

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
*16-cv-01696-W-NLS*   RELIEF; DEMAND FOR JURY TRIAL                    2

O'Donnell and Counterdefendant Brightwell had rekindled a former intimate relationship in 2006, and agreed to share their life together.  Counterdefendant Brightwell claimed that Brian O'Donnell had promised her co-ownership in R.F. Logistics, LLC, and that based on the promises she had provided unpaid services to R.F. Logistics, had made capital contributions to it, and incurred expenses that were not reimbursed.  Counterdefendant Brightwell claimed that O'Donnell had acknowledged her ownership in R.F. Logistics, LLC, which O'Donnell had started in 2003.  O'Donnell denied the Counterdefendant's claims, and for support to his defense had cited to a loan application, executed under penalty of perjury, wherein Counterdefendant had denied any ownership in any business.  Mr. O'Donnell also claimed that he had made principal contributions to the purchase of a Chula Vista house that had been purchased in Counterdefendant's name as Mr. O'Donnell's estranged wife had previously refused to execute a release which would allow the purchase by O'Donnell with Counterdefendant, resulting in Counterdefendant holding title, but with Mr. O'Donnell making half of the mortgage payments.  The Chula Vista house from which Mr. O'Donnell and Counterdefendant operated RF Logistics appreciated significantly in value.  Ultimately, Counterdefendant Brightwell sold the Chula Vista house, retaining all of the increased value despite Mr. O'Donnell's payments toward the principal.

7.  Counterclaimant is informed and believes that O'Donnell claimed that as the years passed, O'Donnell and Counterclaimant's personal relationship became more and more volatile. O'Donnell alleged that while things began well in the beginning of the relationship and also at work, this soon gave way to escalating problems and conflict which included incidents where Counterclaimant would physically assault Mr. O'Donnell in fits of rage and anger.  Eventually, this became too much for Mr. O'Donnell and he sought to conclude the relationship with Counterdefendant.  Counterdefendant pressed Mr. O'Donnell to formalize her ownership in RF Logistics, LLC, but he demurred. In May of 2012, Mr. O'Donnell

1  offered Ms. Brightwell a severance of $100,000 plus reimbursement of her

2  business expenses in the event she wanted to terminate her employment with RF

3  Logistics, LLC. In the Summer of 2012, Mr. O'Donnell's relationship with Ms.

4  Brightwell became adversarial.

5      8.  Counterclaimant is informed and believes that Mr. O'Donnell remained

6  in the house in Chula Vista during the early Summer of 2012, with

7  Counterdefendant in Hawaii.  Upon Counterdefendant's return from Hawaii she

8  discovered that Mr. O'Donnell had moved out of the house, but had left the some

9  of his belongings and the administrative materials for the operation of the RF

10  Logistics LLC at the house.  Counterdefendant locked up the house, and changed

11  the locks, and informed the RF Logistics employee that reported to the house to

12  refrain from coming in.  Unbeknownst to Counterdefendant, Mr. O'Donnell gained

13  access to the Chula Vista house and removed the remainder of the RF Logistics,

14  LLC files, its computer, his clothing, and his daughter's clothing.

15      9.  Crossclaimant is informed and believes that on August 17, 2012, Mr.

16  O'Donnell and Counterclaimant met at a park in Coronado, where Mr. O'Donnell

17  revealed that he'd recovered the items that Counterdefendant locked inside the

18  house. Counterdefendant was not pleased to learn of this.  Counterdefendant had a

19  set of Mr. O'Donnell's keys, and went towards Mr. O'Donnell's vehicle. As she

20  attempted to unlock his vehicle with her copy of the remote, he would lock the

21  vehicle.  Mr. O'Donnell approached Counterdefendant and demanded that she

22  return his keys.   A scuffle ensued that according to the parties, and their respective

23  versions if both are credited, resulted in Mr. O'Donnell with scrapes and a grab to

24  his genitalia, and with Ms. Brightwell off her feet in the parking lot, also with

25  resulting scrapes and bruises.

26      10.  Crossclaimant is informed and believes that Mr. O'Donnell was arrested

27  for domestic violence for the events in the parking lot of the Coronado park, but no

28  charges were filed.  Ms. Brightwell and Mr. O'Donnell brought separate requests

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1    for temporary restraining orders against one another, but nothing resulted.

2       11.  Crossclaimant is informed and believes that on August 18, 2012, Mr.

3    O'Donnell, acting on behalf of RF Logistics, LLC, terminated Counterdefendant

4    from her employment with RF Logistics, LLC, accusing Counterdefendant of

5    falsifying her employment application, unauthorized access to computer systems,

6    and insubordination.

7       12.  Counterclaimant is informed and believes that on August 20, 2012,

8    Brian O'Donnell brought an action for a Temporary Restraining Order against

9    Counterdefendant L. Lee Brightwell, Superior Court of California, County of San

10   Diego, Case No. DV 12732, alleging that Ms. Brightwell physically attacked him,

11   grabbed his genitals in an attempt to injure him, took his car keys, and had

12   previously physically abused him, and had driven past his residence after the

13   physical assault.  Mr. O'Donnell alleged that Ms. Brightwell had told him that

14   she'd been diagnosed with a mental illness, that she treated through acupuncture.

15       13.  Counterclaimant is informed and believes that on August 27, 2012,

16   Counterdefendant Brightwell retained attorney Jaikaran Singh of McKenna Long

17   & Aldridge ("MLA") to represent her in her claims against RF Logistics LLC and

18   Brian O'Donnell, and to defend Counterdefendant in proceedings for restraining

19   orders brought against her by RF Logistics and O'Donnell.  Counterclaimaint is

20   informed and believes that Mr. Singh investigated Counterdefendant's claim

21   against RF Logistics LLC and Brian O'Donnell, spent significant time with

22   Counterdefendant, successfully defended Counterdefendant in restraining order

23   proceedings, engaged in settlement negotiations, prepared for and attended pre-

24   filing mediation before the Hon. Charles Hayes, ret'd., and ultimately filed a

25   lawsuit against RF Logistics, LLC and Brian O'Donnell.

26       14.  On April 25, 2013, on Counterdefendant's behalf, Mr. Singh filed a

27   lawsuit against RF Logistics, LLC and Brian O'Donnell, in the Superior Court of

28   California, County of San Diego, entitled: *L. LEE BRIGHTWELL, an individual,*

1  *Counterclaimant, v. RF LOGISTICS, LLC; BRIAN O'DONNELL; and DOES 1*

2  *through 25, inclusive*, San Diego Superior Court case number

3  37-2013-00046163-CU- OE-CTL.  A true and correct copy of which is attached

4  hereto as **Exhibit A**.  The complaint sought damages and other relief for: (1)

5  Breach of Contract; (2) Promissory  Estoppel; (3) Promissory Fraud; (4) Fraud in

6  the Inducement; (5) Wrongful Termination in Violation of Labor Code Section

7  1102.5; (6) Wrongful Termination in Violation of FEHA; (7) Wrongful

8  Termination In Violation of Public Policy; (8) Assault and Battery; (9) Intentional

9  Infliction of Emotional Distress; (10) Negligent Infliction of Emotional Distress;

10  (11) Violation of Labor Code Section 970; (12) Violation of Labor Code Section

11  2802; (13) Violation of Labor Code Section 202; (14) Declaratory Relief; (15)

12  Breach of Fiduciary Duty; (16) Breach of Fiduciary Duty -Derivative Claim; (17)

13  Conversion-derivative Claim; and (18) Accounting.   The complaint was met by a

14  demurrer, a motion to strike, which the attorneys of MLA responded to.  The MLA

15  attorneys also propounded and responded to discovery, and took the deposition of

16  one witness.

17      15.  On September 13, 2013, Brian O'Donnell and RF Logistics, LLC, filed

18  a cross-complaint against Counterdefendant Brightwell.   A true and correct copy

19  of which is attached hereto as **Exhibit B**. The MLA attorneys prepared an answer

20  for Ms. Brightwell. A true and correct copy of which is attached hereto as **Exhibit**

21  **C**.

22      16.  Throughout the course of the representation by MLA, Counterclaimaint

23  is informed and believes that Counterdefendant "consistently indicated" to Mr.

24  Singh that she would settle for $500,000.  Unbeknownst to Counterclaimant herein

25  at the time of the initiation of Counterclaimant's representation of Ms. Brightwell,

26  in July of 2013, Counterdefendant alleged to Mr. Singh an inability to pay MLA's

27  legal fees she incurred and attempted to renegotiate the MLA fee agreement.

28      17.  On or about December of 2013, Counterdefendant decided that she no

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1    longer wanted Mr. Singh and MLA to represent her.  As of January of 2014,

2    Counterclaimant is informed and believes that Counterdefendant had incurred fees

3    in excess of $140,000 payable to MLA.  Counterdefendant began seeking new

4    counsel.  Counterclaimant is informed and believes that Counterdefendant did not

5    inform MLA that she was seeking new counsel, but instead allowed MLA to

6    continue its representation of Brightwell in ignorance of Counterdefendant's

7    scheme.

8        18.  On or about December of 2013, Counterdefendant contacted

9    Counterclaimant The McMillan Law Firm, APC, Scott McMillan regarding

10    potential representation.  Counterdefendant did not disclose her prior efforts to

11    renegotiate the MLA agreement, or the entirety of the facts surrounding that effort.

12    At the time of the initial discussions Scott McMillan told Counterdefendant that

13    she could expect to spend $200,000 or more in legal fees under the agreement

14    anticipated to bring the case to trial.   Counterdefendant did not engage

15    Counterclaimant at that time.  Rather, on January 20, 2014, Counterdefendant

16    informed Scott McMillan that she had hired Mr. Gruenberg.

17        19.  Counterclaimant is informed and believes that after nearly a year and a

18    half of representing Counterdefendant Brightwell, on January 20, 2014,  Ms.

19    Brightwell claimed that the attorneys of MLA failed to make disclosures to her,

20    specifically that MLA is primarily a defense firm representing corporate clients,

21    that MLA had little to no experience or understanding of the challenges of small

22    business, that MLA had no employment law experience, that MLA lacked any

23    prior experience with assault or emotional anguish, and that MLA did not truly

24    understand the meaning of cost effective or budget conscious representation.

25    Counterdefendant alleged that MLA had committed "despicable and unethical"

26    conduct in its dealings with her.  Counterdefendant demanded that MLA absolve

27    Counterdefendant of any balance due, return Counterdefendant's $7,500.00

28    retainer, and refund Counterdefendant $50,000.00 of payments.  Counterdefendant

1  acknowledged that the complaint was well written and filed, the TRO was

2  successfully defended and dismissed, the defense of the demurrer and the motion

3  to strike was successfully defended and won, and discovery responses were

4  completed and submitted.

5      20.  Counterclaimaint is informed and believes that on January 20, 2014,

6  contemporaneous with allegations against MLA, Counterdefendant entered into a

7  contract for legal/consultant services with the Law Offices of Joshua D.

8  Gruenberg.  This fee agreement also required the timely payment of fees to

9  Attorney Gruenberg's firm.

10      21.  The Gruenberg firm commenced its representation of Counterdefendant

11  Brightwell.   On February 28, 2014, the Gruenberg firm filed a First Amended

12  Complaint.  A true and correct copy of which is attached hereto as **Exhibit D**. The

13  Gruenberg firm took the deposition of Mr. O'Donnell, the deposition of RF

14  Logistics LLC's employee Ms. Hendrix, and defended the deposition of

15  Counterdefendant Brightwell.

16      22.  On August 28, 2014, Ms. Brightwell sat for deposition.  Following the

17  deposition of Ms. Brightwell on August 28, 2014, the relationship between Mr.

18  Gruenberg and Counterdefendant deteriorated.  Ms. Brightwell also owed the

19  Gruenberg firm fees, and was to shortly thereafter reveal – unbeknownst to

20  Counterclaimant herein, that Ms. Brightwell did not intend to pay her fee bill as it

21  came due.  Further, Counterdefendant had entered the engagement with the

22  Gruenberg firm with an undisclosed cap of fees.  Counterclaimant is informed and

23  believes that Ms. Brightwell attempted to renegotiate her agreement with the

24  Gruenberg Firm, and suggested that they cut their fees in order to accomplish a

25  settlement.

26      23.   On or about September 5, 2014, Ms. Brightwell reinitiated contact with

27  Scott McMillan and sought to discuss Counterclaimant The McMillan Law Firm,

28  APC taking over representation of Counterdefendant's case, which was then set for

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1  trial on November 21, 2014.   At that time, all depositions had not been completed,

2  financial discovery was incomplete, the plaintiff's damages expert had not been

3  prepared, and two other depositions of significant fact witnesses remained to be

4  taken.  There was no trial preparation by the prior counsel to speak of.

5      24.  Counterclaimant The McMillan Law Firm, APC agreed to take the case

6  but with the promise that Ms. Brightwell would remain in close contact with the

7  firm, and would come to San Diego and assist in preparing the case for trial as

8  Scott McMillan had but a brief period of time to put the case together, even with a

9  continuance of the trial.  Ms. Brightwell represented that she would indeed come to

10  San Diego, develop a chronology, prepare a set of facts expected to be elicited

11  from each witness, identify 100 documents that were most important to her case

12  from her perspective, and provide an explanation of why those documents were

13  important.  Counterdefendant never completed that task.

14      25.  Counterdefendant Brightwell assured Scott McMillan, on behalf of

15  Counterclaimant, that she had the funds available to pay for the legal fees as they

16  came due, which in light of the state of case preparation were reiterated to be at

17  least $200,000 to bring the case through trial.  Counterdefendant assured

18  Counterclaimant that she would directly pay the charges to third parties necessary

19  for the case preparation.  At the time of such statements to Scott McMillan,

20  Counterdefendant had established a "cap on fees" as she had with the Gruenberg

21  Firm, and which she failed to disclose to Counterclaimant herein.

22      26.  On September 29, 2014, Counterdefendant Brightwell executed the

23  written contract for attorney services with Counterclaimant, a copy of which is

24  attached as Exhibit A to the First Amended Complaint of L. Lee Brightwell, filed

25  on December 7, 2016, ECF 16-1.

26      27.  Almost immediately upon the engagement, with less than two months

27  before the scheduled trial date Counterdefendant Brightwell became a problem

28  client.  Although the Counterclaimant by its staff and attorneys feverishly worked

on preparing the case for trial, Counterdefendant was not cooperative.  Rather than identifying the specific areas of knowledge that the witnesses had regarding the elements of the specific claims, Counterdefendant would engage in other activities unrelated to getting the case to trial.  Rather than preparing the list of the 100 most significant documents, and the reasons why they were significant, Counterdefendant attempted to learn ways to "delegate" – her term, the crucial aspect of case preparation to the unpaid intern Mr. Schil that had merely been assigned to assist her in her efforts to memorialize to "paper" the essence of the case, and the means by which to demonstrate it to the trier of fact.

28.  Rather than focus on the case preparation, Counterdefendant Brightwell came up with excuses why she could not participate in the Firm's trial preparation efforts, take phone calls from Scott McMillan, or otherwise provide information necessary for the trial preparation.  Counterdefendant's social engagements, "quality of life" time, and other extraneous matters were a constant diversion for Ms. Brightwell from the trial preparation.

29.  Counterdefendant, contrary to the promises of cooperation within the fee agreement, when displeased at various times, would simply cease returning phone calls.  Or, worse, would explode in anger and shout at Scott McMillan.

30.  Further, despite the instruction to obtain the printing and assembly of the trial exhibit binders from an outside agency, Counterdefendant refused to do so in a timely manner, refused to communicate regarding the production of the trial binders, thereby imposing upon Counterclaimants the burden of expense of assembly and printing of such binders – an expense that Counterdefendant has not reimbursed Counterclaimant for.

31.  Counterdefendant importuned Counterclaimant's attorney Scott McMillan, to threaten counsel for Mr. O'Donnell and RF Logistics LLC to reveal harmful facts concerning the Defendants O'Donnell and RF Logistics LLC if they would not accede to settlement demands, which Counterdefendant referred to as

"tickling."  Counterclaimant rejected Counterdefendant's demand.  On or about June 9, 2015, the Superior Court of California, Judge Timothy Taylor presiding, issued a tentative ruling on the motions in limine substantially following the rulings made in the earlier tentative.  Such rulings on the motions in limine were favorable to Counterdefendant. The July 2, 2015 Minute Order reflecting those rulings is attached as **Exhibit E.**

32.  On or about July 13, 2015, counsel for Mr. O'Donnell and RF Logistics LLC sent a written settlement offer in the amount of $435,000 with $25,000 of which to be paid over time.  Counterdefendant suggested that Counterclaimant reduce its contractual fees due in exchange for Counterdefendant accepting a settlement at $435,000.

33.  Counterclaimant received installment payments from Counterdefendant between October of 2014 through May 31, 2015.  Thereafter, the payments stopped and Counterdefendant communicated her previously existing intention to discontinue payments on the then outstanding account due of $62,535.87.   The occurrence of further events, provision of additional services, and the advancing of other monies, minus various adjustments, inclusive of the 20% contingency fee, has resulted in an outstanding bill of $151,922.59.

34.  On June 30, 2015, Counterclaimant caused to be served upon L. Lee Brightwell the "Notice of Client's Right to Fee Arbitration."   Counterdefendant Brightwell failed to request arbitration within thirty days of receipt of such notice.

35.  On or about July 31, 2015, while still represented by Counterclaimant, Counterdefendant directly communicated to the mediator in the case that she would accept $435,000.   The case settled for that amount.

36.  On or about August 5, 2015, Counterclaimant was effectively relieved as counsel for Counterdefendant Brightwell resulting from the filing of a proof of service reflecting Counterclaimant's service upon Counterdefendant Brightwell with an order relieving the McMillan Law Firm as counsel to Counterdefendant

Brightwell.

37.  Following August 5, 2015, Counterclaimant remained willing to try the case, except for eliciting the direct testimony of Counterdefendant, despite her retaining new counsel on or about August 5, 2015.

38.  Despite the knowledge that Counterclaimant was relieved as counsel for Counterdefendant, Counterdefendant Brightwell and her agents continued to accrue charges with third party service providers, specifically Andrew Albert, mediator,  which were billed to Counterclaimant's account.   Such third parties looked to Counterclaimant to pay such charges.

39.  Counterclaimant is informed and believes that contemporaneously with or  immediately after the filing of the order withdrawal Counterdefendant, engaged new counsel, and contemporaneously, if not shortly thereafter arrived at a settlement with her defendants in that case.  Counterdefendant's settlement was a direct result of Counterclaimant's efforts on Counterdefendant's behalf.

## FIRST COUNTERCLAIM

### BREACH OF CONTRACT

(Against Counterdefendant Brightwell)

40.  Counterclaimant incorporates by reference the allegations contained in paragraphs 1 through 39, and each and every part thereof with the same force and effect as though set out at length herein.

41.  Counterclaimant provided services to Counterdefendants Brightwell concerning the litigation of a case filed in the Superior Court of California, County of San Diego, entitled: *L. LEE BRIGHTWELL, an individual, Counterclaimant, v. RF LOGISTICS, LLC; BRIAN O'DONNELL; and DOES 1 through 25, inclusive*, San Diego Superior Court case number 37-2013-00046163-CU- OE-CTL, and defense of the cross-complaint against Counterdefendant Brightwell.

42.  A valid written contract exists between Counterclaimant and Counterdefendant.   The contract provided a discount for prompt payment of

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1  invoiced fees, and the right to such discount has lapsed due to the failure to pay

2  such fees.

3      43. Counterclaimant has fulfilled its obligations and complied with all

4  conditions and agreements of the contract that Counterclaimant is required to

5  perform, e.g., all conditions precedent to Counterdefendant's performance.

6      44. Counterdefendant breached her obligations to pay the amounts due, to

7  maintain communication. As a direct and proximate result of the breach,

8  Counterclaimant has been, and continues to be, injured.

9      45. Counterclaimant is entitled to recover actual, special, consequential

10  damages, and prejudgment interest in an amount according to proof at trial.

11  **SECOND COUNTERCLAIM**

12  Breach of the Implied Covenant of Good Faith and Fair Dealing

13  (Against Counterdefendant L. Lee Brightwell)

14      46. Counterclaimant incorporates by reference the allegations contained in

15  paragraphs 1 through 39, 41 through 45, and each and every part thereof with the

16  same force and effect as though set out at length herein.

17      47. As set forth above, Counterdefendant has significantly, materially and

18  intentionally breached the Agreement with Counterclaimant.

19      48. Counterdefendant made her representation, through refusing to timely

20  pay bills, her refusal to stay in communication, her refusal to cooperate with the

21  burdens of trial preparation reasonable under the circumstances, to refrain from

22  offensive behavior in the premises of Counterclaimants' offices, by imposing the

23  burden of expenses that should have been borne directly by Counterdefendant upon

24  Counterclaimant, unreasonably difficult to maintain.

25      49. Notwithstanding demand for performance by Counterclaimant,

26  Counterdefendant has continued her breach.

27      50. Through such actions, Counterdefendant has constructively failed to

28  cooperate with Counterclaimant in the performance of the Agreement and thereby,

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1   breached the implied covenant of good faith and fair dealing respectively.

2       51.  As a direct, proximate and consequential result of Counterdefendant's

3   acts,Counterclaimant has been damaged in a sum to be determined at trial.

4                          **THIRD COUNTERCLAIM**

5                    Quantum Meruit - Common Counts

6              (Against Counterdefendant L. Lee Brightwell)

7       52.  Counterclaimant incorporates by reference the allegations contained in

8   paragraphs 1 through 39, 41 through 45, 47 through 51, and each and every part

9   thereof with the same force and effect as though set out at length herein.

10      53.  Counterdefendant Brightwell requested, by words or conduct, that

11  Counterclaimant perform legal services and advance monies for the benefit of

12  Counterdefendant Brightwell.

13      54.  Counterclaimant performed the services as requested, and advanced

14  monies as as requested.

15      55.  Counterdefendant Brightwell has not paid for the services or the monies

16  advanced.

17      56.  As a result of Counterclaimant's services, Counterdefendant prevailed

18  on her complaint and the RF Logistics LLC cross-complaint, resulting in a greater

19  settlement than had previously ever been offered.

20      57.  The reasonable value of the services, plus interest thereon, is to be

21  determined according to proof at trial.

22                         **FOURTH COUNTERCLAIM**

23                            False Promise

24                  (Against all Counterdefendants)

25      58.  Counterclaimant incorporates by reference the allegations contained in

26  paragraphs 1 through 39, 41 through 45, 47 through 51, 53 through 57, and each

27  and every part thereof with the same force and effect as though set out at length

28  herein.

---

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
*16-cv-01696-W-NLS*        RELIEF; DEMAND FOR JURY TRIAL        14

1   59.  Counterdefendant Brightwell made a promise to Counterclaimant to

2   promptly pay her bills for legal services and reimbursement of expenses as they

3   were incurred, without reservation and without a "cap."  Secretly,

4   Counterdefendant lacked any intention of paying the bills as they came due and

5   intended, as she had with Mr. Gruenberg and MLA, to attempt to renegotiate the

6   deal after running up substantial expenses and incurring significant fees.

7   60.  Counterdefendant Brightwell repeatedly stated that "attorneys do not

8   sue to collect fees," thereby manifesting her belief that she was free to obtain such

9   services through trick, fraud, or artifice.

10   61.  Counterdefendant Brightwell did not intend to perform her promises

11   when she made them.  In her mind, without disclosing same to Counterclaimant,

12   Counterdefendant Brightwell had secretly set an arbitrary limit on the amount that

13   she would pay.

14   62.  Counterdefendant Brightwell intended that Counterclaimant rely on her

15   promises.

16   63.  Counterclaimant reasonably relied on Counterdefendant Brightwell's

17   promises.

18   64.  On or around early June 2015, Counterdefendant Brightwell

19   communicated her pre-existing intention to no longer pay once the amount she had

20   already paid was near $100,000.   Counterdefendant claimed that she was reserving

21   $100,000 for her purchase of a house.

22   65.  Counterdefendant Brightwell had funds in the McMillan Law Firm

23   Client Trust account in the amount of $15,462.34 when she disclosed her

24   previously held intention to cap the payment to the Firm.  Despite acknowledging

25   services rendered and reimburseable advances to third parties together due and

26   owing in excess of that amount, Counterdefendant Brightwell refused to release

27   even those funds to apply to her bill.

28   66.  Counterclaimant was harmed by providing legal services and devoting

---

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

resources which Counterclaimant was otherwise financially unable to provide without prompt payment.  Counterclaimant advanced fees to third parties based on the expectation that such advances would be promptly reimbursed.

67.  Counterdefendant refused to execute a substitution of attorney, and forced Counterclaimant to file a motion to withdraw.  Said motion to withdraw was granted.   Following the "reveal" that Counterclaimant did not intend to pay more, and during the pendency of the motion to withdraw, Counterclaimant was forced to provide additional services on the case and advance additional monies which have not been paid.

68.  On June 30, 2015, Counterclaimant served upon Counterdefendant Brightwell a motion to be relieved as her counsel.

69.  On July 12, 2015, Counterdefendant Brightwell allowed $5,000 to be withdrawn from trust and credited to the billing, such billing which already far exceeded such amount.

70.  On July 31, 2015, the Court granted the motion to be relieved as counsel.

71.  On August 5, 2015, Scott McMillan caused the service of the order granting the motion to be relieved as counsel upon Counterdefendant Brightwell.

72.  Counterclaimant's reliance on Counterdefendant Brightwell's promise was a substantial factor in causing Counterclaimant harm.   Counterclaimant has suffered additional payroll expenses, interest expenses, employee reimbursements, and foregone other remunerative opportunities as a result of the uncompensated time devoted to Counterdefendant Brightwell's case.  Because Counterdefendant Brightwell's refusal to pay based on the previously undisclosed and arbitrary "cap" was unforeseen Counterclaimant suffered financial injuries resulting from the surprise of not only having the bill rejected but having that money held in trust withheld.  Resulting from the services provided and expenses advanced as a consequence of the fraud, Counterdefendant has received a benefit, and has

1  unjustly retained that benefit at the expense of Counterclaimant herein, and
2  Counterclaimant is entitled to restitution thereof.

3       73.  In doing the acts herein alleged, Counterdefendant Brightwell acted with
4  oppression, fraud, malice, and in conscious disregard of the rights of
5  Counterclaimant, and Counterclaimant is therefore entitled to punitive damages
6  according to proof at the time of trial.

7                          **FIFTH COUNTERCLAIM**

8              TO IMPRESS AND FORECLOSE UPON A POSSESSORY LIEN

9                          (Against all Defendants)

10      74.  Counterclaimant incorporates by reference the allegations contained in
11  paragraphs 1 through 39, 41 through 45, 47 through 51, 53 through 57, 59 through
12  72 and each and every part thereof with the same force and effect as though set out
13  at length herein.

14      75.  Counterclaimant has represented Counterdefendant Brightwell, at all
15  times mentioned herein, according to a written attorneys fee agreement which
16  contains a grant of a lien. Counterclaimant has fully complied with California
17  Rules of Professional Conduct Rule 3-300 in that the terms of such agreement were
18  fair and reasonable, the terms of the lien were fully disclosed in writing to L. Lee
19  Brightwell.  L. Lee Brightwell was provided a copy of the agreement, and the
20  opportunity to seek independent legal advice and thereafter she consented to such
21  lien in writing.

22      76.  Under the fee agreement, Counterdefendant Brightwell was required to
23  keep money in trust in the McMillan Law Firm IOLTA account.  As of the date of
24  this complaint, L. Lee Brigthwell has $10,462.34 maintained in the McMillan Law
25  Firm IOLTA account.

26      77.  Counterclaimant requests that its lien be foreclosed.  Counterclaimant
27  requests an order releasing such amount in trust for Counterdefendant Brightwell at
28  the time of judgment to Counterclaimant as a payment against such amounts due

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1   and owing, and to be credited to Counterdefendant Brightwell's account.

2   **SIXTH COUNTERCLAIM**

3   TO IMPRESS AND FORECLOSE UPON A CONTRACTUAL, EQUITABLE,

4   AND CHARGING LIEN

5   (Against all Defendants)

6   78.  Counterclaimant incorporates by reference the allegations contained in

7   paragraphs 1 through 39, 41 through 45, 47 through 51, 53 through 57, 59 through

8   72, 75, 76 and each and every part thereof with the same force and effect as though

9   set out at length herein.

10  79.  An identifiable *res* of property resulting from the litigation activities of

11  Counterclaimant on Counterdefendant Brightwell's behalf is presently held by

12  Counterdefendant's attorneys.   Counterclaimant is entitled to such funds according

13  to the lien agreed to by Counterdefendant Brightwell within the aforesaid attorney

14  client agreement.

15  80.  Counterclaimant requests that its lien be foreclosed.  Counterclaimant

16  requests an order commanding Counterdefendant and her counsel, to release such

17  *res* whether expressly or constructively has been held in trust for Counterdefendant

18  Brightwell,  to Counterclaimant as a payment against such amounts due and owing

19  by Counterdefendant Brightwell, and to be credited to Counterdefendant

20  Brightwell's account.

21  **SEVENTH COUNTERCLAIM**

22  Computer Fraud and Abuse Act, 18 U.S.C. § 1030

23  (Against all Counterdefendants)

24  81.  Counterclaimant re-alleges as though set forth in full herein paragraphs

25  1 through 38, 40 through 44, 46 through 49, 51 through 55, and 58 through 72 as

26  though set forth at length herein.

27  82.  While participating in the preparation for trial in her case,

28  Counterdefendant Lee Brightwell was specifically instructed to only access files

1   within her own directory, and under the supervision of the staff of

2   Counterclaimant.

3       83.  On our about January of 2015, Counterdefendant Lee Brightwell was

4   sequestered from the Counterclaimant's active network, and given a desk inside the

5   Firm's library, with a firewalled IP address.  Despite those efforts to exclude

6   Counterdefendant from accessing the Firm's internal network, Counterclaimant is

7   informed and believes based upon Counterdefendant's suggestions in this case, that

8   she was able to access the Firm's private data.

9       84.  Counterclaimant did not consent to Counterdefendant's access to its

10  private systems and data, or such matters relating to Counterdefendant that were

11  provided to Counterclaimant according to protective order.

12      85.  On or about August 2013, Joshua Heinlein, counsel and authorized

13  agent for Counterdefendant disclosed that he had the entirety of the subdirectory

14  associated with Lee Brightwell.  Such subdirectory had not been made available to

15  Counterdefendant, and the obtaining of that subdirectory was without

16  Counterclaimant's knowledge or authorization.

17      86.  Counterdefendant Lee Brightwell was alleged to have accessed and

18  copied, without authorization, the data of Brian O'Donnell, and R.F. Logistics,

19  LLC, and accessed Counterclaimants' data without authorization as a "practice."

20  [**Exhibit B, ¶¶ 16, 17, 18**.]

21      87.  Counterclaimant is a "person" within the meaning of 18 U.S.C. §

22  1030(e)(12).

23      88.  Counterclaimant's network and component computers in that network

24  are "protected" computera according to 18 U.S.C. § 1030(e)(2)(B):

25      "(2)  the term "protected computer" means a computer--
26      (B)  which is used in or affecting interstate or foreign commerce or
        communication, including a computer located outside the United
27      States that is used in a manner that affects interstate or foreign
        commerce or communication of the United States;"

28

---

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

89.  Counterdefendant Brightwell exceeded authorized access in that she accessed the computer without authorization and obtained information in the computer within the meaning of 18 U.S.C. § 1030(e)(6):

"(6)  the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;"

90.  Counterdefendant's access was intentional, and knowingly unauthorized.

91.  Countercomplainant has been denied its exclusive possessory interest in its data and computer systems by Counterdefendant's actions.

92.  Counterclaimant has suffered loss within the meaning of 18 U.S.C. 1030(e)(11), which defines loss as

"(11)  the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service"

93.  Countercomplainant has been injured as a foreseeable result of the unauthorized access. Counterclaimant has suffered "loss" aggregating at least $ 5,000 in value within the meaning of 18 U.S.C. § 1030(c)(4)(i)(I). Counterclaimant has incurred expense in conducting a damage assessment, investigating the mode of Counterdefendant's unauthorized access, and attempting to foil any data breaches, and has lost revenue as a result of such otherwise unnecessary efforts.

94.  Countercomplainant has been injured in an amount according to proof at trial, and the conduct by Counterdefendant was malicious, fraudulent, and

oppressive as defined in California Civil Code 3295, thereby meriting punitive damages in an amount according to proof.

95.  Counterclaimant requests entry of a mandatory injunction requiring that Counterdefendant identify the means by which she accessed and obtained such data, that Counterdefendant to make account of and relinquish all data obtained through such access, and to purge that data from her possession and certify that such data has not been redistributed to third parties.  And, to the extent that such data has been distributed, that Counterdefendant identify such persons that have received such data such that they may be joined as third party defendants.

96.  Counterclaimaint is entitled to restitution of its data purloined by Counterdefendant.

### EIGHTH COUNTERCLAIM

California  Comprehensive Computer Data Access and Fraud Act,

Penal Code § 502

(Against all Counterdefendants)

97.  Counterclaimant re-alleges as though set forth in full herein paragraphs 1 through 38, 40 through 44, 46 through 49, 51 through 55, 58 through 72, 82 through 91, as though set forth at length herein.

98.  Section 502 of the California Penal Code forbids the "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

99.  Counterclaimant is informed and believes, based on the statements by Counterdefendant and her counsel, that Counterdefendant Brightwell violated section 502(a) of the California Penal Code by committing one or more of the specific offenses set forth at subdivision (c) of section 502, when she:

(1)  Knowingly accesse[d] and without permission alter[ed], damage[d], delete[d], destroy[ed], or otherwise uses any data, computer, computer system, or computer network in order to either

(A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2)  Knowingly access[ed] and without permission took, copied, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3)  Knowingly and without permission use[d] or cause[d] to be used computer services.

(4)  Knowingly accessed and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

\* \* \*

(6)  Knowingly and without permission provided or assisted in providing a means of accessing a computer, computer system, or computer network in violation of section 502.

(7)  Knowingly and without permission accessed or caused to be accessed any computer, computer system, or computer network.

(8)  Knowingly introduced any computer contaminant [as defined in section 502(b)(12)] into any computer, computer system, or computer network.

\* \* \*

100.  Counterdefendant has incurred "victim expenditures" which mean "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access" pursuant to Penal Code section 502(b)(11), in an amount according to proof at trial.

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

101.  Counterdefendant is liable to Counterclaimant for nominal and compensatory damages according to Penal Code section 502(e), which provides:

> " In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. . ."

102.  Counterclaimant is entitled to reasonable attorneys fees according to Penal Code section 502(e)(2) for the violation of Penal Code section 502.

103.   Counterclaimant requests injunctive relief as follows, that: Counterdefendant identify and relinquish all data obtained through such her unauthorized access, and to purge that data from her possession and certify that such data has not been redistributed to third parties.  And, to the extent that such data has been distributed, that Counterdefendant identify such persons that have received such data such that they may be joined as third party defendants.   Further, that Counterdefendant identify the means by which she accessed and obtained such data.

104.  Counterclaimant has been injured in an amount according to proof at trial, and the conduct by Counterdefendant was malicious, fraudulent, and oppressive as defined in California Civil Code 3295, thereby meriting punitive damages in an amount according to proof and pursuant to Penal Code section 502(e)(4).

105.  Counterclaimaint is entitled to restitution of its data purloined by Counterdefendant.

## NINTH COUNTERCLAIM

### UNFAIR COMPETITION, Bus. & Prof. Code § 17200

(Against all Counterdefendants)

---

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

106.  Counterclaimant incorporates by reference the allegations contained in paragraphs 1 through 39, 41 through 45, 47 through 51, 53 through 57, 59 through 72, 75, 76, 82 through 96, 98 through 104 and each and every part thereof with the same force and effect as though set out at length herein.

107.  Counterdefendant Lee Brightwell is engaged independently in business and investment efforts, and engaged Counterclaimant to provide legal services in part, to further such business and investment efforts. Counterdefendant L. Lee Brightwell operates Brightwell Associates, LLC, and other various entities, is actively engaged as a real estate investor, and claimed to be the co-owner of R.F. Logistics, LLC.   Counterdefendant engaged the Counterclaimant to provide legal services to resolve a business dispute with her co-venturer Brian O'Donnell.

108.  California Business & Professional Code §17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice . . ."  For the aforementioned reasons, Counterdefendants' conduct constitutes unfair competition as defined by the California Business & Professional Code §17200.

109.  Counterclaimant has lost money due to the Counterdefendants' unfair competitive practices. Thus, Counterclaimant has standing under California Business & Professional Code section 17204. In accordance to section 17203, Counterclaimant seeks injunctive relief for Counterdefendants to cease their illegal business practices.

110.  Also, Counterclaimant seeks restitution by an order requiring Counterdefendant to disgorge all wrongfully obtained monies.  Counterclaimant may recover money or property wrongfully obtained from the Counterclaimant, and the monies and data taken by Counterdefendant from Counterclaimant are property subject to restitution.

### TENTH COUNTERCLAIM

Declaratory Relief

(Against all Counterdefendants)

SECOND AMENDED COUNTERCLAIM FOR DAMAGES, EQUITABLE AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL

111.  Counterclaimant re-alleges as though set forth in full herein paragraphs 1 through 38, 40 through 44, 46 through 49, 51 through 55, 58 through 72, and 81 through 86, 88, 89, and 90 as though set forth at length herein.

112.  A present and existing controversy exists regarding the ownership and possessory interest of Counterclaimant's property.  A declaration of the rights, responsibilities, duties and obligations regarding the ownership interest is essential to determine and resolve the respective claims of the parties. There is no other adequate or speedy remedy at law.

**ELEVENTH COUNTERCLAIM**

Unjust Enrichment

(Against all Counterdefendants)

113.  Counterclaimant re-alleges as though set forth in full herein paragraphs 1 through 38, 40 through 44, 46 through 49, 51 through 55, 58 through 72, and 81 through 86, 88, 89, and 90 as though set forth at length herein.

114.  Resulting from the services provided and expenses advanced as a consequence of mistake, fraud, coercion, or request, Counterdefendant has received a benefit, and has unjustly retained that benefit at the expense of Counterclaimant herein, and Counterclaimant is entitled to restitution thereof.

**PRAYER FOR RELIEF**

Wherefore, Counterclaimant prays for judgment as follows:

**I.     As to the First Counterclaim for Breach of Contract, the Second Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing, for the Third Counterclaim for Quantum Meruit - Common Counts:**

1.  Actual damages in an amount to be ascertained according to proof at trial;

2.  Special and Consequential Damages in an amount to be determined according to proof at trial;

3.  Alternatively, for rescission and restitution.

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

4. For prejudgment interest

**II.   As to the Fourth Counterclaim for Fraud**

1. General and special damages in an amount according to proof at trial;

2. For punitive and exemplary damages in an amount according to proof at trial.

3. For restitution to Counterclaimant by Counterdefendant of the value of the services provided and expenses advanced by Counterclaimant according to proof at trial.

**III.   As to the Fifth Counterclaim to Impress and Foreclose upon a Possessory Lien and the Sixth Counterclaim to Impress and Foreclose upon a Contractual, Equitable and Charging Lien:**

1. To impress and foreclose upon the possessory lien on the $10,462.34 in the McMillan Law Firm IOLTA account.

2. To impress and foreclose upon lien as to those funds in the amount of $151,922.59 held by Counterdefendant or her attorneys.

**IV.   As to the Seventh Counterclaim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030:**

1. Compensatory damages in an amount according to proof at trial;

2. For punitive and exemplary damages in an amount according to proof at trial;

3. For equitable relief, including restitution.

**V.   As to the Eighth Counterclaim for violation of the California Comprehensive Computer Data Access and Fraud Act,  Penal Code § 502:**

1. Nominal, and Compensatory damages in an amount according to proof at trial;

2. For punitive and exemplary damages in an amount according to proof at

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1  trial;

2       3.  For equitable relief, including restitution.

3

4  **VI.  As to the Ninth Counterclaim for Unfair Competition according to Bus.**

5       **& Prof. Code § 17200:**

6       1. Restitutionary relief to restore all monies, and property, wrongfully taken

7  by Counterdefendant;

8       2.  For preliminary and permanent injunctive relief as provided by the

9  Business and Professions Code Section 17203.

10  **VII.  As to the Tenth Counterclaim for Declartory Relief:**

11       For declaratory relief as to the ownership of the amounts subject to the lien,

12  and the restitution of Counterclaimant's property.

13  **VIII. As to the Eleventh Counterclaim for Unjust Enrichment:**

14       For restitution to Counterclaimant by Counterdefendant of the value of the

15  services provided and expenses advanced by Counterclaimant by which

16  Counterdefendant has been unjustly enriched according to proof at trial.

17

18       **As to all causes of action:**

19       1. Costs of suit; and

20       2. Such other remedies as the court deems just and proper.

21

22                       Respectfully Submitted,

23  Dated:  August 28, 2017        The McMillan Law Firm, A.P.C.

24                       /s/ Scott A. McMillan

25         BY:  _____

26                       Scott A.  McMillan

27                       Attorney for Counterclaimant
                         The McMillan Law Firm, A.P.C.

28

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2      Counterclaimant demands a jury trial on all causes of action so determinable.

3

4                             Respectfully Submitted,

5  Dated: August 28, 2017        The McMillan Law Firm, A.P.C.

6                             /s/ Scott A. McMillan

7              BY:  _____

8                           Scott A.  McMillan
                              Attorney for Counterclaimant

9                           The McMillan Law Firm, A.P.C.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

1

## CERTIFICATE OF SERVICE

2    I, Scott A. McMillan, am an attorney admitted to practice before this court.

3  The foregoing document was served upon the parties to this case by electronically

4  filing the foregoing document(s) using the CM/ECF system. Service of an

5  electronically filed document upon a CM/ECF User who has consented to

6  electronic service is deemed complete upon the transmission of the Notice of

7  Electronic Filing ("NEF"). The NEF will be maintained with the original

8  document(s) in our office.

9    Dated:      August 28, 2017

10                                      /s/ Scott A. McMillan

11                      BY:   _____

12                            Scott A.  McMillan
                              Attorney for Counterclaimant
                              The McMillan Law Firm, A.P.C.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COUNTERCLAIM FOR
DAMAGES, EQUITABLE AND DECLARATORY
RELIEF; DEMAND FOR JURY TRIAL

# EXHIBIT A

1 | JAIKARAN SINGH (SBN 201355)
   jsingh@mckennalong.com
2 | TAYLOR H. STUPIN (SBN 272947)
   tstupin@mckennalong.com
3 | McKENNA LONG & ALDRIDGE LLP
600 West Broadway, Suite 2600
4 | San Diego, California 92101-3372
Telephone:    619.236.1414
5 | Facsimile:    619.232.8311

6 | Attorneys for Plaintiff
L. Lee Brightwell
7 |

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF SAN DIEGO**

10 | L. LEE BRIGHTWELL,

           Case No. **37-2013-00046163-CU-BC-CTL**

11 |        Plaintiff,

           **COMPLAINT FOR: (1) BREACH OF CONTRACT; (2) PROMISSORY ESTOPPEL; (3) PROMISSORY FRAUD;**

12 |        v.

           **(4) FRAUD IN THE INDUCEMENT; (5) WRONGFUL TERMINATION IN**

13 | RF LOGISTICS, LLC; BRIAN
O'DONNELL; and DOES 1 through 25,

           **VIOLATION OF LABOR CODE SECTION 1102.5; (6) WRONGFUL**

14 | inclusive,

           **TERMINATION IN VIOLATION OF FEHA; (7) WRONGFUL TERMINATION**

15 |        Defendants.

           **IN VIOLATION OF PUBLIC POLICY; (8) ASSAULT AND BATTERY; (9)**

16 |            **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; (10)**

17 |            **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; (11)**

18 |            **VIOLATION OF LABOR CODE SECTION 970; (12) VIOLATION OF**

19 |            **LABOR CODE SECTION 2802; (13) VIOLATION OF LABOR CODE**

20 |            **SECTION 202; (14) DECLARATORY RELIEF; (15) BREACH OF FIDUCIARY**

21 |            **DUTY; (16) BREACH OF FIDUCIARY DUTY – DERIVATIVE CLAIM; (17)**

22 |            **CONVERSION – DERIVATIVE CLAIM;**

23 |            **(18) ACCOUNTING**

24 |            **RELIEF REQUESTED IN EXCESS OF $25,000**

25 |

26 |            **JURY TRIAL DEMAND**

27 |

28 |

cKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

COMPLAINT

1   Plaintiff L. Lee Brightwell hereby sues RF Logistics, LLC and Brian O'Donnell, and

2   alleges as follows:

3   **PRELIMINARY ALLEGATIONS**

4   1.   Lee Brightwell is, and at all times mentioned herein was, an individual residing in

5   the County of San Diego, State of California, except as otherwise noted.

6   2.   Defendant RF Logistics, LLC ("RFL") is, and at all times mentioned herein was, a

7   limited liability company doing business in the State of California.  RFL regularly employees five

8   or more employees.

9   3.   Defendant Brian O'Donnell ("O'Donnell") is, and at all times mentioned was, an

10   individual residing in the County of San Diego, State of California, except as otherwise noted.  At

11   all relevant times in this complaint, O'Donnell was the Managing Member and President of RFL.

12   4.   Ms. Brightwell is informed and believes, and based thereon alleges, that at all times

13   mentioned herein, each and every defendant was the agent, alter ego, subsidiary, employee, joint

14   venturer and/or co-conspirator of each other defendant, and that, in performing or failing to

15   perform the acts herein alleged, each was acting individually as well as through and in the

16   foregoing alleged capacity and within the course and scope of such agency, alter ego capacity,

17   subsidiary, employment, joint venture, and/or conspiracy, and each other defendant ratified and

18   affirmed the acts and omissions of the other defendant.  Ms. Brightwell is further informed and

19   believes that each defendant, in taking the actions alleged herein and/or ratifying the actions

20   alleged herein, acted within the course and scope of such authority and, at the same time, for their

21   own financial and individual advantage, as well as in the course and scope of such agency,

22   subsidiary, employment, joint venture and as an alter ego therein.

23   5.   The true names and capacities, whether individual, corporate or associate, or

24   otherwise, of defendants named herein as Does 1 through 25, inclusive, are unknown to Ms.

25   Brightwell, who therefore sues said defendants by such fictitious names pursuant to Code of Civil

26   Procedure section 474.  Ms. Brightwell will amend this complaint to show their true names and

27   capacities when the same have been ascertained.  Ms. Brightwell is informed and believe, and

28   / / /

:KENNA LONG &
ALDRIDGE LLP
SAN DIEGO

COMPLAINT

1   based upon such information and belief, allege that all defendants sued herein are in some manner

2   responsible for the acts herein alleged, or are the alter ego of the other defendants named herein.

3         6.     Venue and jurisdiction are proper in the above-captioned district because the

4   actions referred to in this Complaint were performed in this judicial district, and the parties also

5   reside in this judicial district. Ms. Brightwell further alleges that the breach of the agreement, and

6   other activities supporting the causes of action alleged herein, occurred in the County of San

7   Diego and within this judicial district. Also, the relief requested is within the jurisdictional

8   authority of this Court.

9   **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10         7.     Ms. Brightwell has filed charges of discrimination and retaliation with the

11   California Department of Fair Employment and Housing ("DFEH"), which has issued a "right-to-

12   sue" letter, a copy of which is attached as Exhibit A.

13   **GENERAL ALLEGATIONS**

14         8.     O'Donnell founded RFL in 2003, registering as an LLC in Virginia in

15   January 2004. He ran the business as a sole proprietorship for four years. Ms. Brightwell is

16   informed and believes and based thereon alleges that with O'Donnell's sole involvement, RFL

17   grossed just more than $169,000 in total revenues in 2007. At this time, based on information and

18   belief, RFL did not generate a profit.

19         9.     RFL is primarily a service provider, which develops and supports an inventory

20   management system for the Naval Special Warfare Command ("NSWC") called the Special

21   Warfare Automated Logistics Information System ("SWALIS"). The other part of RFL's business

22   is working as a preferred partner with HandySoft and using its business process software, Biz

23   Flow, to automate the credit card purchasing process for NSWC.

24         10.    The majority of RFL's business is conducted as a sub-contractor, previously to

25   AMSEC LLC ("AMSEC") until September 2010, and then to NTVI Fed LLC ("NTVI") through

26   the present. In addition, RFL subcontracts to CACI, a large government prime contractor,

27   providing inventory management personnel as needed and team support for the development of

28   ///

1  the NAVY Single Supply Baseline. RFL also has BizFlow related contracts directly with NSWC,

2  where the end client is NSWC headquarters on the Naval Amphibious Base in Coronado.

3      11.    Initially, the SWALIS work originated in Virginia Beach at the Naval Amphibious

4  Base in Little Creek, and currently supports clients where ever Navy Seal support bases are

5  established, including Bahrain, Germany, Guam, Hawaii, Mississippi, and Alaska.  In

6  September 2012, NTVI and RFL also acquired a contract with Naval Expeditionary Combat

7  Command ("NECC") in Norfolk, Virginia.  The SWALIS program has been selected to be

8  installed in all of NECC and in "Big NAVY."

9      12.    O'Donnell and Ms. Brightwell began a personal relationship in 2006.  They had

10  worked together from 1986 to 1988 and had stayed friends over the years.  At the time they began

11  a personal relationship, they were both married but separated from their respective spouses with

12  the intention of each getting divorced.  They intended to marry, join together their assets, work,

13  play, and grow old together.

14      13.    Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell

15  is someone who cannot separate his work life from his personal life.  He fell in love with Ms.

16  Brightwell and wanted them to be together.  In addition, on information and belief, O'Donnell

17  knew that Ms. Brightwell's industrial engineering background and experience in process analysis

18  would be a significant benefit to the services RFL could provide.  Accordingly, in many lengthy

19  telephone conversations throughout 2006, O'Donnell asked Ms. Brightwell to move from Hawaii

20  and join him as a "partner" at RFL to "grow this business together" in San Diego.

21      14.    From February 2006 to June 2007, O'Donnell and Ms. Brightwell had a series of

22  discussions regarding the conditions under which Ms. Brightwell would be willing to join

23  O'Donnell in San Diego to work at RFL.  As an important part of those discussions, and in an

24  effort to entice Ms. Brightwell to move to San Diego, O'Donnell promised Ms. Brightwell an

25  equal ownership interest in RFL if she would join the company.  By doing this, Mr. O'Donnell

26  offered the woman he loved ownership in the company he founded with the potential for them to

27  "grow the business together." Mr. O'Donnell told Ms. Brightwell that together, with her

28  / / /

1    participation, they could double the revenues with two people chargeable on the government

2    contract, incur negligible expenses by living together and working from home, thereby "banking"

3    half of the revenues and growing a nest egg. At this time, O'Donnell was opposed to hiring and

4    managing employees.

5        15.    In accepting O'Donnell's offer, Ms. Brightwell relied on O'Donnell's promise to

6    make her an equal owner in RFL. In further reliance on O'Donnell's promise, Ms. Brightwell

7    moved to San Diego from Hawaii on June 15, 2007 to commence work at RFL. Consistent with

8    her role as owner, O'Donnell did not provide Ms. Brightwell with an offer letter of employment,

9    as was done with all future RFL employees.

10       16.    At O'Donnell's request, Ms. Brightwell worked on RFL deliverables in October

11    through December 2006, but was not paid. In October 2007, when Ms. Brightwell began onsite

12    work at RFL, she was brought in as a "Member" of the company, and given the title "Business

13    Process Engineer." At this time, RFL was composed of Ms. Brightwell and O'Donnell, who was

14    designated the Managing Member and held the title, "Senior Business Process Analyst."

15    Ms. Brightwell's title later changed to "Vice-President" and O'Donnell's title became "President,"

16    when RFL hired Alfred McCusker as an employee in March 2009. Ms. Brightwell remained

17    second in charge of RFL operations until she was terminated by O'Donnell in August 2012.

18       17.    When Ms. Brightwell began work at RFL, O'Donnell explained to her that she

19    would be temporarily paid with a Form W-2 to simplify tracking and paying of payroll taxes. He

20    also cautioned Ms. Brightwell that because his divorce was not yet final, attaching Ms. Brightwell

21    to any assets he owned, like the company, could allow his wife to go after her assets. For that

22    reason, O'Donnell explained they would document her ownership at a later time. Although this

23    gave Ms. Brightwell some pause, she trusted O'Donnell and immersed herself in the work.

24       18.    Ms. Brightwell was not paid regularly for the first two years, but rather, like

25    O'Donnell, received income when RFL was able to make distributions. Likewise, like O'Donnell,

26    Ms. Brightwell received no benefits, including health care, vacation time, or sick time, for the first

27    two years. In addition, RFL paid Ms. Brightwell the revenue she generated on her assignments.

28    As an owner, Ms. Brightwell knew it was important to build up reserves in the RFL bank accounts

1  to cover payroll fees, taxes, and operational expenses.  She suggested this to O'Donnell and
2  voluntarily reduced her compensation rate from $80 to $65 in 2008 in order to generate sufficient
3  reserves for RFL.   Consequently, RFL was able to hire Alfred McCusker in March 2009.
4  Ms. Brightwell's pay did not increase for four years, despite pay raises for other employees in
5  2010 and 2011.  It was not until late in 2011 that Ms. Brightwell and O'Donnell agreed to an
6  increase in her pay in line with her position in the company.

7       19.    Based on O'Donnell's promise to Ms. Brightwell of an equal ownership interest in
8  RFL, Ms. Brightwell believed she was an owner of RFL.  Accordingly, in reliance on the promise
9  that she would have ownership interest in RFL, Ms. Brightwell invested significant time, effort
10  and resources into RFL in a manner that is typical of small business owners.

11      20.    For instance, O'Donnell and Ms. Brightwell operated RFL together and worked
12  closely side by side for countless hours through day and at night to develop business, fulfill
13  contract deliverables and to manage the company.  Working in a home office, business and
14  personal time overlapped, making RFL priorities a constant and dominating presence in their daily
15  lives.  In particular, they strategized together regarding the company's operation, identified new
16  business opportunities, met with existing and new clients, trained employees, completed
17  performance reviews of employees and travelled together to support locations.  Ms. Brightwell
18  was involved in all company operational decisions, including new hires, proposals, new business
19  contacts/development, and detail build-up of new business bidding.  And, while RFL employees
20  received performance reviews, O'Donnell and Ms. Brightwell never received any.  Instead, they
21  together reviewed the performance of the RFL employees and determined appropriate
22  compensation and bonuses.

23      21.    In addition, Ms. Brightwell permitted RFL to use her home for its business
24  operations.  Ms. Brightwell's home is located at 787 Esperanza Place, Chula Vista, California
25  91914.   Ms. Brightwell and O'Donnell lived together in this house from December 2008 until
26  early August 2012, when O'Donnell moved out of the home.  Although both made alternating
27  monthly mortgage and utility payments to share living expenses, Ms. Brightwell made the initial
28  down payment to purchase the home and has sole legal title.

22.    During this time, RFL operated its business from the front, living room of Ms. Brightwell's home, as evidenced on business cards, brochures, contracts and invoices, payroll and bank accounts.  No rent was paid by RFL for this office space.

23.    Furthermore, Ms. Brightwell permitted RFL to use her vehicle from 2007 through 2009 for business purposes.  There was no other company car during this time period.  Thereafter, her vehicle was used by the company for business purposes frequently.  In particular, more recently, during June and July 2012 it was used by employees full time to off-set contract incurred travel expenses.  Ms. Brightwell never received any compensation or reimbursement for this use.

24.    Ms. Brightwell also frequently purchased at her own expense business supplies such as desks, chairs, filing cabinets, printers, routers, software, and office supplies. Reimbursement for any of these purchases was not realized until RFL hired an office manager, Liz Hendrix, in November 2010 who compiled expenses going back as far as 2007.  But, even then, many of these items and other expenses remain unreimbursed.  Ms. Brightwell also used her personal laptop to conduct RFL business until it broke and was later replaced with a new one.

25.    Consistent with her ownership interest in RFL, O'Donnell held Ms. Brightwell out to others as an owner in the business.  When O'Donnell introduced Ms. Brightwell to clients, business contacts and friends, he referred to RFL as "our business," "our company" or explained that he and Ms. Brightwell "have our own business."

26.    Likewise, O'Donnell prepared and, on October 16, 2007, submitted a resume for Ms. Brightwell to RFL's prime contractor, AMSEC, to qualify her to perform work for NSWC, and to use for proposals to validate qualified personnel.  (*See* Exhibit B.)  That resume identifies Ms. Brightwell as a "Member" of RFL, and as such, an owner of the limited liability company. (*See* Exhibit B.)

27.    In response to this submission, AMSEC requested that O'Donnell add to the resume Ms. Brightwell's work experience broken down by month.    As a result, O'Donnell submitted Ms. Brightwell's resume to AMSEC a second time, within 24 hours, on October 17, 2007, with the additional requested month and year information for periods of employment.  (*See* Exhibit C.)

28.     In particular, O'Donnell included information indicating that Ms. Brightwell began working for RFL in January 2007.  This information happens to be located on the revised resume just above where Ms. Brightwell is identified in plain sight as a "Member" of RFL.  (*See* Exhibits B and C.)

29.     In early 2008, O'Donnell introduced Ms. Brightwell to Commander Chong Hunter, the Director of Logistics at NSWC in Coronado, who was the primary customer contact and person responsible for overseeing the SWALIS project.  At that time, O'Donnell introduced Ms. Brightwell to Commander Hunter by using words to the effect that she was his business partner at RFL.

30.     From 2008 through 2010, Commander Hunter worked very closely with both Ms. Brightwell and O'Donnell.  In the Spring of 2010, O'Donnell and Ms. Brightwell had face-to-face conversations with Commander Hunter about RFL potentially servicing the government contract directly with the Navy.

31.     As part of these discussions, O'Donnell and Ms. Brightwell explored with Commander Hunter the possibility of RFL applying for the prime contractor position as a Section 8(a) small business.  Section 8(a) of the Small Business Investment Act of 1958 provides assistance to small businesses that are owned and controlled at least 51% by socially and economically disadvantaged individuals, like women and minorities.  If RFL qualified as a Section 8(a) small business, then the government would have the option of awarding a contract to it directly without the need of going through a competitive bidding process.

32.     During these discussions regarding RFL applying as a Section 8(a) small business, O'Donnell told Commander Hunter that they could increase Ms. Brightwell's ownership interest in RFL to give her a majority ownership position in the company.  In this manner, RFL would be a woman owned small business for purposes of qualifying for Section 8(a) status.

33.     Eventually, RFL decided instead to partner with an Alaska Native owned company called NTVI (who provided the computer programmers to write the code) for purposes of qualifying for Section 8(a) status.

/ / /

34.     After RFL teamed up with NTVI to obtain the SWALIS contract in 2010, it hired former AMSEC employees to meet the contract requirements.  To make payroll, RFL needed to borrow money.  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell tried to obtain a line of credit or a business loan with Bank of America and was turned down twice.  With not enough money coming in, Ms. Brightwell stepped up and contributed an initial amount of $15,000 on July 13, 2010, so RFL could make payroll.  She obtained this money through a home equity line of credit ("HELOC") on her house.

35.     From July to December 2010, Ms. Brightwell ultimately made loans to RFL totaling $59,000 using both the HELOC and an advance on her credit card.

36.     These investments came at a critical time for RFL.  Payment on invoices were delayed by AMSEC and the new contract payments were delayed by government processing.  With little income coming in, and O'Donnell unable to obtain a loan, Ms. Brightwell is informed and believes and based thereon alleges that RFL would not have made payroll without Ms. Brightwell's financial loans.

37.     As a result of acquiring and being able to perform under the SWALIS contract, RFL grew rapidly in 2010.  In fact, O'Donnell, as Managing Member of RFL, acknowledged Ms. Brightwell's extraordinary contributions and in a letter to her, he wrote: "Thank you for taking ownership with me on SWALIS!  It's good to not be alone at the top." (*See* Exhibit D.)

38.     Eventually, all loans were paid back by January 2011, and Ms. Brightwell was reimbursed for the interest accrued by the HELOC and the transaction fee incurred on her credit card advance.  Ms. Brightwell, however, did not profit from these loans, nor did she expect to because she understood RFL as her business with O'Donnell.

39.     From time to time, Ms. Brightwell would raise with O'Donnell the need to document her ownership in RFL.  Each time, O'Donnell would let Ms. Brightwell know that everything was alright and he would give some excuse for why the documentation could wait.  The most common excuse O'Donnell gave was that they were too busy with handling deliverables for contract fulfillment to tend to this type of an internal, administrative matter.  On more than one occasion, O'Donnell explained that it really didn't matter anyways because Ms. Brightwell would

1  own everything mutually when she married him.  During these discussions, O'Donnell would use
2  emotional blackmail, challenging Ms. Brightwell by asking if the business was more important to
3  her than the relationship.  O'Donnell certainly never explained to Ms. Brightwell that he lied to
4  her or never intended for her to be an owner in RFL.  Wishing to not strain their personal
5  relationship, as O'Donnell was volatile at times with anger bursts, Ms. Brightwell did not press the
6  issue, and although she was disappointed in his diversion, she trusted him, eventually accepting
7  O'Donnell's response and continuing to expect he would honor his word.

8      40.    In January 2012, O'Donnell and Ms. Brightwell travelled on a cruise with some
9  friends.  During the cruise, O'Donnell proposed to Ms. Brightwell by asking her, "would you
10  consider marrying me?"  She said, "yes."  O'Donnell asked Ms. Brightwell to marry him in that
11  way because he and Ms. Brightwell had agreed that O'Donnell would need to go six months
12  without losing his temper before they became married.

13      41.    On that same cruise, a close personal friend of both O'Donnell and Ms. Brightwell
14  asked O'Donnell privately when he was going to officially document Ms. Brightwell's ownership
15  in the company.  O'Donnell stared blankly and said nothing in response.  This surprised their
16  friend because O'Donnell is a talkative person.  It would seem as though someone who was so
17  unequivocally clear on the ownership of RFL would not be lacking for words.  But here,
18  O'Donnell did not deny the shared ownership.

19      42.    For several years, Ms. Brightwell provided the human resources role for RFL.
20  During this time, several company employees complained to Ms. Brightwell about O'Donnell's
21  verbal abuse and bullying.    Sometimes when Ms. Brightwell spoke to O'Donnell about these
22  events, he calmed down and apologized to the employee.  On other occasions, he would just
23  become more agitated and further the abuse.

24      43.    This behavior by O'Donnell, is part of a pattern and history of yelling, blaming and
25  bullying Ms. Brightwell and others.  This conduct happened privately and publically, in front of
26  his children, Ms. Brightwell's children, employees and in public places.  On several occasions,
27  O'Donnell was reprimanded by RFL's main contractor for his verbal abuse during telephone
28  / / /

1   conferences.  Most of the time, O'Donnell would be remorseful and promise not to repeat this

2   behavior.

3          44.     Until last year, O'Donnell and Ms. Brightwell were engaged to be married.  On

4   March 14, 2012, however, O'Donnell began yelling at Ms. Brightwell, while she sat in bed.  When

5   she reached over to him to stop the obscenities and insults, O'Donnell grabbed her hands, held her

6   down on the bed, his face inches from hers, while continuing to verbally abuse her.

7          45.     O'Donnell later apologized and admitted to Ms. Brightwell that he had failed her in

8   their relationship and could not make her happy.  O'Donnell appeared to be extremely remorseful

9   and saddened by his uncontrollable temper.

10         46.     The parties sought counseling after this incident, but could not reconcile their

11  personal relationship.   They agreed to end their personal relationship, but maintain a business

12  relationship.

13         47.     On May 23, 2012, Ms. Brightwell and O'Donnell discussed options and a plan for

14  how to end their personal relationship, while continuing to handle the RFL business.  O'Donnell

15  requested that Ms. Brightwell remain involved in operating and working at RFL, as her departure

16  would leave RFL unable to fulfill neartime contract deliverables and support.  Ms. Brightwell

17  suggested that she would handle an RFL project in Hawaii during the summer, while O'Donnell

18  would continue to live in Ms. Brightwell's house because his daughters, Stephanie and Hope, were

19  visiting in California for the summer.  Ms. Brightwell believed this would give O'Donnell and her

20  time apart and allow O'Donnell a peaceful environment for his children's visit.

21         48.     Previously, in late March 2012, Ms. Brightwell requested that they move the RFL

22  office out of her house and into a more appropriate commercial space.  O'Donnell agreed that they

23  needed to find commercial space for their business.  During the May 23 meeting, Ms. Brightwell

24  again raised the need to move their business to a commercial space.  O'Donnell promised he

25  would move the RFL office out of the house and into a commercial space before Ms. Brightwell

26  returned from Hawaii at the end of July.

27         49.     At the end of the May 23 meeting, Ms. Brightwell explained that she would

28  continue working as Vice President for RFL, but her expectation was that if she left the company,

10

COMPLAINT

1  she would receive a payment equal to two years of her current salary.  O'Donnell responded in
2  surprise that this was $370,000.  Ms. Brightwell nodded in agreement and then asked O'Donnell
3  to propose his best plan.  O'Donnell said he would think about it.

4    50. The next day, on May 24, O'Donnell sent Ms. Brightwell an email entitled, "Trying
5  to Settle Your Heart . . . a Little."  In the email, O'Donnell reiterated his desire to have
6  Ms. Brightwell continue working at RFL with the possibility of supporting the SWALIS project
7  from outside of San Diego, if she moved.  He confirmed his promise to have the RFL office out of
8  Ms. Brightwell's house by the time she returned from Hawaii.  O'Donnell also offered Ms.
9  Brightwell the amount of $100,000 as severance for when she decided to leave the company.  In
10 return, he asked for a two year non-compete agreement.  (*See* Exhibit E.)

11   51. On that same day, May 24, Ms. Brightwell replied to O'Donnell's email by
12 informing him that while she could not adequately respond that day, in general, she accepted some
13 of what he said, and disagreed with other parts of his email.  (*See* Exhibit E.)

14   52. From June 2012 onward, there was a marked difference with how O'Donnell
15 treated Ms. Brightwell at work.  He stopped keeping her informed of new business developments,
16 he avoided contact with her, he would not respond or even acknowledge many business emails,
17 and she was no longer included in employee interviews.

18   53. When Ms. Brightwell confronted O'Donnell about his behavior, he denied that
19 anything was different.  However, Ms. Brightwell is informed and believes and based thereon
20 alleges that, as O'Donnell had admitted many times before, he could not separate his personal life
21 from his work life.  As O'Donnell and Ms. Brightwell were no longer personally involved,
22 O'Donnell, without notice or discussion, unilaterally changed the business relationship.

23   54. O'Donnell's change in behavior towards Ms. Brightwell and his attempts to shut
24 her out of the business not only negatively impacted their business relationship, but it also
25 interfered with RFL's operations.  For instance, working on a high profile project at the Hawaii
26 SDVT-1 base at the request of Captain Kevin Jones, Ms. Brightwell sought input, brainstorming
27 and personnel support from O'Donnell.  O'Donnell was unavailable, and several times too busy
28 on personal matters during work days to provide support and conference on deliverables.

1  Likewise, Ms. Brightwell was repeatedly contacted by NSWC while she was in Hawaii and on
2  vacation in August to address correcting dashboard reports and SWALIS processes that O'Donnell
3  was in charge of designing and providing to NSWC.

4      55.   With summer looming, Ms. Brightwell traveled to Hawaii on June 9, 2012 to
5  support RFL's clients there for a 7-week period. O'Donnell stayed at Ms. Brightwell's home for
6  the summer with his children.

7      56.   Concerned for the future wellbeing of RFL and hoping to address O'Donnell's
8  sudden adverse change in their working relationship, Ms. Brightwell repeatedly tried to discuss
9  with O'Donnell his behavior and resolve the tension that existed in their business relationship.
10  Each time, however, O'Donnell would be argumentative, and deny his evasiveness, thereby
11  escalating the tension.

12      57.   On June 15, 2012, while in Hawaii, Ms. Brightwell recalled that it was the 5-year
13  anniversary of when she moved to San Diego to join RFL. She again attempted to open up the
14  lines of communication with O'Donnell to address O'Donnell's sudden adverse change in their
15  working relationship by sending him an email that reminded him of how RFL grew over the last 5
16  years based on their teamwork. At the end of the email, she asked O'Donnell, "I'd like to hear
17  what's in your heart and head." (*See* Exhibit F.)

18      58.   That same day, on June 15, O'Donnell responded to Ms. Brightwell by
19  acknowledging that they "have done much together with RFL" and that he was "truly
20  appreciative." But in advising Ms. Brightwell that he would give her a "much deserved, well
21  thought out reply," O'Donnell added, "[a]s you know, I have always tied it all together . . . life,
22  work, personal." (*See* Exhibit F.)

23      59.   On the morning of August 2, 2012, O'Donnell and Ms. Brightwell had a telephone
24  conversation about changes in new employee processing. During the discussion, O'Donnell again
25  stated that he could not separate their personal relationship from their business relationship. That
26  it was all one for him. Later that night, Ms. Brightwell sent O'Donnell an email asking him to
27  complete his June 15 response from over a month and a half ago. Given O'Donnell's repeated
28  statements that his personal life and work life were all one, Ms. Brightwell also inquired whether

1   the change in how O'Donnell treated her at work was caused by the end of their personal
2   relationship. (*See* Exhibit F.)

3       60.     Three days later, on August 5, 2012, O'Donnell, like a scorned lover who was
4   clearly irritated by Ms. Brightwell's August 2 email, demanded that she "cease and desist" from
5   any "displays" which "disrespect me, minimize or challenge my authority, or any de-edification of
6   my role as the sole owner and leader of RF Logistics, LLC." He added, "you have not earned the
7   right to challenge my authority as the owner of this company." All of O'Donnell's prior
8   references to "our company," had now all of a sudden become "my company." (*See* Exhibit F.)

9       61.     Previously, on August 1, 2012, O'Donnell had rented a nearby house.
10  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell moved most of
11  his belongings out of her home on August 3 through 5, and began occupying his new residence.

12      62.     During O'Donnell's move, Ms. Brightwell was away on vacation with her son.
13  When Ms. Brightwell returned to her home on August 13, 2012 she found it in complete disarray.
14  Walls, woodwork and carpet were damaged from O'Donnell's move. In addition,
15  Ms. Brightwell's home was infested with flies, the refrigerator was full of rotting food, and the
16  lawn was brown in large spots from lack of water. Further, windows had been left open with the
17  air-conditioner running so as to cause excessive electric bills. At that moment, Ms. Brightwell
18  was beside herself. Not only had O'Donnell unilaterally changed their business arrangement,
19  thereby breaking his promise of ownership to Ms. Brightwell, but he had also damaged her home.

20      63.     Concerned with further damage to her home, and knowing that O'Donnell had
21  already moved out, Ms. Brightwell changed the locks on her home on August 14, 2012.
22  Ms. Brightwell recognized that her past efforts to communicate with O'Donnell had failed, but she
23  hoped this would motivate him to have a face to face meeting about their deteriorating business
24  relationship and his abrupt unwillingness to recognize her ownership interest in RFL.

25      64.     Prior to changing the locks on her home, Ms. Brightwell confirmed with RFL's
26  office manager, Liz Hendrix, that there was no pressing work that had to be done in the next few
27  days. Ms. Brightwell fully expected that she and O'Donnell would be able to resolve their
28  business dispute once they finally spoke in person, and she was anxious to clear the air with

1    O'Donnell. At the very least, she believed that an arrangement with O'Donnell would be made for

2    access to her home to transition the RFL business into a proper commercial space, as O'Donnell

3    had repeatedly promised in the past to do.

4          65.    That same day, August 14, Ms. Brightwell sent an email to O'Donnell informing

5    him that she had changed the locks on her home and that he was not to enter it without her being

6    present. She requested an in-person discussion about their deteriorating business relationship.

7    (*See* Exhibit F.)

8          66.    Later that day, on August 14, O'Donnell responded by asking Ms. Brightwell what

9    is her objective and goal. The next day, on August 15, Ms. Brightwell responded that she needed

10   for O'Donnell to hear what she was saying, as opposed to ignoring her like he was doing, and

11   reach agreement as to how they both ran the company like they had been doing prior to ending

12   their personal relationship. She was intensely interested in the ongoing success of RFL, and as an

13   owner recognized that cooperating, not fighting, was the best means. She also sent a follow-up

14   email letting O'Donnell know how uncomfortable she had been since May when he unilaterally

15   changed how they worked together. (*See* Exhibit F.)

16         67.    On August 15, Liz Hendrix, RFL's office manager, spoke with Ms. Brightwell to

17   let her know that O'Donnell had accused her of collusion, and that she felt threatened by his words

18   and demeanor. Ms. Hendrix explained that O'Donnell accused her of "aiding and abetting"

19   Ms. Brightwell in an "assault" on the company. The next week Ms. Hendrix was admitted to their

20   hospital with a mild heart attack. Ms. Brightwell is informed and believes and based thereon

21   alleges that after this event, Ms. Hendrix avoids being alone with O'Donnell.

22         68.    Ms. Brightwell arrived at her desk at the military base in Coronado on August 17,

23   2012, arriving that morning from out of town, and began work as usual. O'Donnell was at his desk

24   and they agreed to meet later to discuss the business relationship. On a team call, O'Donnell acted

25   normal and confirmed upcoming work assignments, including those involving Ms. Brightwell.

26   They left the base at 3:00 p.m. to meet at a park near the base.

27   / / /

28   / / /

69.     During this meeting on August 17 at Glorietta Bay Park, O'Donnell and Ms. Brightwell discussed their differences regarding the business, but were unable to reach an agreement.

70.     O'Donnell then pulled out a letter to give Ms. Brightwell.  Not knowing, but suspecting that the letter contained unsubstantiated accusations similar to O'Donnell's recent emails, Ms. Brightwell shook her head and said, "not to go there."  O'Donnell agreed and put away the letter.   Ms. Brightwell then asked O'Donnell if he had the $9,306.16 travel expense reimbursement that he had promised to give her that day.  He did not have it.

71.     O'Donnell then told Ms. Brightwell "to hold onto her seat," as he had something to tell her.  He confessed to breaking into Ms. Brightwell's home and taking all of the office files, computer, his clothes and his daughter's belongings without her knowledge or consent on August 14.  He told Ms. Brightwell she did not have any leverage in the discussions and that he had it all.  O'Donnell had ignored her request to not trespass into her home and then deceitfully kept this information from her for three days.

72.     Ms. Brightwell said nothing more.  She was understandably upset.  She stood up and walked away.  O'Donnell told her to not walk away.  He called after Ms. Brightwell and asked her to come back and talk.  She kept walking.

73.     Because the parties had shared vehicles, Ms. Brightwell had a set of O'Donnell's car keys.  To get back at O'Donnell, Ms. Brightwell thought of driving away in his car and stranding him in the park.  As she passed her vehicle and approached his (they were parked two vehicles away from each other), she unlocked his car with the remote.  O'Donnell ran up quickly behind Ms. Brightwell, calling to her to not walk away and yelled at her to give him his keys.  She did not respond.

74.     O'Donnell then grabbed Ms. Brightwell from behind and tried to wrench the keys from her hand.   She bent over in protection and slipped the keys back inside her pocket. Ms. Brightwell broke away from O'Donnell and ran to her car.  She opened the door and got the keys into the ignition.  O'Donnell followed Ms. Brightwell and before she could close the door, he reached across the steering wheel, pinning her arms against the steering wheel, and smashing her

1    hands into her keys, while wrenching them away from the ignition. Ms. Brightwell incurred cuts
2    and bruises from the struggle.

3        75.     After O'Donnell succeeded in stealing Ms. Brightwell's keys, he backed out of her
4    car and stood a few feet away. He now had her car, house, and mailbox keys. Having just
5    discovered that O'Donnell had broken into her home, she was terrified that he had those keys.

6        76.     Ms. Brightwell asked O'Donnell to return her keys, and when he refused, dangling
7    them high in his right hand, she then reached to take the keys from his hand. O'Donnell threw
8    Ms. Brightwell to the ground, ripping her watch from her arm and breaking the band.
9    Ms. Brightwell's watch lay on the ground and her shoes had come off.

10       77.     When Ms. Brightwell was finally able to stand up, she pulled out her cell phone
11    and considered if she should call the police. She muttered, "I should call the police." O'Donnell
12    moved toward her and demanded that she not call the police. Confused, frightened and humiliated
13    by this public physical abuse, and wanting to just get away, Ms. Brightwell put the phone back in
14    her pocket. She picked up her watch and shoes and saw O'Donnell go to her car on the driver's
15    side where the door still stood open.

16       78.     O'Donnell leaned into her car, and Ms Brightwell was afraid he intended to steal
17    more of her belongings, damage the car, or drive away in it. Ms. Brightwell ran up behind him,
18    but she knew she did not have the strength to pull a 265-pound man from her car. O'Donnell
19    turned around quickly and knocked Ms. Brightwell back to the ground. He then moved away
20    from her car and she scrambled in quickly and found her extra set of keys.

21       79.     O'Donnell leaned against the inside of her open car door and would not let
22    Ms. Brightwell back out. Ms. Brightwell tried to push O'Donnell away from blocking the car
23    door, with her left arm, telling him to move, but he would not budge. She put her car in reverse
24    and he then moved away.

25       80.     Ms. Brightwell drove directly to the police station in Coronado. O'Donnell
26    followed her until she arrived at the station. He then drove away.

27    / / /

28    / / /

81.     Ms. Brightwell filed an assault report.  The police took photographs of her bruised and cut arms, hands, broken watch, and scraped toe.  The police told her they would call O'Donnell and ask him to come to the station, and if located, arrest him that evening.

82.     Ms. Brightwell called the police department the next day on Saturday, August 18.  The police confirmed that they had probable cause and had arrested O'Donnell earlier that morning.  She asked if they had retrieved her keys and they told her O'Donnell said he did not have any keys but his own.

83.     Later that same day, Ms. Brightwell found a text message from O'Donnell on her cell phone that stated that her employment was terminated as of August 18, and that she was not to represent RFL.

84.     On August 20, 2012, Ms. Brightwell went to the San Diego Superior Court courthouse in Chula Vista to file an official eviction notice so that O'Donnell  would not have any claim to be allowed in her home again.  O'Donnell was sitting on a bench in the courthouse.  She asked him whether he still wanted to remove some of his remaining belongings from her home.  O'Donnell said he intended to get them, and Ms. Brightwell told him that a neighbor would make arrangements with him.  Ms. Brightwell asked if O'Donnell still had her keys.  He said, "yes."  The next day, on August 21, Ms. Brightwell was served with a domestic violence temporary restraining order filed by O'Donnell.  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell filed the domestic violence temporary restraining order to punish Ms. Brightwell for reporting him to the police.

85.     Two days later, on August 22, Ms. Brightwell received a letter dated August 18 from O'Donnell on RFL letterhead stating that she was "terminated for cause," but without any explanation. (*See* Exhibit G.)  That same day, she also received a warning memo dated August 17, 2012. (*See* Exhibit H.)

86.     On September 6, 2012, O'Donnell voluntarily dismissed his request for a domestic violence restraining order.

/ / /

/ / /

# FIRST CAUSE OF ACTION

## (Breach of Contract Against RFL and DOES 1-25)

87.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 86, inclusive, as though fully set forth herein.

88.    Between February 2006 and June 2007, in a series of discussions, O'Donnell, as agent for RFL, offered Ms. Brightwell the opportunity to join him as an equal owner to help build RFL.

89.    During this time period, the parties entered into an oral agreement when Ms. Brightwell accepted that offer with the understanding that she was to have significant ownership interest in the company.

90.    Ms. Brightwell invested significant time, effort, money and other resources into RFL over a five year time period with the understanding that she was an equal owner in the company.

91.    Aside from her financial investments in RFL, Ms. Brightwell took on significant leadership and substantive responsibilities in the company that directly contributed to RFL's success, as discussed above.

92.    Ms. Brightwell has performed all conditions, covenants and promises required on her part to be performed in accordance with the terms and conditions of the contract, except to the extent that they were prevented or excused from performing by Defendants' breach.

93.    Defendants breached the oral agreement by failing to transfer ownership in RFL to Ms. Brightwell.

94.    Defendants further breached the agreement by terminating Ms. Brightwell from RFL without any compensation for her ownership in the company.

95.    As a direct and proximate result of Defendants' breach, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

/ / /

/ / /

/ / /

## SECOND CAUSE OF ACTION

### (Promissory Estoppel Against and RFL and DOES 1-25)

96.     Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 95, inclusive, as though fully set forth herein.

97.     Between February 2006 and June 2007, in a series of discussions, O'Donnell, as agent for RFL, made certain promises and representations to Ms. Brightwell, on which he knew or should have known that Ms. Brightwell would be reasonably induced to rely.  For example, O'Donnell promised Ms. Brightwell that if she joined him at RFL, she would be an equal owner in the business.

98.     Ms. Brightwell relied reasonably and foreseeably, to Ms. Brightwell's detriment, on the promises and representations to make her an owner.  For example, as discussed above in detail, Ms. Brightwell invested significant time, effort, money and other resources in RFL with the understanding that she was an owner in the company.

99.     By holding Ms. Brightwell out as an owner of RFL to the public and by preparing resumes that identified Ms. Brightwell as a "Member" in RFL, Defendants recognized the promises and representations made to Ms. Brightwell.

100.     Nonetheless, Defendants have not performed any of the promises or representations.  In fact, Ms. Brightwell was wrongfully terminated from RFL without any compensation for her ownership in the company.

101.     As a direct and proximate result of Defendants' failure to perform according to the promises and representations made by Defendants, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

### (Promissory Fraud Against All Defendants)

102.     Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 101, inclusive, as though fully set forth herein.

/ / /

/ / /

103. Between February 2006 and June 2007, in a series of discussions, O'Donnell, as an agent of RFL, promised Ms. Brightwell that she would be an equal owner in RFL if she joined the company.

104. Ms. Brightwell is informed and believes and based thereon alleges that Defendants knew, based on conversations between the parties that led to the agreement, that an ownership interest in RFL was an important and material part of Ms. Brightwell's decision to move to California to join RFL.

105. Unbeknownst to Ms. Brightwell, at the time Defendants made the promise and the agreement was entered into, Defendants never intended to honor their promise to make Ms. Brightwell an equal owner.

106. The misrepresentations made by Defendants regarding Ms. Brightwell's status as an equal owner were intended to induce reliance by Ms. Brightwell to enter into a business agreement with Defendants, relocate to California, and join RFL.

107. Ms. Brightwell reasonably relied on Defendants' promise, based on representations and assurances she received from O'Donnell that she would be an equal owner in RFL. In reliance on Defendants' promise, Ms. Brightwell moved to San Diego from Hawaii on June 15, 2007, and invested significant time, effort, money and other resources in RFL.

108. Instead of adhering to the promise to make Ms. Brightwell an equal owner of RFL, Ms. Brightwell is informed and believes and based thereon alleges that Defendants terminated Ms. Brightwell on a false pretense to avoid the company's obligation. Defendants engaged in deceitful conduct by ignoring their promise to Ms. Brightwell.

109. Because O'Donnell's fraudulent conduct as an agent of RFL is wrongful in its nature, he is personally liable.

110. As a direct and proximate result of Defendants' failure to perform according to the promise, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

/ / /

/ / /

111.   Defendants acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others.   As a consequence, Ms. Brightwell is entitled to an award of punitive damages against Defendants according to proof.

## FOURTH CAUSE OF ACTION

### (Fraud in the Inducement Against All Defendants)

112.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 111, inclusive, as though fully set forth herein.

113.   Ms. Brightwell's willingness to assent to terms of the agreement with Defendants was caused by material, fraudulent misrepresentation made by O'Donnell, as an agent of RFL, in a series of discussions that took place between February 2006 and June 2007.   In particular, O'Donnell promised Ms. Brightwell that she would be an equal owner in RFL if she joined the company.

114.   Ms. Brightwell is informed and believes and thereon alleges that Defendants, at the time the representation was made to Ms. Brightwell that she would be an equal owner of RFL if she joined the company, had no intention of complying with the representation.

115.   Defendants knew that their representations to Ms. Brightwell were false when they were made.

116.   Defendants' representation was made with the intent to induce reliance by Ms. Brightwell and to entice Ms. Brightwell to enter into a business agreement with Defendants, relocate to California, and join RFL.

117.   Because O'Donnell's fraudulent conduct as an agent of RFL is wrongful in its nature, he is personally liable.

118.   In reasonable reliance on Defendants' representation, Ms. Brightwell moved to San Diego from Hawaii on June 15, 2007, and invested significant time, effort, money and other resources in RFL, believing that Defendants intended to honor their representations and the agreement between the parties and that she was an owner of RFL.

/ / /

/ / /

119.    As a direct and proximate result of Defendants' failure to perform according to the promise, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

120.    Defendants acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others.  As a consequence, Ms. Brightwell is entitled to an award of punitive damages according to proof.

## FIFTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Labor Code Section 1102.5 Against RFL and DOES 1-25)

121.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 120, inclusive, as though fully set forth herein.

122.    On August 17, 2012, Ms. Brightwell reported to the Coronado Police Department unlawful behavior of O'Donnell, an agent of RFL, which included that he physically assaulted her.

123.    On Saturday, August 18, 2012, O'Donnell terminated Ms. Brightwell's employment by text message in retaliation for Ms. Brightwell reporting his unlawful behavior to the police.

124.    Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a motivating reason for Ms. Brightwell's discharge.

125.    A clear "nexus" exists between the termination and Ms. Brightwell's protected activity, which occurred hours apart.

126.    As a direct, foreseeable and proximate result of her wrongful termination, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.  The nature and the extent of Ms. Brightwell's damages are significant in that she has been humiliated, suffered emotional distress, lost income and was forced to leave behind her significant investment of resources and money in RFL.

127.    Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order

/ / /

1   to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages

2   against all Defendants.

3   **SIXTH CAUSE OF ACTION**

4   **(Wrongful Termination in Violation of Fair Employment and Housing Act Against All
    Defendants)**

5

6   128.   Ms. Brightwell alleges and incorporates by this reference the allegations of

7   paragraphs 1 through 127, inclusive, as though fully set forth herein.

8   129.   Defendants violated FEHA by committing unlawful, discriminatory acts during the

9   August 17, 2012 meeting and thereafter. These acts include, but are not limited to, O'Donnell, as

10  agent for RFL, imposing his will on Ms. Brightwell by asserting his strength and power over her.

11  Ms. Brightwell is informed and believes that her gender was a motivating factor of O'Donnell's

12  actions, as he would not have done this to a male employee.

13  130.   On August 17, 2012, Ms. Brightwell reported that O'Donnell physically assaulted

14  her to the Coronado Police Department.

15  131.   On August 18, 2012, O'Donnell terminated Ms. Brightwell's employment by text

16  message in retaliation for Ms. Brightwell reporting his unlawful, discriminatory behavior to the

17  police.

18  132.   Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a

19  motivating reason for Ms. Brightwell's discharge.

20  133.   A clear "nexus" exists between the termination and Ms. Brightwell's protected

21  activity, which occurred hours apart.

22  134.   RFL failed to maintain a work environment free of harassment, discrimination and

23  retaliation, and failed to prevent such illegal conduct from occurring.

24  135.   RFL knew or should have known about the retaliation and encouraged, participated

25  in, ratified or condoned the retaliation.

26  136.   As a direct, foreseeable and proximate result of her wrongful termination, Ms.

27  Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of

28  trial. The nature and the extent of Ms. Brightwell's damages are significant in that she has been

1   humiliated, suffered emotional distress, lost income and was forced to leave behind her significant
2   investment of resources and money in RFL.

3       137.    Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an
4   agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order
5   to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages
6   against all Defendants.

7                           **SEVENTH CAUSE OF ACTION**
8       **(Wrongful Termination in Violation of Public Policy Against RFL and DOES 1-25)**

9       138.    Ms. Brightwell alleges and incorporates by this reference the allegations of
10  paragraphs 1 through 137, inclusive, as though fully set forth herein.

11      139.    Ms. Brightwell was terminated several hours after O'Donnell physically assaulted
12  her and Ms. Brightwell reported him to the Coronado Police Department.

13      140.    Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a
14  motivating reason for Ms. Brightwell's discharge.

15      141.    This termination was a violation of the public policy which encourages individuals
16  to report domestic violence.  (See, e.g., Penal Code §13701(a) ["domestic violence is alleged
17  criminal conduct"]; Penal Code §13701(c) [Legislature has mandated that every law enforcement
18  agency develop and implement written policies and standards for officers' responses to domestic
19  violence calls]; Evid. Code §1107 [allows for expert testimony regarding effects of battered
20  women's syndrome].)

21      142.    A clear "nexus" exists between the termination and Ms. Brightwell's protected
22  activity, which occurred hours apart.

23      143.    As a direct, foreseeable and proximate result of her wrongful termination, Ms.
24  Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of
25  trial.  The nature and the extent of Ms. Brightwell's damages are significant in that she has been
26  humiliated, suffered emotional distress, lost income and was forced to leave behind her significant
27  investment of resources and money in RFL.

28  / / /

144.    Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages against all Defendants.

## EIGHTH CAUSE OF ACTION

### (Assault and Battery Against All Defendants)

145.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 144, inclusive, as though fully set forth herein.

146.    On or about August 17, 2012, during the course and scope of employment, O'Donnell, as agent of RFL, committed assault and battery against Ms. Brightwell during a business meeting to discuss their future handling of RFL.

147.    As discussed above, through threatening conduct and words O'Donnell intended to cause and did cause Ms. Brightwell to be apprehensive of harmful contact.

148.    As discussed above in detail, that meeting culminated in a physical altercation in which O'Donnell repeatedly knocked Ms. Brightwell to the ground and caused her to be bruised, cut and generally afraid for her safety.

149.    As a direct and proximate result of the assault and battery described above, Ms. Brightwell was seriously and painfully injured about the body and limbs, and suffered severe emotional distress, and was otherwise damaged in an amount to be proven at the time of trial.

150.    O'Donnell, as an agent of RFL, acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others. As a consequence, Ms. Brightwell is entitled to an award of punitive damages according to proof.

## NINTH CAUSE OF ACTION\

### (Intentional Infliction of Emotional Distress Against All Defendants)

151.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 150, inclusive, as though fully set forth herein.

152.    As discussed above in detail, the conduct of O'Donnell, an agent of RFL, at the August 17 business meeting in Coronado was extreme and outrageous.

153.   In doing the acts alleged herein, O'Donnell intended to cause emotional distress to Ms. Brightwell or acted with reckless disregard for the probability that Ms. Brightwell would suffer emotional distress to Ms. Brightwell.

154.   O'Donnell knew or should have known that his conduct would likely cause Ms. Brightwell severe emotional distress and mental suffering.

155.   As a direct and proximate result of the altercation, Ms. Brightwell suffered sever emotional distress, including suffering, anguish, anxiety, worry and shock.  Ms. Brightwell has incurred incidental expenses to treat her condition, including counseling.

156.   Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell, as an agent of RFL, acted with malice, oppression and with the intent to cause injury and emotional distress to Ms. Brightwell, or with reckless disregard of the probability of causing severe emotional distress to Ms. Brightwell.  The conduct was outrageous and warrants the award of punitive damages against all Defendants.

## TENTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress Against All Defendants

157.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 156, inclusive, as though fully set forth herein.

158.   By virtue of the business relationship,  Defendants owed a duty to Ms. Brightwell.

159.   Through the conduct alleged in this complaint, O'Donnell, as an agent of RFL, breached the duty by acting negligently and carelessly towards Ms. Brightwell at the August 17 business meeting.

160.   O'Donnell knew or should have known that his conduct would likely cause Ms. Brightwell serious emotional distress and mental suffering.

161.   Defendants' negligence was a substantial factor in causing Ms. Brightwell's serious emotional distress.

162.   As a result of the altercation, Ms. Brightwell suffered serious emotional distress, including suffering, anguish, anxiety, worry and shock.  Ms. Brightwell has incurred incidental expenses to treat her condition, including counseling.

## ELEVENTH CAUSE OF ACTION

### (Violation of Labor Code Section 970 Against All Defendants)

163. Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 162, inclusive, as though fully set forth herein.

164. In 2007, O'Donnell, as agent for RFL, promised Ms. Brightwell that she would be an equal owner of RFL if she joined RFL. At that time, Ms. Brightwell resided in Hawaii, a distance of approximately 2,500 miles from the offered employment in San Diego County, California.

165. When O'Donnell made these representations to Ms. Brightwell, he knew the statements were false because he had no intention of adhering to the representations and promises. Furthermore, he made these representations and promises with the intent that Ms. Brightwell would accept the position and relocate to San Diego.

166. Ms. Brightwell reasonably relied on the representations and promises. Based on the promises and representations, Ms. Brightwell accepted the position and moved to San Diego in June 2007.

167. Nonetheless, instead of adhering to the representation and promise to make Ms. Brightwell an equal owner of RFL, Defendants terminated Ms. Brightwell on a false pretense to avoid the company's obligation.

168. As a direct and proximate result of the false promises and representations, Ms. Brightwell accepted a position that required her to relocate from Hawaii to California. As a result of the false representations, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

169. Therefore, Defendants' actions violated Section 970 of the California Labor Code, and pursuant to Section 972, Ms. Brightwell is entitled to double damages.

## TWELFTH CAUSE OF ACTION

### (Violation of Labor Code Section 2802 Against RFL and DOES 1-25)

170. Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 169, inclusive, as though fully set forth herein.

171.    Labor Code section 2802 requires RFL to indemnify Ms. Brightwell for all necessary expenditures or losses she incurred in direct consequence of the discharge of her duties.

172.    As described above, Ms. Brightwell had expenditures and losses which were incurred in direct consequence of the discharge of her duties, or of her obedience of the directions of Defendants.

173.    To date, Defendants have failed to reimburse Ms. Brightwell for business related expenses.

174.    As a result of Defendants' violations, Ms. Brightwell is entitled to reimbursement of the incurred expenses, as well as attorneys' fees and costs, and interest.

## THIRTEENTH CAUSE OF ACTION

### (Violation of Labor Code Section 202 Against RFL and DOES 1-25)

175.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 174, inclusive, as though fully set forth herein.

176.    Section 201 of the Labor Code requires RFL to pay Ms. Brightwell all earned and unpaid wages immediately upon discharge from duty.  Labor Code Section 203 ensures that employees receive compensation due upon discharge and failure to pay results in the accrual of waiting time penalties.

177.    Ms. Brightwell was terminated on August 18, 2012.

178.    She did not receive her final paycheck until August 28, 2012.

179.    Therefore, Ms. Brightwell demands 11 days of pay, $7,920 ($720/day x 11 days), as penalty for not paying all wages due at the time of termination as provided by Section 203 of the Labor Code, plus interest, costs, and attorney's fees.

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief Against All Defendants)

180.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 179, inclusive, as though fully set forth herein.

181.    Ms. Brightwell seeks a judicial declaration regarding the ownership of RFL, specifically, that:

182.   O'Donnell offered and promised Ms. Brightwell an equal ownership interest in RFL if she would join the company.  Ms. Brightwell accepted this offer, and in reliance, moved from Hawaii to San Diego and joined RFL, where she worked for a time period of over five years. As a result, Ms. Brightwell had and continues to have an ownership interest in RFL that is equal to O'Donnell's ownership interest in the company.

183.   An actual, present controversy exists as to Ms. Brightwell's ownership interest in RFL and Defendants' duties to acknowledge, document, and pay consideration for that ownership interest because Ms. Brightwell has demanded consideration for that ownership interest and Defendants have refused to acknowledge Ms. Brightwell's ownership interest in RFL.   A declaration of the rights, responsibilities, duties and obligations regarding the ownership interest is essential to determine and resolve the respective claims of the parties.  There is no other adequate or speedy remedy at law.

### FIFTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against O'Donnell and DOES 1-25)

184.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 183, inclusive, as though fully set forth herein.

185.   Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

186.   As Managing Member of RFL, O'Donnell owed a fiduciary duty to Ms. Brightwell, as a Member, and to RFL.

187.   Ms. Brightwell is informed and believes, and based thereon alleges that O'Donnell breached his fiduciary duty to Ms. Brightwell and RFL by taking actions that were contrary to RFL's interests, and therefore Ms. Brightwell's interests, and that compromised his fiduciary duty to Ms. Brightwell and RFL, including, but not limited to, mismanaging the operations of RFL, improperly transferring assets from RFL, subjecting RFL to potential tax liability from the taxing authorities, and subjecting RFL to potential adverse action by the United States government and others.

/ / /

188.   As a direct and proximate result of O'Donnell's breach of fiduciary duty, Ms. Brightwell has suffered damages in an amount in excess of the jurisdictional minimum of this Court, to be determined at trial.

189.   Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell's conduct was malicious, fraudulent and/or oppressive, and justify an award of punitive damages in an amount appropriate to punish O'Donnell and to deter him from engaging in similar conduct in the future.

## SIXTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty On Behalf of RFL Against O'Donnell and DOES 1-25)

190.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 189, inclusive, as though fully set forth herein.

191.   This cause of action is being asserted as a derivative claim on behalf of RFL against O'Donnell.  Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

192.   As Managing Member of RFL, O'Donnell owed a fiduciary duty to RFL.

193.   Ms. Brightwell is informed and believes, and based thereon alleges that O'Donnell breached his fiduciary duty to RFL by taking actions that were contrary to RFL's interest and that compromised his fiduciary duty to RFL, including, but not limited to, mismanaging the operations of RFL, improperly transferring assets from RFL, subjecting RFL to potential tax liability from the taxing authorities, and subjecting RFL to potential adverse action by the United States government and others.

194.   As a direct and proximate result of O'Donnell's breach of fiduciary duty, RFL has suffered damages in an amount in excess of the jurisdictional minimum of this Court, to be determined at trial.

195.   Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell's conduct was malicious, fraudulent and/or oppressive, and justify an award of punitive damages in an amount appropriate to punish O'Donnell and to deter him from engaging in similar conduct in the future.

## SEVENTEENTH CAUSE OF ACTION

### (Conversion On Behalf of RFL Against O'Donnell and DOES 1-25)

196.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 195, inclusive, as though fully set forth herein.

197.   This cause of action is being asserted as a derivative claim on behalf of RFL against O'Donnell.  Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

198.   Ms. Brightwell is informed and believes, and thereon alleges that at all times herein mentioned, RFL was, and still is, the owner and was, and still is, entitled to the possession of certain funds that were converted by O'Donnell for his personal use during the course of his relationship with RFL.

199.   As a direct and proximate result of O'Donnell's breach of fiduciary duty, RFL has suffered damages in an amount in excess of the jurisdictional minimum of this Court, to be determined at trial.

200.   Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell's conduct was malicious, fraudulent and/or oppressive, and justify an award of punitive damages in an amount appropriate to punish O'Donnell and to deter him from engaging in similar conduct in the future.

## EIGHTEENTH CAUSE OF ACTION

### (Accounting Against All Defendants)

201.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 200, inclusive, as though fully set forth herein.

202.   Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

203.   Ms. Brightwell is informed and believes, and thereon alleges that at all times herein mentioned, RFL was, and still is, the owner and was, and still is, entitled to the possession of certain funds that were converted by O'Donnell for his personal use during the course of his relationship with RFL.

204.     Ms. Brightwell is informed and believes, and thereon alleges that a portion of those funds are due to and/or affect the value of her ownership interest in RFL.

205.     The amount of money due from RFL to Ms. Brightwell and/or the value of Ms. Brightwell's affected ownership interest is unknown to Ms. Brightwell and cannot be ascertained without an accounting.

206.     Ms. Brightwell has repeatedly demanded that Defendants account for the aforementioned amounts.  Defendants have failed and refused, and continue to fail and refuse, to provide Ms. Brightwell with the requested information.

207.     Accordingly, Ms. Brightwell requests that the Court order Defendants to prepare the accounting to which Ms. Brightwell is entitled.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Brightwell prays for judgment against Defendants as follows:

1.      For a declaration that Ms. Brightwell has a fifty-percent ownership interest in RFL;

2.      For damages, according to proof, along with interest thereon as provided by law;

3.      For civil penalties pursuant to Section 1102.5(f) of the Labor Code;

4.      For double damages pursuant to Section 972 of the California Labor Code;

5.      For reimbursement for expenditures and losses incurred, according to proof, along with interest thereon as provided by Section 2802;

6.      For a penalty of $7,920, as provided by Section 203 of the Labor Code, plus interest;

7.      For an accounting of the business affairs of RFL;

8.      For a temporary restraining order, preliminary injunction, and a permanent injunction prohibiting O'Donnell from further depleting RFL's assets;

9.      For exemplary and punitive damages;

10.     For reasonable attorney's fees;

11.     For costs of suit herein incurred;

12.     For interest as provided by law; and

13.     For other and further relief and the Court deems just and proper.

CKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

## JURY DEMAND

Ms. Brightwell demands a trial by jury.

DATED:  April 25, 2013                    McKENNA LONG & ALDRIDGE LLP

By: _____
Jaikaran Singh
Attorneys for Plaintiff
L. Lee Brightwell

# EXHIBIT "A"

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

GOVERNOR EDMUND G. BROWN JR.

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Mar 24, 2013

Lee Brightwell

787 Esperanza Place

Chula Vista, CA 91914

RE: 101391-45281  - Brightwell Lee - Right To Sue

### Notice of Case Closure and Right to Sue

Dear Lee Brightwell:

This letter informs you that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective Mar 24, 2013 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Department of Fair Employment and Housing

cc: Brian O'Donnell, Agent for Service for RF Logistics LLC

**EXHIBIT A**

EXHIBIT "B"

**From:**          brian.odonnell@rflogistics.com
**Sent:**          Tuesday, October 16, 2007 7:30 AM
**To:**            Hamm, John; Woodruff, Susan
**Cc:**            brian.odonnell@rflogistics.com
**Subject:**       Submitting Resume of L. Lee Brightwell for Project Qualification
**Follow Up Flag:** Follow up
**Flag Status:**   Flagged
**Attachments:**   LLB Resume for RFL 15 Oct 07.doc

Sue & John,

RF Logistics, LLC submits the attached resume of L. Lee Brightwell for qualification as a Business Analyst IV and Business Analyst III to perform technical services related to the Naval Special Warfare Command SWALIS project.

Lee is well qualified to support tasking assigned to RF Logistics, including the technical project management and business process analysis tasks related to SWALIS development and sustainment. Lee possesses an Industrial Engineering degree from Georgia Tech, and well over the minimum years of experience required by the above labor categories. Lee has many years of process improvement and project management experience in government as well as the very demanding commercial construction sector. In addition, Lee's experience in the AIT/RFID sector as an industrial engineer for Sensormatic brings a knowledge base that may be very applicable to future efforts.

Please approve Lee Brightwell to support the Naval Special Warfare Command SWALIS project for the requested Labor Categories.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com
Phone: 571-216-0236
Fax: 619-240-3032

**EXHIBIT B**



*Re-Engineering the Point of Activity*

**L. Lee Brightwell**
735 Diamond Drive • Chula Vista, CA 91911
(619) 240-3032 Home Office • (703) 955-6699 Cell
E-mail: notes4lee@hotmail.com

---

## PROFILE

Strong analytical problem solver, with a broad range of program management and business process/industrial engineering expertise, capable of long-term strategic planning and short-term action plan implementations. Self-motivated, self-directed leader with solid interpersonal skills, and the organizational ability to motivate others toward a common goal.

## PROFESSIONAL EXPERIENCE

**RF Logistics, LLC, San Diego, CA** (2007- Present)
Member, Business Process Engineer—RF Logistics is a Veteran owned small business that works with businesses and government organizations to streamline and apply best practice methodologies to manufacturing, warehouse operations, and supply chain processes. Current responsibilities are to perform site assessments, document as-is process flows, work with customers to re-engineer work flows, insert automated information technology (AIT) where practical, coordinate and support change management, perform any necessary program/project management, cost/schedule control related to contractual obligations.

**'Ohi'a Productions, Inc., Kaneohe, HI** (2002-2007)
President, Board of Directors – 'Ohi'a Productions is a not-for-profit theater company that produces original musicals with educational and entertaining content for Hawaii schools and the Hawaii community. Through this purely volunteer position, responsibilities extend beyond governance and fund-raising activities to interfacing daily with the Executive Director, Artistic and Managing Director, and Director of Finance. Provide direction and guidance on business management practices, financial enhancement and controls, individual/corporate sponsor relationships, funding proposals, program budget reviews, Board development, Board leadership, and strategic planning. Grew company's operating budget from $350,000 to $900,000 during tenure.

**Real Estate Associate, Kailua, HI** (1999-present)
Successfully closed over 35 transactions in excess of $15 million in gross sales. Prior affiliations with The Stott Team, Coldwell Banker Pacific Properties, Abe Lee Realty, and Pacific Property Referrals. Currently affiliated with Watson Realty. Awarded the 2000 Aloha 'Aina Outstanding Newcomers Award from the Honolulu Board of Realtors.

**Real Estate Investor, Renovation & Property Management, Orlando, FL; Silverdale, WA; Kailua, HI** (1990-Present)
Owner/Operator of Property Management Company which identifies and purchases multiple investment properties, managing various levels of renovations, profiting both from re-sales and from property management of ongoing rentals. This effort involves many facets of business development, project management including schedule management of renovations, maximized occupancy, cost controls, facilities management, contract negotiations, vendor controls, and process efficiencies.

**TPA, Incorporated, Longwood, FL** (1990 – 1992)
Construction Project Manager responsible for Owners Representative Services, Claims Analysis, Inspection Services, Cost Estimating, Litigation Support Analysis, business development, client support and the creation of computer graphics presentation materials. Certified Building Inspector, Southern Building Code Congress International.

**EXHIBIT B**



*Re-Engineering the Point of Activity*

**Circuit City, Orlando, FL** (1990, 1991)
Short-term consulting contract to apply process analysis and warehouse process analysis to the retail order fulfillment department of the distribution warehouse.  Implemented recommendations that reduced the error rate by 85%. Requested to return the following year to perform a second process analysis and implement procedures to improve turn around time in the product returns/repairs department.

**Paulin Pacific Group, Honolulu, HI (1988-1990)**
Program Manager of a $3 million refurbishment to the Waikiki Royal Suites, a 48 unit all suite boutique hotel.  Reporting directly to Japanese Investors, Haseko Corporation, oversaw the collaborative efforts of the Design Architect, the Interior Designers, the General Contractor, and roofing and fire sprinkler subcontractors, while continuing hotel operations and room rentals, Managed complete project planning, product and systems design review, configuration control, risk assessment, scheduling, budget development and controls including furniture, fixtures, and equipment purchasing, supply chain management, materials management, logistics, project team coordination, contract administration subcontractor management and quality assurance. Completed full renovation in 6 month window while continuing full hotel operations without incident nor cost or schedule overruns.

Special Projects Manager responsible for advertising, guest services, marketing plan and cash flow analysis for the Waikiki Royal Suites and Waikiki Grand Hotel.

**KPMG Peat Marwick (now BearingPoint), Newport, RI (1986-1988)**
Senior Management Consultant responsible for engagement management, systems development, market development, and business analysis; and extended client interface in an advisory capacity with KPMG Peat Marwick's Defense Management Consulting Practice.  Managed and directed personnel and resources in support to major government R&D and commercial industry programs varying in worth from $18 million to $600 million.  Areas of expertise in Program Management disciplines including:

- Program/Project planning and implementation
- Cost/Schedule development and control
- Identificaty & manage of Program/Project risk
- Product definition and contract selection
- Information systems development
- Cost estimating and cost reduction

Created, managed and maintained 225% growth in business practice area.  Prepared successful business proposals and directed engagement work contributing to more than $2 million in revenue to firm.

**Sensormatic Electronics Corporation (now Tyco), Boca Raton, FL (1983 –1986)**
Project Engineer responsible for the identification, process analysis and control, supply chain management, work instructions, product and design review, configuration control, job order processing and successful implementation of first article production for Electronic Article and Video Surveillance equipment.  Created and maintained project budget and schedules. Liaison with R&D, Purchasing, Production, Manufacturing Engineering, and Warehouse to ensure efficient produce-ability of new product manufacturing runs.

Lead Industrial Engineer responsible for training and supervision of IE technicians, methods and time study analyses of electronic assembly.  Analyzed and improved manufacturing assembly process, material handling and quality control systems.

## EDUCATION

**Graduate work toward Master of Business Administration (completed 19 of 42 required hours)**
Florida Atlantic University, 1984-85

**Bachelor of Industrial Engineering**
Georgia Institute of Technology, 1983

EXHIBIT B



*Re-Engineering the Point of Activity*

## AFFILIATIONS/AWARDS/CERTIFICATIONS

**Former Secret Clearance**
'Ohi'a Productions, Inc. President, Board of Directors
Licensed Real Estate Associate, Honolulu Board of Realtors
2000 Aloha 'Aina Realtor Award, Outstanding Newcomer
Habitat for Humanity, Orlando, FL, Construction Mgr. For single family residence 1991
Certified Toast Master
Honolulu Waldorf School, Parent Council Chair, 1999-2002

## REFERENCES

To be furnished upon request.

EXHIBIT B

# EXHIBIT "C"

| | |
|---|---|
| **From:** | brian.odonnell@rflogistics.com |
| **Sent:** | Wednesday, October 17, 2007 8:08 AM |
| **To:** | john_hamm@amsec.com; Woodruff, Susan |
| **Cc:** | brian.odonnell@rflogistics.com |
| **Subject:** | Re: Submitting Resume of L. Lee Brightwell for Project Qualification |
| **Attachments:** | LLB Resume for RFL 15 Oct 07.doc |

Sue & John,

For some reason, my email is not being forwarded to my blackberry.  Sorry, I didn't realize I did not attach the revised resume until this morning.

Here you go.  Invoice is next.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com
Phone: 571-216-0236
Fax: 619-240-3032

-----Original Message-----
**From:** john_hamm@amsec.com [mailto:john_hamm@amsec.com]
**Sent:** Tuesday, October 16, 2007 02:30 PM
**To:** brian.odonnell@rflogistics.com
**Subject:** RE: Submitting Resume of L. Lee Brightwell for Project Qualification

## No attachment.

-----Original Message-----
**From:** brian.odonnell@rflogistics.com [mailto:brian.odonnell@rflogistics.com]
**Sent:** Tuesday, October 16, 2007 1:29 PM
**To:** Hamm, John B; susan.j.woodruff@hampton.amsec.com
**Cc:** brian.odonnell@rflogistics.com
**Subject:** Re: Submitting Resume of L. Lee Brightwell for Project Qualification

John,

Here is the revised resume for Lee Brightwell with month and year for periods of employment.  Let me know if you need anything else.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com

1

**EXHIBIT C**

Phone: 571-216-0236
Fax: 619-240-3032

-----Original Message-----
**From:** john_hamm@amsec.com [mailto:john_hamm@amsec.com]
**Sent:** Tuesday, October 16, 2007 10:48 AM
**To:** brian.odonnell@rflogistics.com, susan.j.woodruff@hampton.amsec.com
**Subject:** RE: Submitting Resume of L. Lee Brightwell for Project Qualification

**Brian,**

**Before we can take any action on qualifying the new RFL employee we have to have the experience broken down by the year and month. This will allow us to capture a total nur of months required for the qual sheet. Please send updated resume with month and yea details.**

**Thanks**
**jbh**

> -----Original Message-----
> **From:** brian.odonnell@rflogistics.com [mailto:brian.odonnell@rflogistics.com]
> **Sent:** Tuesday, October 16, 2007 10:30 AM
> **To:** Hamm, John B; Woodruff, Susan
> **Cc:** brian.odonnell@rflogistics.com
> **Subject:** Submitting Resume of L. Lee Brightwell for Project Qualification
>
> Sue & John,
>
> RF Logistics, LLC submits the attached resume of L. Lee Brightwell for qualification as a Business Analyst IV and Business Analyst III to perform technical services related to the Naval Special Warfare Command SWALIS project.
>
> Lee is well qualified to support tasking assigned to RF Logistics, including the technical project management and bu process analysis tasks related to SWALIS development and sustainment. Lee possesses an Industrial Engineering de from Georgia Tech, and well over the minimum years of experience required by the above labor categories. Lee has years of process improvement and project management experience in government as well as the very demanding commercial construction sector. In addition, Lee's experience in the AIT/RFID sector as an industrial engineer for Sensormatic brings a knowledge base that may be very applicable to future efforts.
>
> Please approve Lee Brightwell to support the Naval Special Warfare Command SWALIS project for the requested L Categories.
>
> Thanks,
> Brian
> Brian O'Donnell
> Senior Business Process Analyst
> Managing Member & Owner
> RF Logistics, LLC
> email: brian.odonnell@rflogistics.com
> Phone: 571-216-0236
> Fax: 619-240-3032

EXHIBIT C



*Re-Engineering the Point of Activity*

**L. Lee Brightwell**
735 Diamond Drive • Chula Vista, CA  91911
(619) 240-3032 Home Office • (703) 955-6699 Cell
E-mail: notes4lee@hotmail.com

---

## PROFILE

Strong analytical problem solver, with a broad range of program management and business process/industrial engineering expertise, capable of long-term strategic planning and short-term action plan implementations. Self-motivated, self-directed leader with solid interpersonal skills, and the organizational ability to motivate others toward a common goal.

## PROFESSIONAL EXPERIENCE

**RF Logistics, LLC, San Diego, CA** (January 2007- Present)
Member, Business Process Engineer—RF Logistics is a Veteran owned small business that works with businesses and government organizations to streamline and apply best practice methodologies to manufacturing, warehouse operations, and supply chain processes.  Current responsibilities are to perform site assessments, document as-is process flows, work with customers to re-engineer work flows, insert automated information technology (AIT) where practical, coordinate and support change management, perform any necessary program/project management, cost/schedule control related to contractual obligations.

**'Ohi'a Productions, Inc., Kaneohe, HI** (July 2002- August 2007)
<u>President, Board of Directors</u> – 'Ohi'a Productions is a not-for-profit theater company that produces original musicals with educational and entertaining content for Hawaii schools and the Hawaii community.  Through this purely volunteer position, responsibilities extend beyond governance and fund-raising activities to interfacing daily with the Executive Director, Artistic and Managing Director, and Director of Finance. Provide direction and guidance on business management practices, financial enhancement and controls, individual/corporate sponsor relationships, funding proposals, program budget reviews, Board development, Board leadership, and strategic planning. Grew company's operating budget from $350,000 to $900,000 during tenure.

**Real Estate Associate, Kailua, HI** (October 1999-present)
Successfully closed over 35 transactions in excess of $15 million in gross sales. Prior affiliations with The Stott Team, Coldwell Banker Pacific Properties, Abe Lee Realty, and Pacific Property Referrals. Currently affiliated with Watson Realty. Awarded the 2000 Aloha 'Aina Outstanding Newcomers Award from the Honolulu Board of Realtors.

**Real Estate Investor, Renovation & Property Management, Orlando, FL; Silverdale, WA; Kailua, HI** (June 1990-Present)
Owner/Operator of Property Management Company which identifies and purchases multiple investment properties, managing various levels of renovations, profiting both from re-sales and from property management of ongoing rentals.  This effort involves many facets of business development, project management including schedule management of renovations, maximized occupancy, cost controls, facilities management, contract negotiations, vendor controls, and process efficiencies.

**TPA, Incorporated, Longwood, FL** (September 1990 – May 1992)
<u>Construction Project Manager</u> responsible for Owners Representative Services, Claims Analysis, Inspection Services, Cost Estimating, Litigation Support Analysis, business development, client support and the creation of computer graphics presentation materials. Certified Building Inspector, Southern Building Code Congress International.

EXHIBIT C



*Re-Engineering the Point of Activity*

**Circuit City, Orlando, FL** (July-October 1990; then July - August 1991)
Short term consulting contract to apply process analysis to the retail order fulfillment department of the distribution warehouse. Implemented recommendations that reduced the error rate by 85%. Requested to return the following year to perform a second process analysis and implement procedures to improve turn around time in the product returns/repairs department.

**Paulin Pacific Group, Honolulu, HI** (November 1988-July 1990)
<u>Program Manager</u> of a $3 million refurbishment to the Waikiki Royal Suites, a 48 unit all suite boutique hotel. Reporting directly to Japanese Investors, Haseko Corporation, oversaw the collaborative efforts of the Design Architect, the Interior Designers, the General Contractor, and roofing and fire sprinkler subcontractors, while continuing hotel operations and room rentals, Managed complete project planning, product and systems design review, configuration control, risk assessment, scheduling, budget development and controls including furniture, fixtures, and equipment purchasing, supply chain management, materials management, logistics, project team coordination, contract administration subcontractor management and quality assurance. Completed full renovation in 6 month window while continuing full hotel operations without incident nor cost or schedule overruns.

<u>Special Projects Manager</u> responsible for advertising, guest services, marketing plan and cash flow analysis for the Waikiki Royal Suites and Waikiki Grand Hotel.

**KPMG Peat Marwick (now BearingPoint), Newport, RI** (May 1986-April 1988)
<u>Senior Management Consultant</u> responsible for engagement management, systems development, market development, and business analysis; and extended client interface in an advisory capacity with KPMG Peat Marwick's Defense Management Consulting Practice. Managed and directed personnel and resources in support to major government R&D and commercial industry programs varying in worth from $18 million to $600 million. Areas of expertise in Program Management disciplines including:

- Program/Project planning and implementation
- Cost/Schedule development and control
- Identify & manage of Program/Project risk
- Product definition and contract selection
- Information systems development
- Cost estimating and cost reduction

Created, managed and maintained 225% growth in business practice area. Prepared successful business proposals and directed engagement work contributing to more than $2 million in revenue to firm.

**Sensormatic Electronics Corporation (now Tyco), Boca Raton, FL** (October 1983 –April 1986)
<u>Project Engineer</u> responsible for the identification, process analysis and control, supply chain management, work instructions, product and design review, configuration control, job order processing and successful implementation of first article production for Electronic Article and Video Surveillance equipment. Created and maintained project budget and schedules. Liaison with R&D, Purchasing, Production, Manufacturing Engineering, and Warehouse to ensure efficient produce-ability of new product manufacturing runs.

<u>Lead Industrial Engineer</u> responsible for training and supervision of IE technicians, methods and time study analyses of electronic assembly. Analyzed and improved manufacturing assembly process, material handling and quality control systems.

## EDUCATION

**Graduate work toward Master of Business Administration (completed 19 of 42 required hours)**
Florida Atlantic University, 1984-85

**Bachelor of Industrial Engineering**
Georgia Institute of Technology, 1983

**EXHIBIT C**



*Re-Engineering the Point of Activity*

## AFFILIATIONS/AWARDS/CERTIFICATIONS

**Former Secret Clearance**
'Ohi'a Productions, Inc. President, Board of Directors
Licensed Real Estate Associate, Honolulu Board of Realtors
2000 Aloha 'Aina Realtor Award, Outstanding Newcomer
Habitat for Humanity, Orlando, FL, Construction Mgr. For single family residence 1991
Certified Toast Master
Honolulu Waldorf School, Parent Council Chair, 1999-2002

## REFERENCES

To be furnished upon request.

EXHIBIT C

EXHIBIT "D"



*10592 John Ayres Drive, Fairfax, VA 22032*

31 December 2010

Lee Brightwell
787 Esperanza Place
Chula Vista, CA 91914

Dear Lee,

On behalf of all of us here at RF Logistics, LLC we appreciate the extra effort you've given us this year to make the SWALIS Project go smoothly.

Please accept this year-end bonus as a token of our appreciation for your service and leadership.

Happy New Year!! Let's go into 2011 with a clear focus on self-improvement, and continued positive contributions to move the company forward, diversify and grow together.

Thanks Again Lee.

Best Regards,

Brian O'Donnell
Managing Member
RF Logistics, LLC

*Thank you for taking ownership with me on SWALIS! It's good to not be alone at this top.*

EXHIBIT D

# EXHIBIT "E"

**From:**        Brian O'Donnell <btod20@aol.com>
**Sent:**        Thursday, May 24, 2012 2:31 PM
**To:**          Brian O'Donnell
**Cc:**          Lee Brightwell; Lee Brightwell (RF); btod20@aol.com
**Subject:**     Re: Trying to Settle Your Heart...a Little

And yes...no pets.
Brian

Sent from my iPad

On May 24, 2012, at 2:29 PM, Brian O'Donnell <btod20@aol.com> wrote:

> Yes, I will need access for Sunday night and Monday.
> Thanks,
> Brian
>
> Sent from my iPad
>
> On May 24, 2012, at 1:53 PM, Lee Brightwell <notes4lee@hotmail.com> wrote:
>
> > Thank you sending this heartfelt plan.  Some of it is acceptable, some of it is not.
> >
> > My head is too full of pressure today to adequately respond.  I will give you a call concerning your immediate plans.  I am glad to see you list the care for the home.  Please confirm that no pets will be brought into the house.
> >
> > I do need to know if you are still planning to return on Sunday evening and if you need access to the house on Sunday or Monday.  If you are planning to live here for the summer, I would expect yes.
> >
> > *Lee Brightwell*
> > *787 Esperanza Place*
> > *Chula Vista, CA  91914*
> > *703-955-6699*
> > *notes4lee@hotmail.com*
> >
> > *"A diamond is merely a lump of coal that did well under pressure."*
> > *Henry Kissinger*

---

To: notes4lee@hotmail.com
Subject: Trying to Settle Your Heart...a Little
From: btod20@aol.com
CC: BTOD20@aol.com
Date: Thu, 24 May 2012 15:12:13 -0400

1

**EXHIBIT E**

Lee,

You know I love you. And I know you love me. What is happening to us is devastating in so many ways. I hurt all the time...as I know you do as well. We are both on edge which keeps us seeing everything in the negative first. It sometimes takes time to see the good (any good) in what in the past were simple acts of kindness. I hurt every time you say you do not trust me. I write this letter in the hopes that you know you can trust me and the words I use here.

I don't have a complete, detailed master plan that I think is the best plan yet. What I do know is that the immediate challenges before me/us can be settled with the acceptance of your kind offer to allow me and the girls to stay at the Esperanza house for the summer. As you have said, it is the simplest plan and allows for additional time to arrive at the master plan. Thank you for this offer. I accept it. I, in turn offer to pay you $2500 per month plus the utilities, gardener and general upkeep expenses as they arise for as long as I am in the house. I understand that you intend to stay at the house at least until 8 June, or until the SWALIS 2.2 release. I understand you have yet to decide where you will go if you decide to leave San Diego. I ask that you let me know soonest if you intend to leave or stay and where you wish to go, so we can work out a plan to have you continue to work with RFL (if you desire). I will do my utmost best to make sure that as long as we are all under the same roof, we can live in harmony and civility. And I'll make sure the plants are watered and even the compost is turned once in a while.

Financially, I want (ask/agree) you can stay at RFL (at your current salary) for the foreseeable future. We can both keep talking about this, and I believe this will be your decision to separate. I have no intention of asking you to leave unless we have unresolveable mutual disagreements or professional conduct issues. I will continue to run the company as I see fit in the best interest of RFL and the needs of all employees. In order to cover the salary, we both need to make sure you stay chargeable to projects under contract. We're only as good as the next contract. I would appreciate you staying involved in the SWALIS project to support system development and (if this is your destination) as the primary sustainment support for both Hawaii and Guam. I will support travel expenses for a 3-month period as follows: Round trip Airfare one time per month for three months; lodging of $1500 per month for three months; rental car at cost (with fuel reimbursement) based on a long-term rental agreement for intermediate sized car for three months; per diem at JTR rates for one month, then $500 per month for the last two months. I believe I will only be able to have the contract absorb one month of chargeable travel for the Hawaii effort. The remaining two months will be at RFL's expense. For travel to Guam in support of sustainment, travel will be paid in accordance with JTR. While in Guam, your Hawaii expenses will remain in effect with the exception of the per diem which will be paid at the Guam rates for those days. In addition, I offer you a severance in the sum of $100,000.00 which will be payable at the time of your separation from RFL. This is 2.67 times the industry standard of two weeks for every year employed. If you choose installments, we can work that out. In return, I ask that you enter into a non-compete agreement with RFL for a two year period.

I would like to keep the office in the house for the near-term. Yet, I understand that this is a great source of anxiety. If you agree, I will also commit that when you return there will be another office not in the house. If not, then I will need to find a suitable office space next week.

Emotionally, I want to do this in the most amicable way possible. I have always valued our friendship as the key to our relationship. None of this is easy on our hearts, minds, and bodies. I don't want to debate everything. I don't want to fight. I don't want to put innocent bystanders (friends, family, partners or coworkers) into our drama.

Hopefully, this email puts you at ease a little bit. You have asked for a plan. Here's mine. Thanks for your compassion and understanding...and your generosity in the offer of the house for a little while.

Brian

EXHIBIT E

# EXHIBIT "F"

**From:**        Lee Brightwell <notes4lee@hotmail.com>
**Sent:**        Wednesday, August 15, 2012 12:21 PM
**To:**          Brian at aol
**Subject:**     RE: June 15, 2012

Brian,

I can imagine that you are feeling uncomfortable with the situation.  Much as I have been uncomfortable since May when you started changing the way we worked together.

Fighting is not the method for getting what you want.  This will take cooperation and compromise from you to win.  I want the best for you, for me, for the company, and for all of our employees.  Look at the big picture and the end goal.

Please also know that it was very difficult for me to ask Liz to leave yesterday and she did not go without protest.  I apologized for involving her, but there was no other way to get your attention on the seriousness of my perspective.

I know you can find the inner peace to see how to come out on top for all of us.

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

--------------------------------------------------------------------------------

From: notes4lee@hotmail.com
To: btod20@aol.com
Subject: RE: June 15, 2012
Date: Wed, 15 Aug 2012 05:41:59 -1000

Brian,

I need you to listen to me and to hear what I am saying.

We both run this company.  We both control its success or failure.  We are both in charge.

Is that clear now?

And time is short to solve this.

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

**EXHIBIT F**

Date: Tue, 14 Aug 2012 18:44:25 -0700
Subject: RE: June 15, 2012
From: btod20@aol.com
To: notes4lee@hotmail.com

Lee,
What is your objective?  What is your goal?
Brian
Sent from my Verizon Wireless 4G LTE smartphone


Lee Brightwell wrote:

Brian,

I've locked up the house. You and Liz no longer have access.  I sent her home after a few hours today. No one is to acccess the house without me present. If you come onto the property, it will be considered trespassing.

When you want to be reasonable and discuss our business relationship, contact me.  I prefer talking in person, you can make an appointment to see me in LA or wait until I return.

I will return to San Diego around 10:00 AM on Friday but will not be available until later in the afternoon or evening.

It pains me to take this step. It is not easily done. I wish previous efforts to communicate had accomplished their goal.


*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*



Subject: Re: June 15, 2012
From: btod20@aol.com
Date: Sun, 5 Aug 2012 01:03:42 -0700
To: notes4lee@hotmail.com

Lee,
I haven't had the luxury of looking at my aol email until tonight.  So, I'm just reading this now.  To answer your question, no I have not formulated my response yet.  And no, I don't think you still understand, nor have you heard me as late as that conversation from 4:15 to 5:30 Thursday morning.

I am asking you to cease and desist from any further public displays in the presence of any RFL employees or customers (in person, on the phone or in email) which disrespect me, minimize or challenge my authority, or any de-edification of my role as the sole owner and leader of RF Logistics, LLC.  I am asking you to accept that while you remain a VP in my company, you are not in charge, nor do you have direct management authority over any of the employees of RFL.  Your

2

**EXHIBIT F**

experience and understanding of SWALIS is recognized and appreciated by many, and certainly including me. Yes, you have played a large role in bringing RFL to where it is today. No, you didn't do it yourself...and no, you have not done more than me. Yes, your effort proved that my confidence in bringing you on was justified. And you are only in my company because I believed in you, even when you didn't believe in yourself. Yes, you are very valuable to the team, but you are not the team. I focus specifically on edifying all RFL and NTVI people to our SWALIS customers. For you to even question that tells me you really don't understand me or what makes us all successful. We have built this company based on team performance, not personal accolades. The difference between you and me in professional life is I don't bring our personal discussions into the workplace. I stay on topic and I edify. Whether you agree or not, I believe you have demonstrated many times recently that you do not separate personal relationship behavior from your professional relationship behavior. This is a major reason why you are at risk of being excluded from my inner circle with RFL. I cannot trust that you will consider what is best for RFL over wanting to be recognized continuously on a personal level. No one is challenging you as a contributor to the company's success. Does this come down to what is best for you personally? Are you threatening to degrade the confidence our customers have in RFL by what you write below? I hope not. I absolutely edify you to all our NSW customers, and to RFL's and NTVI's associates. I absolutely understand your contribution to our success. You are the highest paid RFL employee, which is edification in itself. But I expect a level of performance commensurate with that salary. And you deliver that performance. Where else would you earn such a salary, or have had the opportunity to earn that salary? So please stop believing you are not appreciated for your extraordinary effort. But you have not earned the right to challenge my authority as the owner of this company. Enough on that.

Personally, I am spending my last weekend with Hope moving because you insisted I be out of the house by your return on the 17th and I will be on travel next week. So, there is no other time. Why you think this is abrupt given your conditions insisted upon is very curious. And it all unfolded before the 2nd trip to Hawaii was planned. But, whatever the circumstances, it is the best action for me right now. And I am turning it into an adventure for my daughter. You seem to have locked into your head and heart that I'm the one that ended our personal relationship. Both you and I know that is not true at all. It took two of us to get the personal relationship down to this point.

I hope the college hunts and special time you are enjoying with Austin are going well. I'm glad you are taking this time for you and him.

Enjoy the rest of the weekend and next week.

Love,
Brian


Sent from my iPad

On Aug 2, 2012, at 11:38 PM, Lee Brightwell <notes4lee@hotmail.com> wrote:

> Brian,
>
> Have you completed the response you promised below? I have been patiently waiting for this, as I believe you have some good thoughts to share.
>
> In our early morning discussion, you stated again that for you, you can not separate our personal relationship from our business relationship. That it is all one for you. You say you cannot do what I do, and just keep our relationship professional.
>
> I think I finally heard what you are telling me. Please confirm if I have this right:
>
> Since for you its all connected, the personal relationship and the work relationship is all one, and as the personal relationship has ended, you are struggling to remain professional and to include me as a partner as you did for 5 years. As you are disconnecting on a personal level, and pulling back or away, eliminating me from your everyday activities and thoughts, then so too this explains why you are pulling back at work and not including me in all the decision making and business operations as you once did. I didn't get this before. Since I separate my personal relationship behavior from my business relationship behavior, and carry no expectations that my work success will result in personal relationship success, I

3

EXHIBIT F

thought you did the same.  Now what I am begining to understand, is that your denial of excluding me from so much of the information that you had shared daily and regularly with me, is a result of your need to protect yourself personally, and that the pulling back emotionally, is the same for you pulling back in the business.  You truly can't separate your behavior, and committment.

Unfortunately, if this is true, you are willing to damage the good we have a achieved as partners.  If you leave me out of full company knowledge, then the reputation and reliance on me from our most important clients - Captain Jones, Mike Warmbier, Joe Peth, Pat Brown, Mike Van Nordheim, Tony Roper and Gloria Kelley will begin to decay and you will not have the full back up on site when you are on travel.  My customer service, and full knowledge base of all our business and at anytime current status had made us excell in the customers eyes for the last 3 years.  Do you see the cost of your pulling back and changing the role I play?  I have the best relationship with these clients, next to you. That can continue, or it can be damaged permanently, and you hold the ability to set us up to succeed by maintaining the business relationship we have had for 5 years.

I have absorbed your vision, your view of SWALIS and BizFlow, your method of communicating with NSW, your desired rules and posturing more fully than anyone else who works for RFL. I have been the number one go to person, next to you.  It is in your best interest, reputation wise, and profitablity, to continue in a manner that has succeeded for years.

This is not direction from me.  It is consideration.  You have chosen business success over our personal relationship success  - with the words and accusations you have screamed at me - APSR, March 14.  If your goal is to increase profitablity, then use the formula that already works.  Edify me as you always have.  I do that for you at NSW regularly.  It has served you well.

What do you think?

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

---

CC: brian.odonnell@rflogistics.com; notes4lee@hotmail.com; lee.brightwell@rflogistics.com
From: btod20@aol.com
Subject: Re: June 15, 2012
Date: Sat, 16 Jun 2012 09:23:03 -0700
To: L.Brightwell.ctr@navsoc.socom.mil

Lee,
Thank you for sharing your thoughts and feelings with me.  Yes, we have done much together with RFL.  And I am truly appreciative.  Clearly there is much for me to read over and absorb here.  And I want to give you a much deserved, well thought out reply. As you know, I have always tied it all together...life, work, personal.

Let me think more, try to reach more for what else to say to you.  I will reply in full.
Love,
Brian

Sent from my iPad

EXHIBIT F

On Jun 15, 2012, at 8:03 PM, "Brightwell, L L Ms CTR USSOCOM NAVSOC"
<L.Brightwell.ctr@navsoc.socom.mil> wrote:

Brian,

I was talking about us today, and our original dream, and it occurred to me that it was 5 years ago today, that I made good on my promise to make it to San Diego on the 15th of June. I at least left that night on a plane and landed in the morning.

5 years ago. So many expectations and promises and hopes. So much accomplished. I found a list of goals we had talked about together. It included growing the business to 2 million. We did. And we did it together. Though it hasn't ended as we expected, and I guess, I mean we didn't expect it to end, it took two of us to get RFL to the beginnings of success. It has much farther to go, and that it will go. But what a great beginning, with a good team of people to carry it on.

If you had stayed in VA, and I had stayed in HI, you would probably still be working by yourself. I would be in Hawaii, though I don't know what I would be doing....still wondering if I can make something work for me here.

You have worked hard, and you built the trusted advisor status that earned you the reputation, and the confidence of NSW to want to work as directly with RFL as possible. And, as I know you'll acknowledge, you were not of a mind to build a business with many employees, nor leave the relationship with AMSEC without a lot of help and encouragement from me. I gave you the help in the business, the confidence in yourself, the comfort of two pursuing the same dream instead of one by himself, the technical skills, the interpersonal relationships when uniforms changed, the stability of a home. You were freed up to use the experience and skills you have with contracts to pursue additional work, all while the cash cow of our existence, SWALIS, was supported, managed, and overseen by my watchful eye. You could travel and have the confidence that I had the home front and the WARCOM customer interface, maintaining the impression that the project was well managed and had constant vigilance.

This last year has brought many more opportunities, and you've chosen wisely to bring Brendan on to manage the Business Development. While it has increased your workload 200%, you wouldn't want it any other way. Luckily Brendan has the SOW and contract experience to pursue new work at the same level you do. I didn't have that experience or skills, and with the Sustainment and design work, did not have the time to divert to learning it. But we each applied our unique skills and effort and it has paid off tremendously. I too have earned trusted advisor status with some of our most important clients. That is a great benefit to RFL.

The work I have done to establish RFL as a 'big' company – versus a mom and pop shop- such as finding a payroll service so Fred could receive checks every two weeks versus the once a month check I had been receiving during 2008, finding health care so Fred could have benefits, and luckily then, we could too. Finding Liz to manage QuickBooks and invoicing and compile your expenses when you finally realized it was too much to do every month and run the contracts. Working through, side by side with you when the contract shifted and we had to work out the numbers with NTVI. Deciding who to pursue from the old contract to become our employees. Getting them set up with payroll. Providing $52,000 to help RFL make payroll during the first few months of the contract – September/October 2010, so the employees would have confidence in RFL and believe we were a 'big' company. Working as the FSO with JPAS. Helping us survive a security visit eval. Attending a seminar on GSA and joining you in selecting a consultant to develop the GSA application. Taking on the Contract Administration for GSA. Identifying and contracting with Frances Larios as an HR consultant to finalize our company Handbook. Getting the handbook into final form and ensuring the edits were corrected just before the company meeting. Helping plan and encourage you to hold a companywide meeting in SD and ensuring it all came off with success, working with Liz, while you travelled. I have always been there to count on, have enhanced every part of the business, and supported you in the business, with long hours, constant vigilance and an insatiable need to learn all aspects of our business. You are where you are today, because of the people who have helped you. But though my tax position in the company was as an employee, at Susan's suggestion, my role has been as partner, with your concurrence, encouragement, and expectation. And I have sacrificed and dedicated myself as any partner, with the same goals of success, would do.

EXHIBIT F

The time and energy I am putting into the work at LOGSU3 is typical of the natural devotion I have to this business. It is hard to turn off the dedication and the work ethic, even when the personal relationship has not only ended, but is in so much pain, that it clouds your view of my goodness. I continue to take action everyday that will benefit you the rest of your life. Can you say the same for me? No, you take action every day that benefits you for the rest of your life. I am asking you to recognize the enormous contribution that 5 years of my life has made to the success of your life. We may never benefit by the emotional connection we once had, and expected to enjoy into our old age, but you will be left with the legacy of my unique and unusual ability to catapult people to success.

Yes, your belief in my abilities has helped me too. You gave me the opportunity to come into the working world at full steam and full salary despite the 14 years as a stay at home Mom. However, from the beginning, we doubled the gross proceeds of RFL. I was able to learn quickly and increase the status of RFL. Everything you paid me, you got back threefold, professionally and personally. I was able to scrub the rust off my brain, and begin to fulfill my dream of living and working with someone I loved. We shared everything. We helped each other. We worked together and we played together. And we worked a lot.

You are more successful now, than you have ever been in business. You are poised to be more successful because of the work we accomplished in the last 5 years. Alone, you did not make the gains you have made with my partnership.

I am more successful now than I have ever been in business. I know things about today's technology that I would never have learned staying in Hawaii. I work with people I enjoy, and I get to solve problems and make people happy and I love that.

I just can't make you happy. And since our relationship was key to my dreams, this work is more painful than happy, since it continues to be a gift to someone who thinks badly of me more often than goodly of me. Seems inconceivable after all the years of devotion and dedication. And that you have prospered from my devotion and dedication so exponentially.

This is what is in my head and heart these days. Certainly it is my perspective of our 5 years together. I left out all the conflicts, because we've not only covered that so many times before, but we agree they are not resolvable, and we tell a different tale, and it just locks in the hate, discontent and disappointment.

I'd like to hear what's in your heart and head.

Love,
Lee
L. Lee Brightwell
SWALIS Team
RF Logistics, LLC
787 Esperanza Place
Chula Vista, CA 91914
619-537-1989 wk
703-955-6699 cell
lee.brightwell@rflogistics.com
l.brightwell.ctr@navsoc.socom.mil

6

**EXHIBIT F**

# EXHIBIT "G"



*10592 John Ayres Drive, Fairfax VA 22032*

August 18, 2012

Ms. Lee Brightwell
787 Esperanza Place
Chula Vista, CA 91914

Dear Ms. Brightwell,

Regretfully, I am informing you that your employment with RF Logistics, LLC is terminated for cause effective immediately this date of August 18, 2012. You are not authorized to perform any travel, work or communications representing RFL from this point forward.

I ask that you surrender your Government Common Access Card (CAC) and all Naval Special Warfare access badges (including WARCOM, NSWG-1 and NSWG-2) to an RFL employee immediately. Please also return any Government Furnished Property (GFP) and Government Furnished Material (GFM) which is in your possession.

In addition, please immediately surrender all working papers to an RFL employee. Working papers consist of documents, paper files, electronic files, and files stored on electronic media.

Please immediately surrender your RFL Laptop and accessories at the same time to an RFL employee.

Payment of any and all remaining funds due to you will be withheld until all items are received, inventoried and accounted for by the company.

Sincerely,

Brian O'Donnell
Managing Member and Owner

Cc:     Brendan O'Donnell
        Liz Hendrix

**EXHIBIT G**

EXHIBIT "H"



*10592 John Ayres Drive, Fairfax VA 22032*

August 17, 2012

MEMO TO FILE:  Official Record to be held indefinitely as part of Lee Brightwell's Company Record

As of August 17, 2012, Lee Brightwell has been demoted from her role as Vice-President to Senior Business Process Analyst.  Ms. Brightwell no longer has any management authority for any decisions related to RF Logistics, LLC.

Ms. Brightwell's actions this week—and in the past—have demonstrated an insubordinate behavior and trend that indicates she is not acting in the best interest of the company and its associates.  Impeding other RFL associates' ability to perform their duties was the last unacceptable act that I will tolerate.

In addition, Ms. Brightwell unilaterally chose to present herself as an officer of RF Logistics, LLC, approve her own request for electronic credential and submitted an unauthorized access request to the US Government's GSA website.  Ms. Brightwell has never been, nor is she now an officer of this company.

Per the RFL Employee Handbook, "The Company reserves the right to discipline or discharge any employee for violating any company policy, practice or rule of conduct. The following list is intended to give you notice of our expectations and standards. However, it does not include every type of unacceptable behavior that can or will result in disciplinary action. Be aware that RF Logistics retains the discretion to determine the nature and extent of any discipline based upon the circumstances of each individual case." Also, "Employees may also be disciplined up to and including termination for *misconduct*, including, but not limited to the following:
• Falsifying an employment application or any other company records or documents, including timesheets
• Insubordination or other refusal to perform

The above incidents indicate Ms. Brightwell is in clear violation of RFL's company standards of conduct.  This is her final warning.  Any further action will be grounds for immediate dismissal.

Sincerely,

Brian O'Donnell
Managing Member and Owner


Cc:  Ms. Lee Brightwell

**EXHIBIT H**

EXHIBIT B

Harvey C. Berger (SBN 102973)
Stephanie Reynolds (SBN 220090)
**POPE, BERGER & WILLIAMS, LLP**
3555 Fifth Avenue, Suite 300
San Diego, California 92103
Telephone: (619) 595-1366
Facsimile: (619) 236-9677

Attorneys for Defendants/Cross-Complainants
RF LOGISTICS, LLC and BRIAN O'DONNELL

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

## CENTRAL DISTRICT - HALL OF JUSTICE

| | |
|---|---|
| L. LEE BRIGHTWELL,<br><br>          Plaintiff,<br><br>vs.<br><br>RF LOGISTICS, LLC; BRIAN O'DONNELL; and DOES 1 through 25, inclusive,<br><br>          Defendants.<br><br>_____<br><br>RF LOGISTICS, LLC; and BRIAN O'DONNELL,<br><br>          Cross-Complainants,<br><br>vs.<br><br>L. LEE BRIGHTWELL; and ROES 1 through 25,<br><br>          Cross-Defendant. | Case No.  37-2013-00046163-CU-BC-CTL<br>**IMAGED FILE**<br><br>Judge: Hon. Ronald S. Prager<br>Dept.: C-71<br><br>**RF LOGISTICS, LLC AND BRIAN O'DONNELL'S CROSS-COMPLAINT AGAINST L. LEE BRIGHTWELL**<br><br><br><br><br><br>Complaint Filed:    April 25, 2013<br>Trial Date:         None Set |

Cross-Complainants RF LOGISTICS, LLC and BRIAN O'DONNELL (collectively referred to as "RF LOGISTICS") allege as follows based upon information and belief:

/ / /

- 1 -

**CROSS-COMPLAINT AGAINST L. LEE BRIGHTWELL**

# I.

## PARTIES AND JURISDICTION

1.      Cross-Complainant RF LOGISTICS, LLC (the "Company") is a limited liability company organized under the laws of California with its principal place of business in San Diego, California. RF LOGISTICS is a consulting business in the data collection and information technology field, and its principal client is the United States government.

2.      Cross-Complainant BRIAN O'DONNELL ("O'DONNELL") is an individual residing in the County of San Diego, State of California. At all times relevant, O'DONNELL is the sole owner and chief executive of RF LOGISTICS, LLC.

3.      Cross-Defendant L. LEE BRIGHTWELL ("BRIGHTWELL") is, and at all relevant times was, an individual residing in the County of San Diego, State of California. At all relevant times herein, BRIGHTWELL was an employee of RF LOGISTICS, LLC.

4.      RF LOGISTICS sues Cross-Defendants ROES 1 through 25 under fictitious names. Their true names and capacities, whether individual, corporate, associate, or otherwise, are unknown to RF LOGISTICS. When RF LOGISTICS ascertains their true names and capacities, it will amend the Cross-Complaint to insert the true name and capacity of each fictitiously-named Cross-Defendant. On information and belief, each fictitiously named Cross-Defendant is legally responsible in some manner for the occurrences alleged in this Cross-Complaint, and that those Cross-Defendants directly and proximately caused by RF LOGISTICS' damages.

5.      On information and belief, at all times relevant to this Cross-Complaint, Cross-Defendants, and each of them, were the agents, servants, employees, alter egos, successors-in-interest, subsidiaries, affiliated companies or corporations, and joint ventures of the other Cross-Defendants, and were as such acting within the course, scope, and authority of each other Cross-Defendant. RF LOGISTICS further alleges on information and belief that each of the Cross-Defendants acted in concert with, and with the consent of, each of the other Cross-Defendants, and that each of the Cross-Defendants ratified or agreed to accept the benefits of the conduct if each of the Cross-Defendants.

///

///

-2-

## II.

### GENERAL ALLEGATIONS

6. O'DONNELL started the Company in 2003 and, since that time, has grown the business over the years and now employs twenty people.

7. O'DONNELL re-met BRIGHTWELL while on a trip to Hawaii six years ago, where BRIGHTWELL was living at the time. O'DONNELL and BRIGHTWELL began a personal relationship and began planning a future together, which included BRIGHTWELL relocating to San Diego from Hawaii to be with O'DONNELL. O'DONNELL ignored his better instincts not to mix business and personal relationships, as well as the fact that BRIGHTWELL had been unemployed for fourteen years, and offered BRIGHTWELL employment at RF LOGISTICS, LLC and a place to live so that they could be together. At the time of O'DONNELL's offer, BRIGHTWELL had no experience working as a consultant in the logistics, data collection or information technology fields. O'DONNELL told BRIGHTWELL that she would be hired as an employee of the Company. At no time did O'DONNELL or the Company represent or promise that BRIGHTWELL would be a partner at the Company.

8. In June 2007, BRIGHTWELL moved to San Diego and lived with O'DONNELL at the home he rented in Chula Vista, California.

9. At RF LOGISTICS, LLC, O'DONNELL took BRIGHTWELL under his wing, and taught her the business despite the fact that BRIGHTWELL did not have the experience or skill set to perform the vast majority of work at the Company. While BRIGHTWELL did a good job performing some of her job duties, she struggled in various aspects of her job which included her inability to deliver on major contracts.

10. In late 2007, government contractors that worked with the Company approved of BRIGHTWELL and she began receiving payment of an annual salary of $85,000.00 (based on a 40-hour workweek) beginning in 2008, approximately six months after she relocated to San Diego.

11. In December 2008, O'DONNELL and BRIGHTWELL attempted to purchase a house together, but O'DONNELL's ex-wife was unwilling execute a release agreement which would allow O'DONNELL to do so. As an alternative, BRIGHTWELL and O'DONNELL agreed that title on the

1   house would be in BRIGHTWELL's name, with O'DONNELL paying the mortgage every other
2   month (i.e. O'DONNELL paid the mortgage 6 months/year and BRIGHTWELL paid the mortgage 6
3   months/year).  Additionally, O'DONNELL paid for the utilities at the residence and, when
4   BRIGHTWELL went to Hawaii for several months, O'DONNELL paid the mortgage every month
5   from May, 2012 - September, 2012.

6   12.   As the years passed, O'DONNELL and BRIGHTWELL's personal relationship
7   became more and more volatile.  While things began well in the beginning of the relationship with
8   O'DONNELL and also at work, this soon gave way to escalating problems and conflict which
9   included incidents where BRIGHTWELL would physically assault O'DONNELL in fits of rage and
10  anger.

11  13.   Eventually, the drain on O'DONNELL's personal life became too much and he sought
12  to end the relationship.  In May 2012, O'DONNELL offered BRIGHTWELL a severance of
13  $100,000.00 plus reimbursement payments for business expenses in the event she wanted to leave her
14  employment at the Company.  In the event BRIGHTWELL did not want to accept the severance,
15  O'DONNELL offered BRIGHTWELL the opportunity to continue her employment with the
16  Company as an employee, despite her erratic performance and negative attitude toward other
17  employees.

18  14.   In May 2012, BRIGHTWELL moved back to Hawaii until August 2012.  During this
19  time, O'DONNELL paid the entire mortgage and utilities at the house they shared.

20  15.   Rather than peacefully ending their personal relationship, BRIGHTWELL became
21  obsessed with making a claim for O'DONNELL's business and/or destroying the Company and/or
22  O'DONNELL.  BRIGHTWELL furnished O'DONNELL with a list of demands where she wanted a
23  lump sum payment of $800,000, full signature authority on company bank accounts, promotion to a
24  position as an officer of the Company, and a position of administrative authority that effectively made
25  her "boss of all employees."  Needless to say, O'DONNELL rejected these illogical demands.
26  O'DONNELL and BRIGHTWELL did agree, however, that O'DONNELL would move out of the
27  house they shared by August 17, 2012.

28  / / /

CROSS-COMPLAINT AGAINST L. LEE BRIGHTWELL

16.     When BRIGHTWELL understood that her demands were not going to be met, she began to employ more aggressively coercive tactics to harm the Company which included, but were not limited to, falsifying clearances to alter account information with government clients.

17.     When O'DONNELL attempted to move out of the house he shared with BRIGHTWELL, BRIGHTWELL changed the locks on the house so that O'DONNELL was unable to obtain his personal and Company property.  Shortly thereafter, O'DONNELL discovered that BRIGHTWELL stole his car keys and removed Company files/sensitive information from the residence and from O'DONNELL's car.  BRIGHTWELL also instructed Company employees to abandon the daily operations of the Company when she ordered them to leave the Company's office, which included locking the office (and changing the locks) so that the Company was unable to conduct any business.  This conduct violates several company policies and served as grounds for termination.

18.     As a result of BRIGHTWELL's improper conduct, O'DONNELL decided to officially reprimand BRIGHTWELL and demote her from her position on August 17, 2012.  Concerned BRIGHTWELL would try to sabotage the Company computer system, O'DONNELL suspended BRIGHTWELL's company network access.

19.     Within hours of suspending her network access, and upon BRIGHTWELL learning that she could not access the network, BRIGHTWELL demanded that O'DONNELL accept her demands if he wanted to retrieve the Company files that she took.  O'DONNELL informed BRIGHTWELL that he had been able to access the house they once shared on August 14 and retrieve many of these files.  O'DONNELL also attempted to provide BRIGHTWELL with a copy of the reprimand and demotion letter, which she refused to look at or accept.  BRIGHTWELL then became irate and threatened O'DONNELL by stating, "you are not getting away so easy, you are so going to pay for this."

20.     Shortly thereafter, BRIGHTWELL attempted to steal and/or gain access to O'DONNELL's car using a spare key she had.  After repeated attempts to obtain the spare key to his car that BRIGHTWELL had, BRIGHTWELL grabbed O'DONNELL's arm with one hand, and attempted to grab O'DONNELL's genitals with her other hand through his pants.  Shocked by

- 5 -

1 | BRIGHTWELL's actions, O'DONNELL spun around to protect himself and, in the process, saw
2 | BRIGHTWELL lose her balance and fall on the ground on her rear. BRIGHTWELL did not complain
3 | of any injuries, but immediately stood up and angrily told O'DONNELL, "you are going to jail."
4 | O'DONNELL continued to walk away from BRIGHTWELL while asking her to trade keys (he had a
5 | spare key for BRIGHTWELL's car). BRIGHTWELL produced another key to her car, got in her car,
6 | pulled behind O'DONNELL's car so that he could not leave, and demanded the return of her car key.
7 | Shortly thereafter, BRIGHTWELL drove off while telling O'DONNELL, "You're going to jail" and
8 | "I know where you live."

9 |      21.     The next morning, O'DONNELL sent BRIGHTWELL a text message informing her
10 | that her employment with the Company was being terminated. On this same morning, O'DONNELL
11 | saw BRIGHTWELL drive past the new home he was renting. He was immediately concerned as he
12 | had not provided BRIGHTWELL with his address. Shortly thereafter, police officers arrived at
13 | O'DONNELL's home and arrested him for domestic violence. The authorities refused to press any
14 | charges against O'DONNELL finding that there was no evidence to support BRIGHTWELL's claims
15 | or any charges. After being released from jail after being locked up for 10 hours, O'DONNELL
16 | sought, and received, a temporary restraining order against BRIGHTWELL for the injuries he
17 | suffered on August 17, which are clearly documented in photographs.

18 |      22.     On September 26, BRIGHTWELL sent the Company a letter demanding
19 | reimbursement of "business expenses" and "indemnification." In this letter, BRIGHTWELL claimed
20 | to be owed reimbursement for her personal living expenses (i.e. rent and utilities) and legitimate
21 | business expenses. The Company immediately paid BRIGHTWELL for legitimate business expenses
22 | in the amount of $10,532.15, and requested additional information and/or documentation regarding
23 | other questionable categories of expenses. The Company denied certain reimbursement requests
24 | outright which clearly related to BRIGHTWELL's personal living expenses and personal property.

25 |      23.     BRIGHTWELL filed suit against the Company where she claims to be both an
26 | employee, entitled to the protections of California's wage and hour laws, and a partner in the
27 | Company. BRIGHTWELL also alleges various causes of action against O'DONNELL and/or the
28 | Company which relate to alleged promises O'DONNELL made to BRIGHTWELL regarding her

1  employment with the Company, her termination by the Company, and claims relating to an alleged

2  assault by O'DONNELL.   O'DONNELL and the Company deny each and every cause of action.

### III.

### CAUSES OF ACTION AGAINST BRIGHTWELL

### FIRST CAUSE OF ACTION

### (Conversion, Against all Cross-Defendants)

7       24.     RF LOGISTICS incorporates by reference as though fully set forth herein Paragraphs 1

8  through 23 of this Cross-Complaint.

9       25.     As alleged above, RF LOGISTICS is informed and believes that BRIGHTWELL and

10  ROES 1-25 converted an array of property from RF LOGISTICS when she wrongfully took into her

11  personal possession and without authorization: (I) Company property which included confidential

12  employment and personnel files for almost 20 employees/personnel, health insurance and benefit

13  information, and payroll information; (ii) government information disclosure releases; (iii) marketing

14  plans; and (iv) sensitive communications with the Department of Defense.

15       26.     RF LOGISTICS is, and at all times relevant herein was, the owner of the property,

16  including the property identified above, and RF LOGISTICS was entitled to exclusive possession of

17  its property.  At not time did RF LOGISTICS authorize BRIGHTWELL to take its Company

18  property.

19       27.     California Labor Code section 2860 provides as follows:

20            Everything which an employee acquires by virtue of his employment,
          except the compensation which is due him from his employer,

21            belongs to the employer, whether acquired lawfully or unlawfully, or
          during or after the expiration of the term of his employment.

22

23       28.     BRIGHTWELL's wrongful taking of Company property deprived the Company of

24  information needed to carry out its daily operations and/or to fulfill its contracts with its clients, and

25  has caused the Company damages.  In fact, it is significant to note that only after the Company's

26  counsel made a demand for the return of this property was some of the property returned to the

27  Company, which was months after BRIGHTWELL's theft.  Upon information and belief, RF

28  ///

-7-

1  LOGISTICS believes that BRIGHTWELL is still in possession of Company property which includes

2  a company laptop.

3         29.     As a result of BRIGHTWELL's conversion, RF LOGISTICS has been deprived of its

4  ownership interest and rights to this property and had to make other arrangements to access this

5  information (to the extent it could), all to the Company's damage.  BRIGHTWELL knew that the

6  Company would be damaged when it was denied access to its property, and the Company believes

7  that BRIGHTWELL wrongfully took company property so that she could inflict damage on the

8  Company.

9         30.     As a direct and proximate result of the unlawful conversion by BRIGHTWELL and

10  ROES 1-25, RF LOGISTICS has suffered and will continue to suffer actual damages, including costs

11  incurred attempting to mitigate damages, costs incurred in seeking to recover its property, loss of the

12  use of the property, and legal costs and expenses.  RF LOGISTICS is entitled to the immediate return

13  of its property and to an award of damages in an amount to be proven at trial.

14         31.     The acts and omissions of BRIGHTWELL and ROES 1-25 were intentional, malicious

15  and oppressive, and were done with the intent and design to damage RF LOGISTICS.  In fact,

16  BRIGHTWELL refused to return RF LOGISTICS' property despite requests for the same and the

17  obvious awareness that an employment relationship no longer existed.  For those reasons, RF

18  LOGISTICS is entitled to recover punitive damages in an amount to be determined at the time of

19  trial.

20                 **SECOND CAUSE OF ACTION**

21          **(Breach of Duty of Loyalty, Against all Cross-Defendants)**

22         32.     RF LOGISTICS incorporates by reference as though fully set forth herein Paragraphs 1

23  through 31 of this Cross-Complaint.

24         33.     During the course of BRIGHTWELL's employment with RF LOGISTICS,

25  BRIGHTWELL owed an undivided duty of loyalty to RF LOGISTICS to affirmatively protect its

26  interests and to refrain from doing anything that would cause injury to the Company.

27         34.     As alleged in this Cross-Complaint, BRIGHTWELL breached her duty of loyalty

28  when she engaged in multiple acts while an employee of RF LOGISTICS that were likely to injure,

- 8 -

1 | and did injure, RF LOGISTICS and/or to benefit herself at RF LOGISTICS' expense.

2 | 35.    As a direct and proximate result of BRIGHTWELL's conduct and breach of duty of

3 | loyalty to RF LOGISTICS, RF LOGISTICS has suffered and will continue to suffer actual damages

4 | in an amount that is in excess of this Court's minimum jurisdiction which will be determined at the

5 | time of trial.

6 | 36.    RF LOGISTICS is thus entitled to recover from BRIGHTWELL nominal, actual, and

7 | compensatory damages, and all other damages reasonably foreseeable by BRIGHTWELL's breach of

8 | her duty of loyalty, in amounts according to proof at trial and in excess of this Court's minimum

9 | jurisdiction which will be determined at the time of trial.

10 | **THIRD CAUSE OF ACTION**

11 | **(Intentional Interference with Prospective Economic Advantage, Against all Cross-Defendants)**

12 | 37.    RF LOGISTICS incorporates by reference as though fully set forth herein Paragraphs 1

13 | through 36 of this Cross-Complaint.

14 | 38.    RF LOGISTICS enjoyed an economic relationship with its employees whereby RF

15 | LOGISTICS obtained an actual economic benefit from such relationship, and was likely to continue

16 | enjoying a future economic benefit regarding the same.

17 | 39.    BRIGHTWELL had knowledge of this relationship and knowledge of the economic

18 | benefit RF LOGISTICS enjoyed.

19 | 40.    As alleged in this Cross-Complaint, BRIGHTWELL engaged in intentional acts that

20 | were designed to disrupt this relationship.  In August 2012, BRIGHTWELL instructed Company

21 | employees to abandon the daily operations of the Company when she ordered them to leave the

22 | Company's office, which included changing the locks for the office so that the Company was unable

23 | to conduct any business.

24 | 41.    By her actions, BRIGHTWELL caused the office and business to shut down, and

25 | prevented employees from performing their work for the Company.  BRIGHTWELL's unilateral

26 | decision to lock down the Company hindered the Company's ability to conduct business and satisfy

27 | its contractual obligations to its clients and caused economic harm to RF LOGISTICS.

28 | ///

42.     BRIGHTWELL knew that shutting down the business would have a detrimental effect on the Company, yet did it anyway, causing the Company to suffer damages caused by her direct interference and unauthorized conduct.  RF LOGISTICS has suffered and will continue to suffer damages in an amount that is in excess of this Court's minimum jurisdiction and will be determined at the time of trial.

## IV.

## PRAYER FOR RELIEF

43.     RF LOGISTICS incorporates by reference as though fully set forth herein Paragraphs 1 through 42 of this Cross-Complaint.

44.     WHEREFORE, RF LOGISTICS, LLC and O'DONNELL pray for the following relief:

    a.     Nominal, actual, and/or compensatory damages;

    b.     Punitive and/or exemplary damages;

    c.     Costs of suit;

    d.     Prejudgment interest; and

    e.     For such further and other relief as the Court deems just and proper.


POPE, BERGER & WILLIAMS, LLP

Dated: September 13, 2013              By: _____
                                           Harvey C. Berger
                                           Stephanie Reynolds
                                           Attorneys for Defendants/Cross-Complainants
                                           RF LOGISTICS, LLC and BRIAN
                                           O'DONNELL

- 10 -

# EXHIBIT C

1 | JAIKARAN SINGH (SBN 201355)
     jsingh@mckennalong.com
2 | EVAN MIX (SBN 287504)
     emix@mckennalong.com
3 | McKENNA LONG & ALDRIDGE LLP
   | 600 West Broadway, Suite 2600
4 | San Diego, California 92101-3372
   | Telephone:    619.236.1414
5 | Facsimile:     619.232.8311

6 | Attorneys for Plaintiff and Cross-Defendant
   | L. Lee Brightwell

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**10/18/2013** at 03:25:00 PM

Clerk of the Superior Court
By Sandra Villanueva,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN DIEGO

| | |
|---|---|
| L. LEE BRIGHTWELL, | Case No. 37-2013-00046163-CU-BC-CTL |
|          Plaintiff, | **IMAGED FILE** |
|     v. | Judge:    Hon. Ronald S. Prager |
| RF LOGISTICS, LLC; BRIAN O'DONNELL; and DOES 1 through 25, inclusive, | Dept:     C-71 |
|          Defendant. | **CROSS-DEFENDANT L. LEE BRIGHTWELL'S ANSWER TO CROSS-COMPLAINT OF RF LOGISTICS, LLC AND BRIAN O'DONNELL** |
| RF LOGISTICS, LLC; and BRIAN O'DONNELL, | Action Filed:    April 25, 2013 |
|          Cross-Complainants, | Trial Date:      April 25, 2014 |
|     v. | |
| L. LEE BRIGHTWELL; and ROES 1 through 25, | |
|          Cross-Defendant. | |

McKenna Long &
Aldridge LLP
San Diego

L. LEE BRIGHTWELL'S ANSWER TO CROSS-COMPLAINT

1    Cross-Defendant L. Lee Brightwell ("Cross-Defendant"), hereby responds to the

2    unverified Cross-Complaint of RF Logistics, LLC and Brian O'Donnell (the "Cross-Complaint").

3    Pursuant to the provisions of Section 431.30 of the California Code of Civil Procedure,

4    Cross-Defendant generally denies each and every allegation and claim asserted in the Cross-

5    Complaint, and denies that Cross-Complainants are entitled to equitable or injunctive relief,

6    compensatory damages, disgorgement of profits, restitution, punitive or exemplary damages,

7    attorneys' fees in any amount, pre-judgment interest, costs of suit, or any other relief of any kind

8    whatsoever.

### AFFIRMATIVE DEFENSES

10    In addition to the foregoing general denial, Cross-Defendant alleges and asserts the

11    affirmative defenses set forth in this answer.  By pleading these affirmative defenses, Cross-

12    Defendant does not assume the burden of proving any fact, issue, or element of a cause of action

13    where such burden properly belongs to Cross-Complainants.  Moreover, nothing stated in this

14    answer is intended or shall be construed as a concession that any particular issue or subject matter

15    is relevant to Cross-Complainants' allegations.

### FIRST AFFIRMATIVE DEFENSE

#### (Failure To State A Cause of Action)

18    The Cross-Complaint, and each cause of action alleged therein, fails to state facts sufficient

19    to constitute a cause of action for relief against Cross-Defendant.

### SECOND AFFIRMATIVE DEFENSE

#### (Unclean Hands)

22    Cross-Complainants come into this Court with unclean hands, and under the circumstances

23    of this case, the equitable doctrine of unclean hands bars or limits any relief requested or recovery

24    against Cross-Defendant.

### THIRD AFFIRMATIVE DEFENSE

#### (Failure To Mitigate Damages)

27    Cross-Complainants have failed to exercise reasonable care and diligence to avoid loss and

28    to minimize or mitigate the damages, if any, that Cross-Complainants have suffered.

McKenna Long &
Aldridge LLP
San Diego

1

## FOURTH AFFIRMATIVE DEFENSE

### (Estoppel)

Cross-Complainants engaged in acts, conduct, and omissions such that they are barred by the doctrine of estoppel from recovering any relief against Cross-Defendant.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver)

Cross-Complainants engaged in conduct and activities sufficient to constitute a waiver of any alleged causes of action set forth in the Cross-Complaint.

## SIXTH AFFIRMATIVE DEFENSE

### (Good Faith)

At all times relevant, Cross-Defendant conducted herself in good faith and in a legitimate exercise of business discretion.

## SEVENTH AFFIRMATIVE DEFENSE

### (Cross-Complainants' Breach)

Cross-Complainants are barred from any recovery against Cross-Defendant due to their material breaches of contract and failure to perform obligations. These material breaches have also caused Cross-Defendant to sustain damages in excess of the damages allegedly sustained by Cross-Complainants.

## EIGHTH AFFIRMATIVE DEFENSE

### (Excuse and/or Release)

Cross-Complainants are barred from obtaining any relief against Cross-Defendant as sought in the Cross-Complaint as Cross-Complainants' acts, omissions, and conduct constitute excuse and/or release of any claim or cause of action which Cross-Complainants may otherwise have had against Cross-Defendant.

## NINTH AFFIRMATIVE DEFENSE

### (Set Off)

Cross-Complainants' causes of action, and each of them, are barred, reduced, or off set by amounts owed to Cross-Defendant by Cross-Complainants.

1  **TENTH AFFIRMATIVE DEFENSE**

2  **(Statute of Limitations)**

3   While specifically denying any liability, Cross-Complainants' claims are barred in whole

4  or in part by reason of the applicable statute of limitations.

5  **ELEVENTH AFFIRMATIVE DEFENSE**

6  **(Unjust Enrichment)**

7   Cross-Complainants' claims are barred to the extent that any award in this action would

8  constitute unjust enrichment.

9  **TWELFTH AFFIRMATIVE DEFENSE**

10  **(Mootness)**

11   Cross-Complainants' claims are barred, in whole or in part, by the doctrine of mootness.

12  **THIRTEENTH AFFIRMATIVE DEFENSE**

13  **(No Damages)**

14   Cross-Complainants will not be able to prove any damages caused by Cross-Defendant.

15  **FOURTEENTH AFFIRMATIVE DEFENSE**

16  **(Lack of Legal Causation)**

17   There is no cause or connection between Cross-Defendant's conduct and any alleged loss

18  or damage that Cross-Complainants contend they have sustained.

19  **FIFTEENTH AFFIRMATIVE DEFENSE**

20  **(Lack of Proximate Causation)**

21   Any and all damage, loss and injuries suffered or to be suffered by Cross-Complainants, if

22  any, were and are due to causes beyond the control or responsibility of Cross-Defendant.

23  **SIXTEENTH AFFIRMATIVE DEFENSE**

24  **(Privilege and Justification)**

25   Without in any way admitting that the Cross-Complainants were damaged by Cross-

26  Defendant's behavior, Cross-Defendant alleges that her actions were justified and privileged.

27

28

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Contributory Fault)

A loss, if any, sustained by Cross-Complainants was proximately caused and contributed to by the negligence, conduct, or intervening acts of Cross-Complainants or Cross-Complainants' agents, officers, representatives or employees, not including Cross-Defendant.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Third Parties)

Any damages Cross-Complainants allegedly suffered was caused, in whole or in part, by third parties, and not by Cross-Defendant.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Failure to State Facts Sufficient – Damages)

The Cross-Complaint, and each cause of action alleged therein, fails to state facts sufficient to entitle Cross-Complainants to an award of general or special damages.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Punitive Damages Unawardable)

Cross-Complainants' purported claims for punitive damages against Cross-Defendant is barred by the provisions of Civil Code section 3294 because Cross-Defendant did not commit the alleged acts with oppression, fraud or malice.

## TWENTY-FIRSTFIRST AFFIRMATIVE DEFENSE

### (Reservation of Rights)

Cross-Defendant presently has insufficient knowledge or information upon which to form a belief as to whether she may have additional, as yet unstated, affirmative defenses available. Cross-Defendant reserves the right to assert additional affirmative defenses in the event discovery indicates that they would be appropriate.

WHEREFORE, Cross-Defendant prays:

1.     That judgment be entered in favor of Cross-Defendants and against Cross-Complainants on the Cross-Complaint;

2.     That the Cross-Complaint and all claims therein be dismissed with prejudice;

1    3.    For costs of this suit incurred herein; and

2    4.    For such other relief that the Court deems just and proper.

3

4    DATED: October 18, 2013          McKENNA LONG & ALDRIDGE LLP

5

6                    By:

7                      Jaikaran Singh

8                      Attorneys for Plaintiff and Cross-Defendant
                        L. Lee Brightwell

9    USW 804014477.1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAIKARAN SINGH (SBN 201355)
  jsingh@mckennalong.com
EVAN C. MIX (SBN 287504)
  emix@mckennalong.com
McKENNA LONG & ALDRIDGE LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone:   619.236.1414
Facsimile:   619.232.8311

Attorneys for Plaintiff and Cross-Defendant
L. Lee Brightwell

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

10/18/2013 at 03:25:00 PM

Clerk of the Superior Court
By Sandra Villanueva,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| L. LEE BRIGHTWELL,<br><br>            Plaintiff,<br><br>      v.<br><br>RF LOGISTICS, LLC; BRIAN<br>O'DONNELL; and DOES 1 through 25,<br>inclusive,<br><br>            Defendant.<br>_____<br>RF LOGISTICS, LLC; and BRIAN<br>O'DONNELL,<br><br>            Cross-Complainants,<br><br>      v.<br><br>L. LEE BRIGHTWELL; and ROES 1 through<br>25,<br><br>            Cross-Defendant. | Case No. 37-2013-00046163-CU-BC-CTL<br>**IMAGED FILE**<br><br>Judge:   Hon. Ronald S. Prager<br>Dept:    C-71<br><br>**PROOF OF SERVICE**<br><br>Action Filed:   April 25, 2013<br>Trial Date:     None Set |

---

PROOF OF SERVICE

I, Geralynn D. Vidmar, declare under penalty of perjury that I am over the age of eighteen years, that I am not a party to the above-referenced action, and that I am employed in the State of California, County of San Diego, where the within-mentioned service occurred. My business address is 600 West Broadway, Suite 2600, San Diego, California 92101; telephone number (619) 236-1414.

On October 18, 2013, I served the following document(s):

1. **CROSS-DEFENDANT L. LEE BRIGHTWELL'S ANSWER TO CROSS-COMPLAINT OF RF LOGISTICS, LLC AND BRIAN O'DONNELL**

on the interested parties in this action by:

XX  **U. S. MAIL:** I placed a copy in a separate envelope, with postage fully prepaid, for each address named below / on the attached service list for collection and mailing on the below indicated day following the ordinary business practices at McKenna Long & Aldridge LLP.  I certify I am familiar with the ordinary business practices of my place of employment with regard to collection for mailing with the United States Postal Service.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit or mailing affidavit.

_____  **OVERNIGHT COURIER SERVICE:** I placed a copy in a separate envelope addressed to each addressee as indicated below, and caused such envelope(s) to be delivered via **FEDERAL EXPRESS**.

_____  **HAND DELIVERY:** I placed a copy in a separate envelope addressed to each addressee as indicated below, and delivered it to Cal Express for personal service.

_____  **ELECTRONIC SERVICE:** On _____ I sent the above-referenced documents via an email transmission to the email addresses indicated below.  I am readily familiar with this office's practice for transmissions by email.  Transmissions are sent as soon as possible and are repeated, if necessary, until they are reported as complete and without error.  In sending the foregoing documents by email, I followed this office's ordinary business practices. The sending email address is gvidmar@mckennalong.com.

_____  **ELECTRONIC FILING AND SERVICE:** I affected electronic service of the above-referenced document(s) on the interested parties below by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1   by serving a true copy thereof to the following:

2   Harvey C. Berger, Esq.                      Daniel R. Friedenthal, Esq.
    Stephanie Reynolds, Esq.                    FRIEDENTHAL, HEFFERNAN & KLEIN LLP
3   Pope, Berger & Williams, LLP                155 North Lake Avenue, Suite 430
    3555 Fifth Avenue, Suite 300                Pasadena, CA  91101
4   San Diego, CA 92103                         Tel:    (626) 628-2800
    Tel:    619.595.1366                        Fax:    (626) 628-2828
5   Fax:    619.236.9677
    berger@popeberger.com
6   reynolds@popeberger.com

7   Attorneys for Defendants and Cross-         Attorneys for Defendants and Cross-
    Complainants BRIAN O'DONNELL and RF         Complainants BRIAN O'DONNELL and RF
8   LOGISTICS, LLC                              LOGISTICS, LLC

9    __XX__    **(STATE):** I declare under penalty of perjury under the laws of the State of California that
10             the foregoing is true and correct.

11   _____    **(FEDERAL):** I declare that I am employed in the office of a member of the bar of this
               court at whose direction the service was made.
12

13          Executed at San Diego, California on October 18, 2013.

14

15                                          Geralynn D. Vidmar

16                                          Geralynn D. Vidmar

17

18   USW 101982503.8

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

# EXHIBIT D

Joshua D. Gruenberg, Esq. SB #163281
Corey P. Hanrahan, Esq. SB #256835
Benjamin S. Silver, Esq. SB #284741
Nikolas T. Djordjevski, Esq. SB # 294728
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**L. LEE BRIGHTWELL**

FILED
CIVIL BUSINESS OFFICE 2
CENTRAL DIVISION

**2014 FEB 28  PH 1:00**

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

FEB 28 '14 PM 3:21

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| L. LEE BRIGHTWELL, | Case No. 37-2013-00046163-CU-BC-CTL |
| Plaintiff, | **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:** |
| v. | |
| RF LOGISTICS, LLC; BRIAN O'DONNELL; and DOES 1 through 25, inclusive, | (1) **BREACH OF CONTRACT;** |
| Defendants. | (2) **PROMISSORY ESTOPPEL;** |

(1) **BREACH OF CONTRACT;**
(2) **PROMISSORY ESTOPPEL;**
(3) **PROMISSORY FRAUD;**
(4) **FRAUD IN THE INDUCEMENT;**
(5) **WRONGFUL TERMINATION IN VIOLATION OF LABOR CODE SECTION 1102.5;**
(6) **WRONGFUL TERMINATION IN VIOLATION OF FEHA;**
(7) **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;**
(8) **ASSAULT AND BATTERY;**
(9) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**
(10) **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**
(11) **VIOLATION OF LABOR CODE SECTION 970;**
(12) **VIOLATION OF LABOR CODE SECTION 2802;**
(13) **VIOLATION OF LABOR CODE SECTION 202;**
(14) **DECLARATORY RELIEF;**
(15) **BREACH OF FIDUCIARY DUTY;**
(16) **ACCOUNTING;**
(17) **SEXUAL HARASSMENT IN VIOLATION OF FEHA**

**[JURY TRIAL DEMANDED]**

---

PLAINTIFF'S FIRST AMENDED COMPLAINT

1        Plaintiff L. Lee Brightwell hereby sues RF Logistics, LLC and Brian O'Donnell, and

2   alleges as follows:

3                                       **PRELIMINARY ALLEGATIONS**

4        1.     Lee Brightwell is, and at all times mentioned herein was, an individual residing in

5   the County of San Diego, State of California, except as otherwise noted.

6        2.     Defendant RF Logistics, LLC ("RFL") is, and at all times mentioned herein was, a

7   limited liability company doing business in the State of California.  RFL regularly employees five

8   or more employees.

9        3.     Defendant Brian O'Donnell ("O'Donnell") is, and at all times mentioned was, an

10  individual residing in the County of San Diego, State of California, except as otherwise noted.  At

11  all relevant times in this complaint, O'Donnell was the Managing Member and President of RFL.

12       4.     Ms. Brightwell is informed and believes, and based thereon alleges, that at all times

13  mentioned herein, each and every defendant was the agent, alter ego, subsidiary, employee, joint

14  venturer and/or co-conspirator of each other defendant, and that, in performing or failing to

15  perform the acts herein alleged, each was acting individually as well as through and in the

16  foregoing alleged capacity and within the course and scope of such agency, alter ego capacity,

17  subsidiary, employment, joint venture, and/or conspiracy, and each other defendant ratified and

18  affirmed the acts and omissions of the other defendant.  Ms. Brightwell is further informed and

19  believes that each defendant, in taking the actions alleged herein and/or ratifying the actions

20  alleged herein, acted within the course and scope of such authority and, at the same time, for their

21  own financial and individual advantage, as well as in the course and scope of such agency,

22  subsidiary, employment, joint venture and as an alter ego therein.

23       5.     The true names and capacities, whether individual, corporate or associate, or

24  otherwise, of defendants named herein as Does 1 through 25, inclusive, are unknown to Ms.

25  Brightwell, who therefore sues said defendants by such fictitious names pursuant to Code of Civil

26  Procedure section 474.  Ms. Brightwell will amend this complaint to show their true names and

27  capacities when the same have been ascertained.  Ms. Brightwell is informed and believe, and

28  / / /

1  based upon such information and belief, allege that all defendants sued herein are in some manner

2  responsible for the acts herein alleged, or are the alter ego of the other defendants named herein.

3        6.    Venue and jurisdiction are proper in the above-captioned district because the

4  actions referred to in this Complaint were performed in this judicial district, and the parties also

5  reside in this judicial district.  Ms. Brightwell further alleges that the breach of the agreement, and

6  other activities supporting the causes of action alleged herein, occurred in the County of San

7  Diego and within this judicial district.   Also, the relief requested is within the jurisdictional

8  authority of this Court.

9  **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10        7.    Ms. Brightwell has filed charges of discrimination and retaliation with the

11  California Department of Fair Employment and Housing ("DFEH"), which has issued a "right-to-

12  sue" letter, a copy of which is attached as Exhibit A.

13        8.    On February 26, 2014, Ms. Brightwell amended her charges with the DFEH, and

14  was issued a new Right to Sue letter, attached herein as Exhibit 1.

15  **GENERAL ALLEGATIONS**

16        9.    O'Donnell founded RFL in 2003, registering as an LLC in Virginia in

17  January 2004.  He ran the business as a sole proprietorship for four years.  Ms. Brightwell is

18  informed and believes and based thereon alleges that with O'Donnell's sole involvement, RFL

19  grossed just more than $169,000 in total revenues in 2007.  At this time, based on information and

20  belief, RFL did not generate a profit.

21        10.    RFL is primarily a service provider, which develops and supports an inventory

22  management system for the Naval Special Warfare Command ("NSWC") called the Special

23  Warfare Automated Logistics Information System ("SWALIS").  The other part of RFL's business

24  is working as a preferred partner with HandySoft and using its business process software, Biz

25  Flow, to automate the credit card purchasing process for NSWC.

26        11.    The majority of RFL's business is conducted as a sub-contractor, previously to

27  AMSEC LLC ("AMSEC") until September 2010, and then to NTVI Fed LLC ("NTVI") through

28  the present.  In addition, RFL subcontracts to CACI, a large government prime contractor,

PLAINTIFF'S FIRST AMENDED COMPLAINT

1   providing inventory management personnel as needed and team support for the development of

2   the NAVY Single Supply Baseline.  RFL also has BizFlow related contracts directly with NSWC,

3   where the end client is NSWC headquarters on the Naval Amphibious Base in Coronado.

4         12.    Initially, the SWALIS work originated in Virginia Beach at the Naval Amphibious

5   Base in Little Creek, and currently supports clients where ever Navy Seal support bases are

6   established, including Bahrain, Germany, Guam, Hawaii, Mississippi, and Alaska.   In

7   September 2012, NTVI and RFL also acquired a contract with Naval Expeditionary Combat

8   Command ("NECC") in Norfolk, Virginia.   The SWALIS program has been selected to be

9   installed in all of NECC and in "Big NAVY."

10         13.    O'Donnell and Ms. Brightwell began a personal relationship in 2006.  They had

11   worked together from 1986 to 1988 and had stayed friends over the years.  At the time they began

12   a personal relationship, they were both married but separated from their respective spouses with

13   the intention of each getting divorced.  They intended to marry, join together their assets, work,

14   play, and grow old together.

15         14.    Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell

16   is someone who cannot separate his work life from his personal life.  He fell in love with Ms.

17   Brightwell and wanted them to be together.  In addition, on information and belief, O'Donnell

18   knew that Ms. Brightwell's industrial engineering background and experience in process analysis

19   would be a significant benefit to the services RFL could provide.  Accordingly, in many lengthy

20   telephone conversations throughout 2006, O'Donnell asked Ms. Brightwell to move from Hawaii

21   and join him as a "partner" at RFL to "grow this business together" in San Diego.

22         15.    From February 2006 to June 2007, O'Donnell and Ms. Brightwell had a series of

23   discussions regarding the conditions under which Ms. Brightwell would be willing to join

24   O'Donnell in San Diego to work at RFL.  As an important part of those discussions, and in an

25   effort to entice Ms. Brightwell to move to San Diego, O'Donnell promised Ms. Brightwell an

26   equal ownership interest in RFL if she would join the company.  By doing this, Mr. O'Donnell

27   offered the woman he loved ownership in the company he founded with the potential for them to

28   "grow the business together."   Mr. O'Donnell told Ms. Brightwell that together, with her

1  participation, they could double the revenues with two people chargeable on the government

2  contract, incur negligible expenses by living together and working from home, thereby "banking"

3  half of the revenues and growing a nest egg. At this time, O'Donnell was opposed to hiring and

4  managing employees.

5      16.     In accepting O'Donnell's offer, Ms. Brightwell relied on O'Donnell's promise to

6  make her an equal owner in RFL. In further reliance on O'Donnell's promise, Ms. Brightwell

7  moved to San Diego from Hawaii on June 15, 2007 to commence work at RFL. Consistent with

8  her role as owner, O'Donnell did not provide Ms. Brightwell with an offer letter of employment,

9  as was done with all future RFL employees.

10     17.     At O'Donnell's request, Ms. Brightwell worked on RFL deliverables in October

11  through December 2006, but was not paid. In October 2007, when Ms. Brightwell began onsite

12  work at RFL, she was brought in as a "Member" of the company, and given the title "Business

13  Process Engineer." At this time, RFL was composed of Ms. Brightwell and O'Donnell, who was

14  designated the Managing Member and held the title, "Senior Business Process Analyst."

15  Ms. Brightwell's title later changed to "Vice-President" and O'Donnell's title became "President,"

16  when RFL hired Alfred McCusker as an employee in March 2009. Ms. Brightwell remained

17  second in charge of RFL operations until she was terminated by O'Donnell in August 2012.

18     18.     When Ms. Brightwell began work at RFL, O'Donnell explained to her that she

19  would be temporarily paid with a Form W-2 to simplify tracking and paying of payroll taxes. He

20  also cautioned Ms. Brightwell that because his divorce was not yet final, attaching Ms. Brightwell

21  to any assets he owned, like the company, could allow his wife to go after her assets. For that

22  reason, O'Donnell explained they would document her ownership at a later time. Although this

23  gave Ms. Brightwell some pause, she trusted O'Donnell and immersed herself in the work.

24     19.     Ms. Brightwell was not paid regularly for the first two years, but rather, like

25  O'Donnell, received income when RFL was able to make distributions. Likewise, like O'Donnell,

26  Ms. Brightwell received no benefits, including health care, vacation time, or sick time, for the first

27  two years. In addition, RFL paid Ms. Brightwell the revenue she generated on her assignments.

28  As an owner, Ms. Brightwell knew it was important to build up reserves in the RFL bank accounts

1   to cover payroll fees, taxes, and operational expenses.  She suggested this to O'Donnell and

2   voluntarily reduced her compensation rate from $80 to $65 in 2008 in order to generate sufficient

3   reserves for RFL.  Consequently, RFL was able to hire Alfred McCusker in March 2009.

4   Ms. Brightwell's pay did not increase for four years, despite pay raises for other employees in

5   2010 and 2011.  It was not until late in 2011 that Ms. Brightwell and O'Donnell agreed to an

6   increase in her pay in line with her position in the company.

7       20.   Based on O'Donnell's promise to Ms. Brightwell of an equal ownership interest in

8   RFL, Ms. Brightwell believed she was an owner of RFL.  Accordingly, in reliance on the promise

9   that she would have ownership interest in RFL, Ms. Brightwell invested significant time, effort

10  and resources into RFL in a manner that is typical of small business owners.

11      21.   For instance, O'Donnell and Ms. Brightwell operated RFL together and worked

12  closely side by side for countless hours through day and at night to develop business, fulfill

13  contract deliverables and to manage the company.  Working in a home office, business and

14  personal time overlapped, making RFL priorities a constant and dominating presence in their daily

15  lives.  In particular, they strategized together regarding the company's operation, identified new

16  business opportunities, met with existing and new clients, trained employees, completed

17  performance reviews of employees and travelled together to support locations.  Ms. Brightwell

18  was involved in all company operational decisions, including new hires, proposals, new business

19  contacts/development, and detail build-up of new business bidding.  And, while RFL employees

20  received performance reviews, O'Donnell and Ms. Brightwell never received any.  Instead, they

21  together reviewed the performance of the RFL employees and determined appropriate

22  compensation and bonuses.

23      22.   In addition, Ms. Brightwell permitted RFL to use her home for its business

24  operations.  Ms. Brightwell's home is located at 787 Esperanza Place, Chula Vista, California

25  91914.   Ms. Brightwell and O'Donnell lived together in this house from December 2008 until

26  early August 2012, when O'Donnell moved out of the home.  Although both made alternating

27  monthly mortgage and utility payments to share living expenses, Ms. Brightwell made the initial

28  down payment to purchase the home and has sole legal title.

23.     During this time, RFL operated its business from the front, living room of Ms. Brightwell's home, as evidenced on business cards, brochures, contracts and invoices, payroll and bank accounts. No rent was paid by RFL for this office space.

24.     Furthermore, Ms. Brightwell permitted RFL to use her vehicle from 2007 through 2009 for business purposes. There was no other company car during this time period. Thereafter, her vehicle was used by the company for business purposes frequently. In particular, more recently, during June and July 2012 it was used by employees full time to off-set contract incurred travel expenses. Ms. Brightwell never received any compensation or reimbursement for this use.

25.     Ms. Brightwell also frequently purchased at her own expense business supplies such as desks, chairs, filing cabinets, printers, routers, software, and office supplies. Reimbursement for any of these purchases was not realized until RFL hired an office manager, Liz Hendrix, in November 2010 who compiled expenses going back as far as 2007. But, even then, many of these items and other expenses remain unreimbursed. Ms. Brightwell also used her personal laptop to conduct RFL business until it broke and was later replaced with a new one.

26.     Consistent with her ownership interest in RFL, O'Donnell held Ms. Brightwell out to others as an owner in the business. When O'Donnell introduced Ms. Brightwell to clients, business contacts and friends, he referred to RFL as "our business," "our company" or explained that he and Ms. Brightwell "have our own business."

27.     Likewise, O'Donnell prepared and, on October 16, 2007, submitted a resume for Ms. Brightwell to RFL's prime contractor, AMSEC, to qualify her to perform work for NSWC, and to use for proposals to validate qualified personnel. (*See* Exhibit B.) That resume identifies Ms. Brightwell as a "Member" of RFL, and as such, an owner of the limited liability company. (*See* Exhibit B.)

28.     In response to this submission, AMSEC requested that O'Donnell add to the resume Ms. Brightwell's work experience broken down by month. As a result, O'Donnell submitted Ms. Brightwell's resume to AMSEC a second time, within 24 hours, on October 17, 2007, with the additional requested month and year information for periods of employment. (*See* Exhibit C.)

29.     In particular, O'Donnell included information indicating that Ms. Brightwell began working for RFL in January 2007.  This information happens to be located on the revised resume just above where Ms. Brightwell is identified in plain sight as a "Member" of RFL.  (*See* Exhibits B and C.)

30.     In early 2008, O'Donnell introduced Ms. Brightwell to Commander Chong Hunter, the Director of Logistics at NSWC in Coronado, who was the primary customer contact and person responsible for overseeing the SWALIS project.  At that time, O'Donnell introduced Ms. Brightwell to Commander Hunter by using words to the effect that she was his business partner at RFL.

31.     From 2008 through 2010, Commander Hunter worked very closely with both Ms. Brightwell and O'Donnell.  In the Spring of 2010, O'Donnell and Ms. Brightwell had face-to-face conversations with Commander Hunter about RFL potentially servicing the government contract directly with the Navy.

32.     As part of these discussions, O'Donnell and Ms. Brightwell explored with Commander Hunter the possibility of RFL applying for the prime contractor position as a Section 8(a) small business.  Section 8(a) of the Small Business Investment Act of 1958 provides assistance to small businesses that are owned and controlled at least 51% by socially and economically disadvantaged individuals, like women and minorities.  If RFL qualified as a Section 8(a) small business, then the government would have the option of awarding a contract to it directly without the need of going through a competitive bidding process.

33.     During these discussions regarding RFL applying as a Section 8(a) small business, O'Donnell told Commander Hunter that they could increase Ms. Brightwell's ownership interest in RFL to give her a majority ownership position in the company.  In this manner, RFL would be a woman owned small business for purposes of qualifying for Section 8(a) status.

34.     Eventually, RFL decided instead to partner with an Alaska Native owned company called NTVI (who provided the computer programmers to write the code) for purposes of qualifying for Section 8(a) status.

/ / /

7

35.     After RFL teamed up with NTVI to obtain the SWALIS contract in 2010, it hired former AMSEC employees to meet the contract requirements.  To make payroll, RFL needed to borrow money.  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell tried to obtain a line of credit or a business loan with Bank of America and was turned down twice.  With not enough money coming in, Ms. Brightwell stepped up and contributed an initial amount of $15,000 on July 13, 2010, so RFL could make payroll.  She obtained this money through a home equity line of credit ("HELOC") on her house.

36.     From July to December 2010, Ms. Brightwell ultimately made loans to RFL totaling $59,000 using both the HELOC and an advance on her credit card.

37.     These investments came at a critical time for RFL.  Payment on invoices were delayed by AMSEC and the new contract payments were delayed by government processing.  With little income coming in, and O'Donnell unable to obtain a loan, Ms. Brightwell is informed and believes and based thereon alleges that RFL would not have made payroll without Ms. Brightwell's financial loans.

38.     As a result of acquiring and being able to perform under the SWALIS contract, RFL grew rapidly in 2010.  In fact, O'Donnell, as Managing Member of RFL, acknowledged Ms. Brightwell's extraordinary contributions and in a letter to her, he wrote: "Thank you for taking ownership with me on SWALIS! It's good to not be alone at the top." (*See* Exhibit D.)

39.     Eventually, all loans were paid back by January 2011, and Ms. Brightwell was reimbursed for the interest accrued by the HELOC and the transaction fee incurred on her credit card advance.  Ms. Brightwell, however, did not profit from these loans, nor did she expect to because she understood RFL as her business with O'Donnell.

40.     From time to time, Ms. Brightwell would raise with O'Donnell the need to document her ownership in RFL.  Each time, O'Donnell would let Ms. Brightwell know that everything was alright and he would give some excuse for why the documentation could wait.  The most common excuse O'Donnell gave was that they were too busy with handling deliverables for contract fulfillment to tend to this type of an internal, administrative matter.  On more than one occasion, O'Donnell explained that it really didn't matter anyways because Ms. Brightwell would

PLAINTIFF'S FIRST AMENDED COMPLAINT

own everything mutually when she married him.  During these discussions, O'Donnell would use emotional blackmail, challenging Ms. Brightwell by asking if the business was more important to her than the relationship.  O'Donnell certainly never explained to Ms. Brightwell that he lied to her or never intended for her to be an owner in RFL.  Wishing to not strain their personal relationship, as O'Donnell was volatile at times with anger bursts, Ms. Brightwell did not press the issue, and although she was disappointed in his diversion, she trusted him, eventually accepting O'Donnell's response and continuing to expect he would honor his word.

41.     In January 2012, O'Donnell and Ms. Brightwell travelled on a cruise with some friends.  During the cruise, O'Donnell proposed to Ms. Brightwell by asking her, "would you consider marrying me?"  She said, "yes."  O'Donnell asked Ms. Brightwell to marry him in that way because he and Ms. Brightwell had agreed that O'Donnell would need to go six months without losing his temper before they became married.

42.     On that same cruise, a close personal friend of both O'Donnell and Ms. Brightwell asked O'Donnell privately when he was going to officially document Ms. Brightwell's ownership in the company.  O'Donnell stared blankly and said nothing in response.  This surprised their friend because O'Donnell is a talkative person.  It would seem as though someone who was so unequivocally clear on the ownership of RFL would not be lacking for words.  But here, O'Donnell did not deny the shared ownership.

43.     For several years, Ms. Brightwell provided the human resources role for RFL. During this time, several company employees complained to Ms. Brightwell about O'Donnell's verbal abuse and bullying.   Sometimes when Ms. Brightwell spoke to O'Donnell about these events, he calmed down and apologized to the employee.  On other occasions, he would just become more agitated and further the abuse.

44.     This behavior by O'Donnell, is part of a pattern and history of yelling, blaming and bullying Ms. Brightwell and others.  This conduct happened privately and publically, in front of his children, Ms. Brightwell's children, employees and in public places.  On several occasions, O'Donnell was reprimanded by RFL's main contractor for his verbal abuse during telephone

/ / /

1  conferences.  Most of the time, O'Donnell would be remorseful and promise not to repeat this

2  behavior.

3      45.    Until last year, O'Donnell and Ms. Brightwell were engaged to be married.  On

4  March 14, 2012, however, O'Donnell began yelling at Ms. Brightwell, while she sat in bed.  When

5  she reached over to him to stop the obscenities and insults, O'Donnell grabbed her hands, held her

6  down on the bed, his face inches from hers, while continuing to verbally abuse her.

7      46.    O'Donnell later apologized and admitted to Ms. Brightwell that he had failed her in

8  their relationship and could not make her happy.  O'Donnell appeared to be extremely remorseful

9  and saddened by his uncontrollable temper.

10      47.    The parties sought counseling after this incident, but could not reconcile their

11  personal relationship.  They agreed to end their personal relationship, but maintain a business

12  relationship.

13      48.    On May 23, 2012, Ms. Brightwell and O'Donnell discussed options and a plan for

14  how to end their personal relationship, while continuing to handle the RFL business.  O'Donnell

15  requested that Ms. Brightwell remain involved in operating and working at RFL, as her departure

16  would leave RFL unable to fulfill neartime contract deliverables and support.  Ms. Brightwell

17  suggested that she would handle an RFL project in Hawaii during the summer, while O'Donnell

18  would continue to live in Ms. Brightwell's house because his daughters, Stephanie and Hope, were

19  visiting in California for the summer.  Ms. Brightwell believed this would give O'Donnell and her

20  time apart and allow O'Donnell a peaceful environment for his children's visit.

21      49.    Previously, in late March 2012, Ms. Brightwell requested that they move the RFL

22  office out of her house and into a more appropriate commercial space.  O'Donnell agreed that they

23  needed to find commercial space for their business.  During the May 23 meeting, Ms. Brightwell

24  again raised the need to move their business to a commercial space.  O'Donnell promised he

25  would move the RFL office out of the house and into a commercial space before Ms. Brightwell

26  returned from Hawaii at the end of July.

27      50.    At the end of the May 23 meeting, Ms. Brightwell explained that she would

28  continue working as Vice President for RFL, but her expectation was that if she left the company,

1  she would receive a payment equal to two years of her current salary.  O'Donnell responded in

2  surprise that this was $370,000.  Ms. Brightwell nodded in agreement and then asked O'Donnell

3  to propose his best plan.  O'Donnell said he would think about it.

4       51.     The next day, on May 24, O'Donnell sent Ms. Brightwell an email entitled, "Trying

5  to Settle Your Heart . . . a Little."  In the email, O'Donnell reiterated his desire to have

6  Ms. Brightwell continue working at RFL with the possibility of supporting the SWALIS project

7  from outside of San Diego, if she moved.  He confirmed his promise to have the RFL office out of

8  Ms. Brightwell's house by the time she returned from Hawaii.  O'Donnell also offered Ms.

9  Brightwell the amount of $100,000 as severance for when she decided to leave the company.  In

10  return, he asked for a two year non-compete agreement.  (*See* Exhibit E.)

11       52.     On that same day, May 24, Ms. Brightwell replied to O'Donnell's email by

12  informing him that while she could not adequately respond that day, in general, she accepted some

13  of what he said, and disagreed with other parts of his email.  (*See* Exhibit E.)

14       53.     From June 2012 onward, there was a marked difference with how O'Donnell

15  treated Ms. Brightwell at work.  He stopped keeping her informed of new business developments,

16  he avoided contact with her, he would not respond or even acknowledge many business emails,

17  and she was no longer included in employee interviews.

18       54.     When Ms. Brightwell confronted O'Donnell about his behavior, he denied that

19  anything was different.  However, Ms. Brightwell is informed and believes and based thereon

20  alleges that, as O'Donnell had admitted many times before, he could not separate his personal life

21  from his work life.  As O'Donnell and Ms. Brightwell were no longer personally involved,

22  O'Donnell, without notice or discussion, unilaterally changed the business relationship.

23       55.     O'Donnell's change in behavior towards Ms. Brightwell and his attempts to shut

24  her out of the business not only negatively impacted their business relationship, but it also

25  interfered with RFL's operations.  For instance, working on a high profile project at the Hawaii

26  SDVT-1 base at the request of Captain Kevin Jones, Ms. Brightwell sought input, brainstorming

27  and personnel support from O'Donnell.  O'Donnell was unavailable, and several times too busy

28  on personal matters during work days to provide support and conference on deliverables.

11

1   Likewise, Ms. Brightwell was repeatedly contacted by NSWC while she was in Hawaii and on
2   vacation in August to address correcting dashboard reports and SWALIS processes that O'Donnell
3   was in charge of designing and providing to NSWC.

4        56.    With summer looming, Ms. Brightwell traveled to Hawaii on June 9, 2012 to
5   support RFL's clients there for a 7-week period.  O'Donnell stayed at Ms. Brightwell's home for
6   the summer with his children.

7        57.    Concerned for the future wellbeing of RFL and hoping to address O'Donnell's
8   sudden adverse change in their working relationship, Ms. Brightwell repeatedly tried to discuss
9   with O'Donnell his behavior and resolve the tension that existed in their business relationship.
10  Each time, however, O'Donnell would be argumentative, and deny his evasiveness, thereby
11  escalating the tension.

12       58.    On June 15, 2012, while in Hawaii, Ms. Brightwell recalled that it was the 5-year
13  anniversary of when she moved to San Diego to join RFL.  She again attempted to open up the
14  lines of communication with O'Donnell to address O'Donnell's sudden adverse change in their
15  working relationship by sending him an email that reminded him of how RFL grew over the last 5
16  years based on their teamwork.  At the end of the email, she asked O'Donnell, "I'd like to hear
17  what's in your heart and head." (*See* Exhibit F.)

18       59.    That same day, on June 15, O'Donnell responded to Ms. Brightwell by
19  acknowledging that they "have done much together with RFL" and that he was "truly
20  appreciative."  But in advising Ms. Brightwell that he would give her a "much deserved, well
21  thought out reply," O'Donnell added, "[a]s you know, I have always tied it all together . . . life,
22  work, personal." (*See* Exhibit F.)

23       60.    On the morning of August 2, 2012, O'Donnell and Ms. Brightwell had a telephone
24  conversation about changes in new employee processing.  During the discussion, O'Donnell again
25  stated that he could not separate their personal relationship from their business relationship.  That
26  it was all one for him.  Later that night, Ms. Brightwell sent O'Donnell an email asking him to
27  complete his June 15 response from over a month and a half ago.  Given O'Donnell's repeated
28  statements that his personal life and work life were all one, Ms. Brightwell also inquired whether

1   the change in how O'Donnell treated her at work was caused by the end of their personal

2   relationship. (*See* Exhibit F.)

3       61.     Three days later, on August 5, 2012, O'Donnell, like a scorned lover who was

4   clearly irritated by Ms. Brightwell's August 2 email, demanded that she "cease and desist" from

5   any "displays" which "disrespect me, minimize or challenge my authority, or any de-edification of

6   my role as the sole owner and leader of RF Logistics, LLC." He added, "you have not earned the

7   right to challenge my authority as the owner of this company."   All of O'Donnell's prior

8   references to "our company," had now all of a sudden become "my company." (*See* Exhibit F.)

9       62.     Previously, on August 1, 2012, O'Donnell had rented a nearby house.

10  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell moved most of

11  his belongings out of her home on August 3 through 5, and began occupying his new residence.

12      63.     During O'Donnell's move, Ms. Brightwell was away on vacation with her son.

13  When Ms. Brightwell returned to her home on August 13, 2012 she found it in complete disarray.

14  Walls, woodwork and carpet were damaged from O'Donnell's move.    In addition,

15  Ms. Brightwell's home was infested with flies, the refrigerator was full of rotting food, and the

16  lawn was brown in large spots from lack of water.  Further, windows had been left open with the

17  air-conditioner running so as to cause excessive electric bills.  At that moment, Ms. Brightwell

18  was beside herself.  Not only had O'Donnell unilaterally changed their business arrangement,

19  thereby breaking his promise of ownership to Ms. Brightwell, but he had also damaged her home.

20      64.     Concerned with further damage to her home, and knowing that O'Donnell had

21  already moved out, Ms. Brightwell changed the locks on her home on August 14, 2012.

22  Ms. Brightwell recognized that her past efforts to communicate with O'Donnell had failed, but she

23  hoped this would motivate him to have a face to face meeting about their deteriorating business

24  relationship and his abrupt unwillingness to recognize her ownership interest in RFL.

25      65.     Prior to changing the locks on her home, Ms. Brightwell confirmed with RFL's

26  office manager, Liz Hendrix, that there was no pressing work that had to be done in the next few

27  days.  Ms. Brightwell fully expected that she and O'Donnell would be able to resolve their

28  business dispute once they finally spoke in person, and she was anxious to clear the air with

1    O'Donnell.  At the very least, she believed that an arrangement with O'Donnell would be made for
2    access to her home to transition the RFL business into a proper commercial space, as O'Donnell
3    had repeatedly promised in the past to do.

4        66.    That same day, August 14, Ms. Brightwell sent an email to O'Donnell informing
5    him that she had changed the locks on her home and that he was not to enter it without her being
6    present.  She requested an in-person discussion about their deteriorating business relationship.
7    (*See* Exhibit F.)

8        67.    Later that day, on August 14, O'Donnell responded by asking Ms. Brightwell what
9    is her objective and goal.  The next day, on August 15, Ms. Brightwell responded that she needed
10   for O'Donnell to hear what she was saying, as opposed to ignoring her like he was doing, and
11   reach agreement as to how they both ran the company like they had been doing prior to ending
12   their personal relationship.  She was intensely interested in the ongoing success of RFL, and as an
13   owner recognized that cooperating, not fighting, was the best means.  She also sent a follow-up
14   email letting O'Donnell know how uncomfortable she had been since May when he unilaterally
15   changed how they worked together.  (*See* Exhibit F.)

16       68.    On August 15, Liz Hendrix, RFL's office manager, spoke with Ms. Brightwell to
17   let her know that O'Donnell had accused her of collusion, and that she felt threatened by his words
18   and demeanor.  Ms. Hendrix explained that O'Donnell accused her of "aiding and abetting"
19   Ms. Brightwell in an "assault" on the company.  The next week Ms. Hendrix was admitted to their
20   hospital with a mild heart attack.  Ms. Brightwell is informed and believes and based thereon
21   alleges that after this event, Ms. Hendrix avoids being alone with O'Donnell.

22       69.    Ms. Brightwell arrived at her desk at the military base in Coronado on August 17,
23   2012, arriving that morning from out of town, and began work as usual.  O'Donnell was at his desk
24   and they agreed to meet later to discuss the business relationship.  On a team call, O'Donnell acted
25   normal and confirmed upcoming work assignments, including those involving Ms. Brightwell.
26   They left the base at 3:00 p.m. to meet at a park near the base.

27   ///

28   ///

70.     During this meeting on August 17 at Glorietta Bay Park, O'Donnell and Ms. Brightwell discussed their differences regarding the business, but were unable to reach an agreement.

71.     O'Donnell then pulled out a letter to give Ms. Brightwell.  Not knowing, but suspecting that the letter contained unsubstantiated accusations similar to O'Donnell's recent emails, Ms. Brightwell shook her head and said, "not to go there."  O'Donnell agreed and put away the letter.   Ms. Brightwell then asked O'Donnell if he had the $9,306.16 travel expense reimbursement that he had promised to give her that day.  He did not have it.

72.     O'Donnell then told Ms. Brightwell "to hold onto her seat," as he had something to tell her.  He confessed to breaking into Ms. Brightwell's home and taking all of the office files, computer, his clothes and his daughter's belongings without her knowledge or consent on August 14.  He told Ms. Brightwell she did not have any leverage in the discussions and that he had it all.  O'Donnell had ignored her request to not trespass into her home and then deceitfully kept this information from her for three days.

73.     Ms. Brightwell said nothing more.  She was understandably upset.  She stood up and walked away.  O'Donnell told her to not walk away.  He called after Ms. Brightwell and asked her to come back and talk.  She kept walking.

74.     Because the parties had shared vehicles, Ms. Brightwell had a set of O'Donnell's car keys.  To get back at O'Donnell, Ms. Brightwell thought of driving away in his car and stranding him in the park.  As she passed her vehicle and approached his (they were parked two vehicles away from each other), she unlocked his car with the remote.  O'Donnell ran up quickly behind Ms. Brightwell, calling to her to not walk away and yelled at her to give him his keys.  She did not respond.

75.     O'Donnell then grabbed Ms. Brightwell from behind and tried to wrench the keys from her hand.   She bent over in protection and slipped the keys back inside her pocket.  Ms. Brightwell broke away from O'Donnell and ran to her car.  She opened the door and got the keys into the ignition.  O'Donnell followed Ms. Brightwell and before she could close the door, he reached across the steering wheel, pinning her arms against the steering wheel, and smashing her

1 | hands into her keys, while wrenching them away from the ignition.  Ms. Brightwell incurred cuts
2 | and bruises from the struggle.

3 | 76.   After O'Donnell succeeded in stealing Ms. Brightwell's keys, he backed out of her
4 | car and stood a few feet away.  He now had her car, house, and mailbox keys.  Having just
5 | discovered that O'Donnell had broken into her home, she was terrified that he had those keys.

6 | 77.   Ms. Brightwell asked O'Donnell to return her keys, and when he refused, dangling
7 | them high in his right hand, she then reached to take the keys from his hand. O'Donnell threw
8 | Ms. Brightwell to the ground, ripping her watch from her arm and breaking the band.
9 | Ms. Brightwell's watch lay on the ground and her shoes had come off.

10 | 78.   When Ms. Brightwell was finally able to stand up, she pulled out her cell phone
11 | and considered if she should call the police.  She muttered, "I should call the police."  O'Donnell
12 | moved toward her and demanded that she not call the police.  Confused, frightened and humiliated
13 | by this public physical abuse, and wanting to just get away, Ms. Brightwell put the phone back in
14 | her pocket.  She picked up her watch and shoes and saw O'Donnell go to her car on the driver's
15 | side where the door still stood open.

16 | 79.   O'Donnell leaned into her car, and Ms. Brightwell was afraid he intended to steal
17 | more of her belongings, damage the car, or drive away in it.  Ms. Brightwell ran up behind him,
18 | but she knew she did not have the strength to pull a 265-pound man from her car.  O'Donnell
19 | turned around quickly and knocked Ms. Brightwell back to the ground.  He then moved away
20 | from her car and she scrambled in quickly and found her extra set of keys.

21 | 80.   O'Donnell leaned against the inside of her open car door and would not let
22 | Ms. Brightwell back out.  Ms. Brightwell tried to push O'Donnell away from blocking the car
23 | door, with her left arm, telling him to move, but he would not budge.  She put her car in reverse
24 | and he then moved away.

25 | 81.   Ms. Brightwell drove directly to the police station in Coronado.  O'Donnell
26 | followed her until she arrived at the station.  He then drove away.

27 | / / /

28 | / / /

82.    Ms. Brightwell filed an assault report.  The police took photographs of her bruised and cut arms, hands, broken watch, and scraped toe.  The police told her they would call O'Donnell and ask him to come to the station, and if located, arrest him that evening.

83.    Ms. Brightwell called the police department the next day on Saturday, August 18. The police confirmed that they had probable cause and had arrested O'Donnell earlier that morning.  She asked if they had retrieved her keys and they told her O'Donnell said he did not have any keys but his own.

84.    Later that same day, Ms. Brightwell found a text message from O'Donnell on her cell phone that stated that her employment was terminated as of August 18, and that she was not to represent RFL.

85.    On August 20, 2012, Ms. Brightwell went to the San Diego Superior Court courthouse in Chula Vista to file an official eviction notice so that O'Donnell would not have any claim to be allowed in her home again.  O'Donnell was sitting on a bench in the courthouse.  She asked him whether he still wanted to remove some of his remaining belongings from her home. O'Donnell said he intended to get them, and Ms. Brightwell told him that a neighbor would make arrangements with him.  Ms. Brightwell asked if O'Donnell still had her keys.  He said, "yes." The next day, on August 21, Ms. Brightwell was served with a domestic violence temporary restraining order filed by O'Donnell.  Ms. Brightwell is informed and believes and based thereon alleges that O'Donnell filed the domestic violence temporary restraining order to punish Ms. Brightwell for reporting him to the police.

86.    Two days later, on August 22, Ms. Brightwell received a letter dated August 18 from O'Donnell on RFL letterhead stating that she was "terminated for cause," but without any explanation. (*See* Exhibit G.)  That same day, she also received a warning memo dated August 17, 2012. (*See* Exhibit H.)

87.    Ms. Brightwell was also therefore subjected to sexual harassment.  Soon after Ms. Brightwell ended the sexual relationship between her and O'Donnell, O'Donnell terminated Ms. Brightwell's employment with RFL, and attempted to terminate her ownership interest in RFL.

///

17

PLAINTIFF'S FIRST AMENDED COMPLAINT

88.     On September 6, 2012, O'Donnell voluntarily dismissed his request for a domestic violence restraining order.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against RFL and DOES 1-25)

89.     Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 86, inclusive, as though fully set forth herein.

90.     Between February 2006 and June 2007, in a series of discussions, O'Donnell, as agent for RFL, offered Ms. Brightwell the opportunity to join him as an equal owner to help build RFL.

91.     During this time period, the parties entered into an oral agreement when Ms. Brightwell accepted that offer with the understanding that she was to have significant ownership interest in the company.

92.     Ms. Brightwell invested significant time, effort, money and other resources into RFL over a five year time period with the understanding that she was an equal owner in the company.

93.     Aside from her financial investments in RFL, Ms. Brightwell took on significant leadership and substantive responsibilities in the company that directly contributed to RFL's success, as discussed above.

94.     Ms. Brightwell has performed all conditions, covenants and promises required on her part to be performed in accordance with the terms and conditions of the contract, except to the extent that they were prevented or excused from performing by Defendants' breach.

95.     Defendants breached the oral agreement by failing to transfer ownership in RFL to Ms. Brightwell.

96.     Defendants further breached the agreement by terminating Ms. Brightwell from RFL without any compensation for her ownership in the company.

97.     As a direct and proximate result of Defendants' breach, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

/ / /

## SECOND CAUSE OF ACTION

### (Promissory Estoppel Against and RFL and DOES 1-25)

98.     Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 95, inclusive, as though fully set forth herein.

99.     Between February 2006 and June 2007, in a series of discussions, O'Donnell, as agent for RFL, made certain promises and representations to Ms. Brightwell, on which he knew or should have known that Ms. Brightwell would be reasonably induced to rely.  For example, O'Donnell promised Ms. Brightwell that if she joined him at RFL, she would be an equal owner in the business.

100.     Ms. Brightwell relied reasonably and foreseeably, to Ms. Brightwell's detriment, on the promises and representations to make her an owner.  For example, as discussed above in detail, Ms. Brightwell invested significant time, effort, money and other resources in RFL with the understanding that she was an owner in the company.

101.     By holding Ms. Brightwell out as an owner of RFL to the public and by preparing resumes that identified Ms. Brightwell as a "Member" in RFL, Defendants recognized the promises and representations made to Ms. Brightwell.

102.     Nonetheless, Defendants have not performed any of the promises or representations.  In fact, Ms. Brightwell was wrongfully terminated from RFL without any compensation for her ownership in the company.

103.     As a direct and proximate result of Defendants' failure to perform according to the promises and representations made by Defendants, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

### (Promissory Fraud Against All Defendants)

104.     Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 101, inclusive, as though fully set forth herein.

/ / /

/ / /

105.   Between February 2006 and June 2007, in a series of discussions, O'Donnell, as an agent of RFL, promised Ms. Brightwell that she would be an equal owner in RFL if she joined the company.

106.   Ms. Brightwell is informed and believes and based thereon alleges that Defendants knew, based on conversations between the parties that led to the agreement, that an ownership interest in RFL was an important and material part of Ms. Brightwell's decision to move to California to join RFL.

107.   Unbeknownst to Ms. Brightwell, at the time Defendants made the promise and the agreement was entered into, Defendants never intended to honor their promise to make Ms. Brightwell an equal owner.

108.   The misrepresentations made by Defendants regarding Ms. Brightwell's status as an equal owner were intended to induce reliance by Ms. Brightwell to enter into a business agreement with Defendants, relocate to California, and join RFL.

109.   Ms. Brightwell reasonably relied on Defendants' promise, based on representations and assurances she received from O'Donnell that she would be an equal owner in RFL.   In reliance on Defendants' promise, Ms. Brightwell moved to San Diego from Hawaii on June 15, 2007, and invested significant time, effort, money and other resources in RFL.

110.   Instead of adhering to the promise to make Ms. Brightwell an equal owner of RFL, Ms. Brightwell is informed and believes and based thereon alleges that Defendants terminated Ms. Brightwell on a false pretense to avoid the company's obligation.   Defendants engaged in deceitful conduct by ignoring their promise to Ms. Brightwell.

111.   Because O'Donnell's fraudulent conduct as an agent of RFL is wrongful in its nature, he is personally liable.

112.   As a direct and proximate result of Defendants' failure to perform according to the promise, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

/ / /

/ / /

PLAINTIFF'S FIRST AMENDED COMPLAINT

113.   Defendants acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others.   As a consequence, Ms. Brightwell is entitled to an award of punitive damages against Defendants according to proof.

## FOURTH CAUSE OF ACTION

### (Fraud in the Inducement Against All Defendants)

114.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 111, inclusive, as though fully set forth herein.

115.   Ms. Brightwell's willingness to assent to terms of the agreement with Defendants was caused by material, fraudulent misrepresentation made by O'Donnell, as an agent of RFL, in a series of discussions that took place between February 2006 and June 2007.   In particular, O'Donnell promised Ms. Brightwell that she would be an equal owner in RFL if she joined the company.

116.   Ms. Brightwell is informed and believes and thereon alleges that Defendants, at the time the representation was made to Ms. Brightwell that she would be an equal owner of RFL if she joined the company, had no intention of complying with the representation.

117.   Defendants knew that their representations to Ms. Brightwell were false when they were made.

118.   Defendants' representation was made with the intent to induce reliance by Ms. Brightwell and to entice Ms. Brightwell to enter into a business agreement with Defendants, relocate to California, and join RFL.

119.   Because O'Donnell's fraudulent conduct as an agent of RFL is wrongful in its nature, he is personally liable.

120.   In reasonable reliance on Defendants' representation, Ms. Brightwell moved to San Diego from Hawaii on June 15, 2007, and invested significant time, effort, money and other resources in RFL, believing that Defendants intended to honor their representations and the agreement between the parties and that she was an owner of RFL.

/ / /

/ / /

121.   As a direct and proximate result of Defendants' failure to perform according to the promise, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

122.   Defendants acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others.  As a consequence, Ms. Brightwell is entitled to an award of punitive damages according to proof.

## FIFTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Labor Code Section 1102.5 Against RFL and DOES 1-25)

123.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 120, inclusive, as though fully set forth herein.

124.   On August 17, 2012, Ms. Brightwell reported to the Coronado Police Department unlawful behavior of O'Donnell, an agent of RFL, which included that he physically assaulted her.

125.   On Saturday, August 18, 2012, O'Donnell terminated Ms. Brightwell's employment by text message in retaliation for Ms. Brightwell reporting his unlawful behavior to the police.

126.   Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a motivating reason for Ms. Brightwell's discharge.

127.   A clear "nexus" exists between the termination and Ms. Brightwell's protected activity, which occurred hours apart.

128.   As a direct, foreseeable and proximate result of her wrongful termination, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.  The nature and the extent of Ms. Brightwell's damages are significant in that she has been humiliated, suffered emotional distress, lost income and was forced to leave behind her significant investment of resources and money in RFL.

129.   Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order

///

1  to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages

2  against all Defendants.

3  ### SIXTH CAUSE OF ACTION

4  **(Wrongful Termination in Violation of Fair Employment and Housing Act Against All Defendants)**

5

6  130.   Ms. Brightwell alleges and incorporates by this reference the allegations of

7  paragraphs 1 through 127, inclusive, as though fully set forth herein.

8  131.   Defendants violated FEHA by committing unlawful, discriminatory acts during the

9  August 17, 2012 meeting and thereafter.  These acts include, but are not limited to, O'Donnell, as

10  agent for RFL, imposing his will on Ms. Brightwell by asserting his strength and power over her.

11  Ms. Brightwell is informed and believes that her gender was a motivating factor of O'Donnell's

12  actions, as he would not have done this to a male employee.

13  132.   On August 17, 2012, Ms. Brightwell reported that O'Donnell physically assaulted

14  her to the Coronado Police Department.

15  133.   On August 18, 2012, O'Donnell terminated Ms. Brightwell's employment by text

16  message in retaliation for Ms. Brightwell reporting his unlawful, discriminatory behavior to the

17  police.

18  134.   Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a

19  motivating reason for Ms. Brightwell's discharge.

20  135.   A clear "nexus" exists between the termination and Ms. Brightwell's protected

21  activity, which occurred hours apart.

22  136.   RFL failed to maintain a work environment free of harassment, discrimination and

23  retaliation, and failed to prevent such illegal conduct from occurring.

24  137.   RFL knew or should have known about the retaliation and encouraged, participated

25  in, ratified or condoned the retaliation.

26  138.   As a direct, foreseeable and proximate result of her wrongful termination, Ms.

27  Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of

28  trial.  The nature and the extent of Ms. Brightwell's damages are significant in that she has been

1  humiliated, suffered emotional distress, lost income and was forced to leave behind her significant

2  investment of resources and money in RFL.

3      139.   Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an

4  agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order

5  to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages

6  against all Defendants.

7  **SEVENTH CAUSE OF ACTION**

8  **(Wrongful Termination in Violation of Public Policy Against RFL and DOES 1-25)**

9      140.   Ms. Brightwell alleges and incorporates by this reference the allegations of

10  paragraphs 1 through 137, inclusive, as though fully set forth herein.

11      141.   Ms. Brightwell was terminated several hours after O'Donnell physically assaulted

12  her and Ms. Brightwell reported him to the Coronado Police Department.

13      142.   Ms. Brightwell reporting O'Donnell to the Coronado Police Department was a

14  motivating reason for Ms. Brightwell's discharge.

15      143.   This termination was a violation of the public policy which encourages individuals

16  to report domestic violence.  (See, e.g., Penal Code §13701(a) ["domestic violence is alleged

17  criminal conduct"]; Penal Code §13701(c) [Legislature has mandated that every law enforcement

18  agency develop and implement written policies and standards for officers' responses to domestic

19  violence calls]; Evid. Code §1107 [allows for expert testimony regarding effects of battered

20  women's syndrome].)

21      144.   A clear "nexus" exists between the termination and Ms. Brightwell's protected

22  activity, which occurred hours apart.

23      145.   As a direct, foreseeable and proximate result of her wrongful termination, Ms.

24  Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of

25  trial.  The nature and the extent of Ms. Brightwell's damages are significant in that she has been

26  humiliated, suffered emotional distress, lost income and was forced to leave behind her significant

27  investment of resources and money in RFL.

28  / / /

146.    Because the acts taken toward Ms. Brightwell were carried out by O'Donnell, an agent of RFL, in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Ms. Brightwell, Ms. Brightwell requests an award of punitive damages against all Defendants.

## EIGHTH CAUSE OF ACTION

### (Assault and Battery Against All Defendants)

147.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 144, inclusive, as though fully set forth herein.

148.    On or about August 17, 2012, during the course and scope of employment, O'Donnell, as agent of RFL, committed assault and battery against Ms. Brightwell during a business meeting to discuss their future handling of RFL.

149.    As discussed above, through threatening conduct and words O'Donnell intended to cause and did cause Ms. Brightwell to be apprehensive of harmful contact.

150.    As discussed above in detail, that meeting culminated in a physical altercation in which O'Donnell repeatedly knocked Ms. Brightwell to the ground and caused her to be bruised, cut and generally afraid for her safety.

151.    As a direct and proximate result of the assault and battery described above, Ms. Brightwell was seriously and painfully injured about the body and limbs, and suffered severe emotional distress, and was otherwise damaged in an amount to be proven at the time of trial.

152.    O'Donnell, as an agent of RFL, acted oppressively, fraudulently, maliciously, and with conscious disregard of the rights of others.  As a consequence, Ms. Brightwell is entitled to an award of punitive damages according to proof.

## NINTH CAUSE OF ACTION\

### (Intentional Infliction of Emotional Distress Against All Defendants)

153.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 150, inclusive, as though fully set forth herein.

154.    As discussed above in detail, the conduct of O'Donnell, an agent of RFL, at the August 17 business meeting in Coronado was extreme and outrageous.

PLAINTIFF'S FIRST AMENDED COMPLAINT

155.    In doing the acts alleged herein, O'Donnell intended to cause emotional distress to Ms. Brightwell or acted with reckless disregard for the probability that Ms. Brightwell would suffer emotional distress to Ms. Brightwell.

156.    O'Donnell knew or should have known that his conduct would likely cause Ms. Brightwell severe emotional distress and mental suffering.

157.    As a direct and proximate result of the altercation, Ms. Brightwell suffered sever emotional distress, including suffering, anguish, anxiety, worry and shock.  Ms. Brightwell has incurred incidental expenses to treat her condition, including counseling.

158.    Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell, as an agent of RFL, acted with malice, oppression and with the intent to cause injury and emotional distress to Ms. Brightwell, or with reckless disregard of the probability of causing severe emotional distress to Ms. Brightwell.  The conduct was outrageous and warrants the award of punitive damages against all Defendants.

## TENTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress Against All Defendants

159.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 156, inclusive, as though fully set forth herein.

160.    By virtue of the business relationship,  Defendants owed a duty to Ms. Brightwell.

161.    Through the conduct alleged in this complaint, O'Donnell, as an agent of RFL, breached the duty by acting negligently and carelessly towards Ms. Brightwell at the August 17 business meeting.

162.    O'Donnell knew or should have known that his conduct would likely cause Ms. Brightwell serious emotional distress and mental suffering.

163.    Defendants' negligence was a substantial factor in causing Ms. Brightwell's serious emotional distress.

164.    As a result of the altercation, Ms. Brightwell suffered serious emotional distress, including suffering, anguish, anxiety, worry and shock.  Ms. Brightwell has incurred incidental expenses to treat her condition, including counseling.

**ELEVENTH CAUSE OF ACTION**

**(Violation of Labor Code Section 970 Against All Defendants)**

165.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 162, inclusive, as though fully set forth herein.

166.    In 2007, O'Donnell, as agent for RFL, promised Ms. Brightwell that she would be an equal owner of RFL if she joined RFL.  At that time, Ms. Brightwell resided in Hawaii, a distance of approximately 2,500 miles from the offered employment in San Diego County, California.

167.    When O'Donnell made these representations to Ms. Brightwell, he knew the statements were false because he had no intention of adhering to the representations and promises. Furthermore, he made these representations and promises with the intent that Ms. Brightwell would accept the position and relocate to San Diego.

168.    Ms. Brightwell reasonably relied on the representations and promises.  Based on the promises and representations, Ms. Brightwell accepted the position and moved to San Diego in June 2007.

169.    Nonetheless, instead of adhering to the representation and promise to make Ms. Brightwell an equal owner of RFL, Defendants terminated Ms. Brightwell on a false pretense to avoid the company's obligation.

170.    As a direct and proximate result of the false promises and representations, Ms. Brightwell accepted a position that required her to relocate from Hawaii to California.  As a result of the false representations, Ms. Brightwell has suffered, and continues to suffer, damages in an amount to be proven at the time of trial.

171.    Therefore, Defendants' actions violated Section 970 of the California Labor Code, and pursuant to Section 972, Ms. Brightwell is entitled to double damages.

**TWELFTH CAUSE OF ACTION**

**(Violation of Labor Code Section 2802 Against RFL and DOES 1-25)**

172.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 169, inclusive, as though fully set forth herein.

PLAINTIFF'S FIRST AMENDED COMPLAINT

173.   Labor Code section 2802 requires RFL to indemnify Ms. Brightwell for all necessary expenditures or losses she incurred in direct consequence of the discharge of her duties.

174.   As described above, Ms. Brightwell had expenditures and losses which were incurred in direct consequence of the discharge of her duties, or of her obedience of the directions of Defendants.

175.   To date, Defendants have failed to reimburse Ms. Brightwell for business related expenses.

176.   As a result of Defendants' violations, Ms. Brightwell is entitled to reimbursement of the incurred expenses, as well as attorneys' fees and costs, and interest.

### THIRTEENTH CAUSE OF ACTION

### (Violation of Labor Code Section 202 Against RFL and DOES 1-25)

177.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 174, inclusive, as though fully set forth herein.

178.   Section 201 of the Labor Code requires RFL to pay Ms. Brightwell all earned and unpaid wages immediately upon discharge from duty.   Labor Code Section 203 ensures that employees receive compensation due upon discharge and failure to pay results in the accrual of waiting time penalties.

179.   Ms. Brightwell was terminated on August 18, 2012.

180.   She did not receive her final paycheck until August 28, 2012.

181.   Therefore, Ms. Brightwell demands 11 days of pay, $7,920 ($720/day x 11 days), as penalty for not paying all wages due at the time of termination as provided by Section 203 of the Labor Code, plus interest, costs, and attorney's fees.

### FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief Against All Defendants)

182.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 179, inclusive, as though fully set forth herein.

183.   Ms. Brightwell seeks a judicial declaration regarding the ownership of RFL, specifically, that:

PLAINTIFF'S FIRST AMENDED COMPLAINT

184.   O'Donnell offered and promised Ms. Brightwell an equal ownership interest in RFL if she would join the company.  Ms. Brightwell accepted this offer, and in reliance, moved from Hawaii to San Diego and joined RFL, where she worked for a time period of over five years. As a result, Ms. Brightwell had and continues to have an ownership interest in RFL that is equal to O'Donnell's ownership interest in the company.

185.   An actual, present controversy exists as to Ms. Brightwell's ownership interest in RFL and Defendants' duties to acknowledge, document, and pay consideration for that ownership interest because Ms. Brightwell has demanded consideration for that ownership interest and Defendants have refused to acknowledge Ms. Brightwell's ownership interest in RFL.  A declaration of the rights, responsibilities, duties and obligations regarding the ownership interest is essential to determine and resolve the respective claims of the parties.  There is no other adequate or speedy remedy at law.

### FIFTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against O'Donnell and DOES 1-25)

186.   Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 183, inclusive, as though fully set forth herein.

187.   Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

188.   As Managing Member of RFL, O'Donnell owed a fiduciary duty to Ms. Brightwell, as a Member, and to RFL.

189.   Ms. Brightwell is informed and believes, and based thereon alleges that O'Donnell breached his fiduciary duty to Ms. Brightwell and RFL by taking actions that were contrary to RFL's interests, and therefore Ms. Brightwell's interests, and that compromised his fiduciary duty to Ms. Brightwell and RFL, including, but not limited to, mismanaging the operations of RFL, improperly transferring assets from RFL, subjecting RFL to potential tax liability from the taxing authorities, and subjecting RFL to potential adverse action by the United States government and others.

/ / /

190.    As a direct and proximate result of O'Donnell's breach of fiduciary duty, Ms. Brightwell has suffered damages in an amount in excess of the jurisdictional minimum of this Court, to be determined at trial.

191.    Ms. Brightwell is informed and believes, and thereon alleges, that in taking the actions alleged above, O'Donnell's conduct was malicious, fraudulent and/or oppressive, and justify an award of punitive damages in an amount appropriate to punish O'Donnell and to deter him from engaging in similar conduct in the future.

## SIXTEENTH CAUSE OF ACTION

### (Accounting Against All Defendants)

192.    Ms. Brightwell alleges and incorporates by this reference the allegations of paragraphs 1 through 200, inclusive, as though fully set forth herein.

193.    Ms. Brightwell was a Member with an ownership interest in RFL at the time of the actions about which she herein complains.

194.    Ms. Brightwell is informed and believes, and thereon alleges that at all times herein mentioned, RFL was, and still is, the owner and was, and still is, entitled to the possession of certain funds that were converted by O'Donnell for his personal use during the course of his relationship with RFL.

195.    Ms. Brightwell is informed and believes, and thereon alleges that a portion of those funds are due to and/or affect the value of her ownership interest in RFL.

196.    The amount of money due from RFL to Ms. Brightwell and/or the value of Ms. Brightwell's affected ownership interest is unknown to Ms. Brightwell and cannot be ascertained without an accounting.

197.    Ms. Brightwell has repeatedly demanded that Defendants account for the aforementioned amounts.  Defendants have failed and refused, and continue to fail and refuse, to provide Ms. Brightwell with the requested information.

198.    Accordingly, Ms. Brightwell requests that the Court order Defendants to prepare the accounting to which Ms. Brightwell is entitled.

/ / /

## SEVENTEENTH CAUSE OF ACTION

### (Sexual Harassment Against all Defendants)

199.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

200.    At all times mentioned herein, California Government Code section 12940 *et seq.* was in full force and effect and was binding on Defendants. This section requires Defendants, as employers, to refrain from sexually harassing any employee.

201.    Plaintiff was sexually harassed by Defendant O'Donnell, as alleged herein.  Such actions are unlawful, in violation of California Government Code section 12940 *et seq.* and have resulted in damage and injury to Plaintiff, as alleged herein.

202.    As a proximate result of Defendants' willful, knowing, and intentional harassment against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings, bonuses, and other employment benefits and opportunities.

203.    As a proximate result of Defendants' willful, knowing, and intentional harassment of Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

204.    As a result of Defendants' deliberate, outrageous, and despicable conduct, plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with each of Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

205.    Plaintiff has incurred and continues to incur legal expenses and attorney fees.  In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorney fees and costs pursuant to Cal. Gov't Code §12965.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Brightwell prays for judgment against Defendants as follows:

1.    For a declaration that Ms. Brightwell has a fifty-percent ownership interest in RFL;

2.    For damages, according to proof, along with interest thereon as provided by law;

3.    For civil penalties pursuant to Section 1102.5(f) of the Labor Code;

1    4.    For double damages pursuant to Section 972 of the California Labor Code;

2    5.    For reimbursement for expenditures and losses incurred, according to proof, along

3          with interest thereon as provided by Section 2802;

4    6.    For a penalty of $7,920, as provided by Section 203 of the Labor Code, plus

5          interest;

6    7.    For an accounting of the business affairs of RFL;

7    8.    For a temporary restraining order, preliminary injunction, and a permanent

8          injunction prohibiting O'Donnell from further depleting RFL's assets;

9    9.    For exemplary and punitive damages;

10   10.   For reasonable attorney's fees;

11   11.   For costs of suit herein incurred;

12   12.   For interest as provided by law; and

13   13.   For other and further relief and the Court deems just and proper.

14                              **JURY DEMAND**

15   Ms. Brightwell demands a trial by jury.

16

17   DATED: February **27**, 2014                    **GRUENBERG LAW**

18

19

20                                                   JOSHUA D. GRUENBERG, ESQ.
                                                     COREY P. HANRAHAN, ESQ.
21                                                   BENJAMIN S. SILVER, ESQ.
                                                     NIKOLAS T. DJORDJEVSKI, ESQ.
22                                                   Attorneys for Plaintiff,
                                                     **L. LEE BRIGHTWELL**
23

24

25

26

27

28

PLAINTIFF'S FIRST AMENDED COMPLAINT

1
2
3
4                            **EXHIBIT 1**
5  (1)   PLAINTIFF'S AMENDED CHARGE FILED WITH THE DEPARTMENT OF FAIR
6        EMPLOYMENT AND HOUSING (DFEH).
7  (2)   PLAINTIFF'S AMENDED RIGHT TO SUE LETTERS FROM THE DFEH.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.
**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                             DIRECTOR PHYLLIS W. CHENG
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | Videophone 916 226 5285 | TTY 800 700 2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

Mar 23, 2013

Lee Brightwell
787 Esperanza Place
Chula Vista, CA 91914

RE:  **Notice of Case Closure and Right to Sue**
     DFEH Matter Number: 101391-45281-R
     Right to Sue: Brightwell / RF Logistics LLC, Brian O`Donnell

Dear Lee Brightwell:

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective Mar 23, 2013 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

**This letter is also your Right to Sue notice.** According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commision (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Department of Fair Employment and Housing

Enclosures
cc:  RF Logistics LLC

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GOVERNOR EDMUND G. BROWN JR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

DIRECTOR PHYLLIS W. CHENG

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | Videophone 916-226-5285 | TTY 800-700-2320
www.dfeh.ca.gov | email contact center@dfeh.ca.gov

Mar 23, 2013

RE: **Notice of Filing of Discrimination Complaint**
DFEH Number: 101391-45281-R
Right to Sue: Brightwell / RF Logistics LLC

To All Respondent(s):

Enclosed is a copy of an complaint of discrimination that has been filed with the Department of Fair Employment and Housing (DFEH) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

**No response to DFEH is requested or required.**

Sincerely,

Department of Fair Employment and Housing



STATE OF CALIFORNIA | Department of Fair Employment and Housing                                    EMPLOYMENT RIGHT TO SUE

# COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

DFEH NUMBER
101391-45281-R

COMPLAINANT
Lee Brightwell

NAMED IS THE EMPLOYER, PERSON, AGENCY, ORGANIZATION OR GOVERNMENT ENTITY WHO DISCRIMINATED AGAINST ME

| RESPONDENT | ADDRESS | PHONE |
|---|---|---|
| RF Logistics LLC<br>Brian O'Donnell | 2400 Fenton St., Ste 214  Chula Vista CA 91914 | (571) 216-0236 |

| NO. OF EMPLOYEES | MOST RECENT DISCRIMINATION TOOK PLACE | TYPE OF EMPLOYER |
|---|---|---|
| 20 | Aug 17, 2012 | Private Employer |

CO-RESPONDENT(S)                                                                                            ADDRESS

DATE FILED  Mar 23, 2013
MODIFIED    Feb 26, 2014

REVISED JULY 2013
PAGE 1/3



STATE OF CALIFORNIA | Department of Fair Employment and Housing                    EMPLOYMENT RIGHT TO SUE

## COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

DFEH NUMBER:
101391-45281-R

I ALLEGE THAT I EXPERIENCED     Discrimination, Harassment, Retaliation

ON OR BEFORE     Aug 17, 2012

BECAUSE OF MY     Sex- Gender

AS A RESULT, I WAS     Terminated

STATEMENT OF FACTS

I was employed by RF Logistics, LLC from October 2007 to August 2012. I served as Vice-President of the company from 2009 to 2012. During this time period, on more than one occasion, the President and Managing Member of the company, Brian O'Donnell, physically assaulted me in the work place. Most recently, on August 17, 2012, following a business discussion, Mr. O'Donnell physically assaulted me. I believe Mr. O'Donnell took advantage of me as a woman, overpowered me, threw me to the ground, breaking my watch, taking my car and house keys and leaving bruises and scratches on my arms and foot. I do not believe Mr. O'Donnell would have done this to another male. When I escaped from Mr. O'Donnell, I drove to the police station for safety. I saw Mr. O'Donnell follow me and then speed away when I parked at the police station. I reported Mr. O'Donnell to the police for physically assaulting me. The police arrested Mr. O'Donnell the next day, on August 18. That same day, Mr. O'Donnell terminated my employment with RF Logistics, LLC by text message and email, with no cause stated. I believe that RF Logistics, LLC, through Mr. O'Donnell, terminated my employment because I reported Mr. O'Donnell to the police for assaulting me. In addition, RF Logistics, LLC made false promises to me about my employment with the company, it did not send a final paycheck to me for 10 days after my termination and the company continues to owe me reimbursement for business expenses I incurred during my employment. I also believe that I was sexually harassed. After I informed Brian O'Donnell that I was ending the sexual relationship with him, he terminated my employment and attempted to terminate my ownership interest with the company.



STATE OF CALIFORNIA | Department of Fair Employment and Housing

EMPLOYMENT RIGHT TO SUE

## COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE
## CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

DFEH NUMBER
101391-45281-R

**SIGNED UNDER PENALTY OF PERJURY**

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right to sue. I understand that if I want a federal right to sue notice, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure and Right to Sue," or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

By submitting this complaint, I am declaring under penalty of perjury under the laws of the State of California that, to the best of my knowledge, all information contained in this complaint is true and correct, except matters stated on my information and belief, and I declare that those matters I believe to be true.

Verified by Nikolas T. Djordjevski, Attorney for Complainant, and dated on Feb 26, 2014 at San Diego, California.

# EXHIBIT "A"



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

2218 Kausan Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 | Videophone (916) 226-5285 | TDD (800) 700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

GOVERNOR EDMUND G. BROWN JR.

DIRECTOR PHYLLIS W. CHENG

Mar 24, 2013

Lee Brightwell

787 Esperanza Place

Chula Vista, CA 91914

RE: 101391-45281  - Brightwell Lee - Right To Sue

Notice of Case Closure and Right to Sue

Dear Lee Brightwell:

This letter informs you that the above-referenced complaint that was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective Mar 24, 2013 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

Department of Fair Employment and Housing

cc: Brian O'Donnell, Agent for Service for RF Logistics LLC

**EXHIBIT A**

# EXHIBIT "B"

| From: | brian.odonnell@rflogistics.com |
|---|---|
| Sent: | Tuesday, October 16, 2007 7:30 AM |
| To: | Hamm, John; Woodruff, Susan |
| Cc: | brian.odonnell@rflogistics.com |
| Subject: | Submitting Resume of L. Lee Brightwell for Project Qualification |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |
| Attachments: | LLB Resume for RFL 15 Oct 07.doc |

Sue & John,

RF Logistics, LLC submits the attached resume of L. Lee Brightwell for qualification as a Business Analyst IV and Business Analyst III to perform technical services related to the Naval Special Warfare Command SWALIS project.

Lee is well qualified to support tasking assigned to RF Logistics, including the technical project management and business process analysis tasks related to SWALIS development and sustainment. Lee possesses an Industrial Engineering degree from Georgia Tech, and well over the minimum years of experience required by the above labor categories. Lee has many years of process improvement and project management experience in government as well as the very demanding commercial construction sector. In addition, Lee's experience in the AIT/RFID sector as an industrial engineer for Sensormatic brings a knowledge base that may be very applicable to future efforts.

Please approve Lee Brightwell to support the Naval Special Warfare Command SWALIS project for the requested Labor Categories.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com
Phone: 571-216-0236
Fax: 619-240-3032

**EXHIBIT B**



**Re-Engineering the Point of Activity**

L. Lee Brightwell
735 Diamond Drive • Chula Vista, CA  91911
(619) 240-3032 Home Office • (703) 955-6699 Cell
E-mail: notes4lee@hotmail.com

## PROFILE

Strong analytical problem solver, with a broad range of program management and business process/industrial engineering expertise, capable of long-term strategic planning and short-term action plan implementations. Self-motivated, self-directed leader with solid interpersonal skills, and the organizational ability to motivate others toward a common goal.

## PROFESSIONAL EXPERIENCE

**RF Logistics, LLC, San Diego, CA (2007- Present)**
Member, Business Process Engineer—RF Logistics is a Veteran owned small business that works with businesses and government organizations to streamline and apply best practice methodologies to manufacturing, warehouse operations, and supply chain processes.  Current responsibilities are to perform site assessments, document as-is process flows, work with customers to re-engineer work flows, insert automated information technology (AIT) where practical, coordinate and support change management, perform any necessary program/project management, cost/schedule control related to contractual obligations.

**'Ohi'a Productions, Inc., Kaneohe, HI (2002-2007)**
President, Board of Directors – 'Ohi'a Productions is a not-for-profit theater company that produces original musicals with educational and entertaining content for Hawaii schools and the Hawaii community.  Through this purely volunteer position, responsibilities extend beyond governance and fund-raising activities to interfacing daily with the Executive Director, Artistic and Managing Director, and Director of Finance. Provide direction and guidance on business management practices, financial enhancement and controls, individual/corporate sponsor relationships, funding proposals, program budget reviews, Board development, Board leadership, and strategic planning. Grew company's operating budget from $350,000 to $900,000 during tenure.

**Real Estate Associate, Kailua, HI (1999-present)**
Successfully closed over 35 transactions in excess of $15 million in gross sales. Prior affiliations with The Stott Team, Coldwell Banker Pacific Properties, Abe Lee Realty, and Pacific Property Referrals. Currently affiliated with Watson Realty. Awarded the 2000 Aloha 'Aina Outstanding Newcomers Award from the Honolulu Board of Realtors.

**Real Estate Investor, Renovation & Property Management, Orlando, FL; Silverdale, WA; Kailua, HI (1990-Present)**
Owner/Operator of Property Management Company which identifies and purchases multiple investment properties, managing various levels of renovations, profiting both from re-sales and from property management of ongoing rentals.  This effort involves many facets of business development, project management including schedule management of renovations, maximized occupancy, cost controls, facilities management, contract negotiations, vendor controls, and process efficiencies.

**TPA, Incorporated, Longwood, FL (1990 – 1992)**
Construction Project Manager responsible for Owners Representative Services, Claims Analysis, Inspection Services, Cost Estimating, Litigation Support Analysis, business development, client support and the creation of computer graphics presentation materials. Certified Building Inspector, Southern Building Code Congress International.

EXHIBIT B



*Re-Engineering the Point of Activity*

**Circuit City, Orlando, FL (1990, 1991)**
Short-term consulting contract to apply process analysis and warehouse process analysis to the retail order fulfillment department of the distribution warehouse. Implemented recommendations that reduced the error rate by 85%. Requested to return the following year to perform a second process analysis and implement procedures to improve turn around time in the product returns/repairs department.

**Paulin Pacific Group, Honolulu, HI (1988-1990)**
<u>Program Manager</u> of a $3 million refurbishment to the Waikiki Royal Suites, a 48 unit all suite boutique hotel. Reporting directly to Japanese Investors, Haseko Corporation, oversaw the collaborative efforts of the Design Architect, the Interior Designers, the General Contractor, and roofing and fire sprinkler subcontractors, while continuing hotel operations and room rentals, Managed complete project planning, product and systems design review, configuration control, risk assessment, scheduling, budget development and controls including furniture, fixtures, and equipment purchasing, supply chain management, materials management, logistics, project team coordination, contract administration subcontractor management and quality assurance. Completed full renovation in 6 month window while continuing full hotel operations without incident nor cost or schedule overruns.

<u>Special Projects Manager</u> responsible for advertising, guest services, marketing plan and cash flow analysis for the Waikiki Royal Suites and Waikiki Grand Hotel.

**KPMG Peat Marwick (now BearingPoint), Newport, RI (1986-1988)**
<u>Senior Management Consultant</u> responsible for engagement management, systems development, market development, and business analysis; and extended client interface in an advisory capacity with KPMG Peat Marwick's Defense Management Consulting Practice. Managed and directed personnel and resources in support to major government R&D and commercial industry programs varying in worth from $18 million to $600 million. Areas of expertise in Program Management disciplines including:

- Program/Project planning and implementation
- Cost/Schedule development and control
- Identificaty & manage of Program/Project risk

- Product definition and contract selection
- Information systems development
- Cost estimating and cost reduction

Created, managed and maintained 225% growth in business practice area. Prepared successful business proposals and directed engagement work contributing to more than $2 million in revenue to firm.

**Sensormatic Electronics Corporation (now Tyco), Boca Raton, FL (1983 –1986)**
<u>Project Engineer</u> responsible for the identification, process analysis and control, supply chain management, work instructions, product and design review, configuration control, job order processing and successful implementation of first article production for Electronic Article and Video Surveillance equipment. Created and maintained project budget and schedules. Liaison with R&D, Purchasing, Production, Manufacturing Engineering, and Warehouse to ensure efficient produce-ability of new product manufacturing runs.

<u>Lead Industrial Engineer</u> responsible for training and supervision of IE technicians, methods and time study analyses of electronic assembly. Analyzed and improved manufacturing assembly process, material handling and quality control systems.

## EDUCATION

**Graduate work toward Master of Business Administration (completed 19 of 42 required hours)**
Florida Atlantic University, 1984-85

**Bachelor of Industrial Engineering**
Georgia Institute of Technology, 1983

EXHIBIT B



*Re-Engineering the Point of Activity*

## AFFILIATIONS/AWARDS/CERTIFICATIONS

Former Secret Clearance
'Ohi'a Productions, Inc. President, Board of Directors
Licensed Real Estate Associate, Honolulu Board of Realtors
2000 Aloha 'Aina Realtor Award, Outstanding Newcomer
Habitat for Humanity, Orlando, FL, Construction Mgr. For single family residence 1991
Certified Toast Master
Honolulu Waldorf School, Parent Council Chair, 1999-2002

## REFERENCES

To be furnished upon request.

EXHIBIT B

EXHIBIT "C"

| | |
|---|---|
| **From:** | brian.odonnell@rflogistics.com |
| **Sent:** | Wednesday, October 17, 2007 8:08 AM |
| **To:** | john_hamm@amsec.com; Woodruff, Susan |
| **Cc:** | brian.odonnell@rflogistics.com |
| **Subject:** | Re: Submitting Resume of L. Lee Brightwell for Project Qualification |
| **Attachments:** | LLB Resume for RFL 15 Oct 07.doc |

Sue & John,

For some reason, my email is not being forwarded to my blackberry. Sorry, I didn't realize I did not attach the revised resume until this morning.

Here you go. Invoice is next.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com
Phone: 571-216-0236
Fax: 619-240-3032

-----Original Message-----
**From:** john_hamm@amsec.com [mailto:john_hamm@amsec.com]
**Sent:** Tuesday, October 16, 2007 02:30 PM
**To:** brian.odonnell@rflogistics.com
**Subject:** RE: Submitting Resume of L. Lee Brightwell for Project Qualification

**No attachment.**

-----Original Message-----
**From:** brian.odonnell@rflogistics.com [mailto:brian.odonnell@rflogistics.com]
**Sent:** Tuesday, October 16, 2007 1:29 PM
**To:** Hamm, John B; susan.j.woodruff@hampton.amsec.com
**Cc:** brian.odonnell@rflogistics.com
**Subject:** Re: Submitting Resume of L. Lee Brightwell for Project Qualification

John,

Here is the revised resume for Lee Brightwell with month and year for periods of employment. Let me know if you need anything else.

Thanks,
Brian
Brian O'Donnell
Senior Business Process Analyst
Managing Member & Owner
RF Logistics, LLC
email: brian.odonnell@rflogistics.com

1

EXHIBIT C

Phone: 571-216-0236
Fax: 619-240-3032

-----Original Message-----
**From:** john_hamm@amsec.com [mailto:john_hamm@amsec.com]
**Sent:** Tuesday, October 16, 2007 10:48 AM
**To:** brian.odonnell@rflogistics.com, susan.j.woodruff@hampton.amsec.com
**Subject:** RE: Submitting Resume of L. Lee Brightwell for Project Qualification

**Brian,**

**Before we can take any action on qualifying the new RFL employee we have to have the experience broken down by the year and month. This will allow us to capture a total nur of months required for the qual sheet. Please send updated resume with month and yea details.**

**Thanks**
**jbh**

> -----Original Message-----
> **From:** brian.odonnell@rflogistics.com [mailto:brian.odonnell@rflogistics.com]
> **Sent:** Tuesday, October 16, 2007 10:30 AM
> **To:** Hamm, John B; Woodruff, Susan
> **Cc:** brian.odonnell@rflogistics.com
> **Subject:** Submitting Resume of L. Lee Brightwell for Project Qualification
>
> Sue & John,
>
> RF Logistics, LLC submits the attached resume of L. Lee Brightwell for qualification as a Business Analyst IV and Business Analyst III to perform technical services related to the Naval Special Warfare Command SWALIS project.
>
> Lee is well qualified to support tasking assigned to RF Logistics, including the technical project management and bu process analysis tasks related to SWALIS development and sustainment. Lee possesses an Industrial Engineering de from Georgia Tech, and well over the minimum years of experience required by the above labor categories. Lee has years of process improvement and project management experience in government as well as the very demanding commercial construction sector. In addition, Lee's experience in the AIT/RFID sector as an industrial engineer for Sensormatic brings a knowledge base that may be very applicable to future efforts.
>
> Please approve Lee Brightwell to support the Naval Special Warfare Command SWALIS project for the requested L Categories.
>
> Thanks,
> Brian
> Brian O'Donnell
> Senior Business Process Analyst
> Managing Member & Owner
> RF Logistics, LLC
> email: brian.odonnell@rflogistics.com
> Phone: 571-216-0236
> Fax: 619-240-3032

EXHIBIT C



**Re-Engineering the Point of Activity**

**L. Lee Brightwell**
735 Diamond Drive • Chula Vista, CA  91911
(619) 240-3032 Home Office • (703) 955-6699 Cell
E-mail: notes4lee@hotmail.com

---

### PROFILE

Strong analytical problem solver, with a broad range of program management and business process/industrial engineering expertise, capable of long-term strategic planning and short-term action plan implementations. Self-motivated, self-directed leader with solid interpersonal skills, and the organizational ability to motivate others toward a common goal.

### PROFESSIONAL EXPERIENCE

**RF Logistics, LLC, San Diego, CA** (January 2007- Present)
Member, Business Process Engineer—RF Logistics is a Veteran owned small business that works with businesses and government organizations to streamline and apply best practice methodologies to manufacturing, warehouse operations, and supply chain processes. Current responsibilities are to perform site assessments, document as-is process flows, work with customers to re-engineer work flows, insert automated information technology (AIT) where practical, coordinate and support change management, perform any necessary program/project management, cost/schedule control related to contractual obligations.

**'Ohi'a Productions, Inc., Kaneohe, HI** (July 2002- August 2007)
President, Board of Directors – 'Ohi'a Productions is a not-for-profit theater company that produces original musicals with educational and entertaining content for Hawaii schools and the Hawaii community. Through this purely volunteer position, responsibilities extend beyond governance and fund-raising activities to interfacing daily with the Executive Director, Artistic and Managing Director, and Director of Finance. Provide direction and guidance on business management practices, financial enhancement and controls, individual/corporate sponsor relationships, funding proposals, program budget reviews, Board development, Board leadership, and strategic planning. Grew company's operating budget from $350,000 to $900,000 during tenure.

**Real Estate Associate, Kailua, HI** (October 1999-present)
Successfully closed over 35 transactions in excess of $15 million in gross sales. Prior affiliations with The Stott Team, Coldwell Banker Pacific Properties, Abe Lee Realty, and Pacific Property Referrals. Currently affiliated with Watson Realty. Awarded the 2000 Aloha 'Aina Outstanding Newcomers Award from the Honolulu Board of Realtors.

**Real Estate Investor, Renovation & Property Management, Orlando, FL; Silverdale, WA; Kailua, HI** (June 1990-Present)
Owner/Operator of Property Management Company which identifies and purchases multiple investment properties, managing various levels of renovations, profiting both from re-sales and from property management of ongoing rentals.  This effort involves many facets of business development, project management including schedule management of renovations, maximized occupancy, cost controls, facilities management, contract negotiations, vendor controls, and process efficiencies.

**TPA, Incorporated, Longwood, FL** (September 1990 – May 1992)
Construction Project Manager responsible for Owners Representative Services, Claims Analysis, Inspection Services, Cost Estimating, Litigation Support Analysis, business development, client support and the creation of computer graphics presentation materials. Certified Building Inspector, Southern Building Code Congress International.

EXHIBIT C



*Re-Engineering the Point of Activity*

**Circuit City, Orlando, FL** (July-October 1990; then July - August 1991)
Short term consulting contract to apply process analysis to the retail order fulfillment department of the distribution warehouse. Implemented recommendations that reduced the error rate by 85%. Requested to return the following year to perform a second process analysis and implement procedures to improve turn around time in the product returns/repairs department.

**Paulin Pacific Group, Honolulu, HI** (November 1988-July 1990)
Program Manager of a $3 million refurbishment to the Waikiki Royal Suites, a 48 unit all suite boutique hotel. Reporting directly to Japanese Investors, Haseko Corporation, oversaw the collaborative efforts of the Design Architect, the Interior Designers, the General Contractor, and roofing and fire sprinkler subcontractors, while continuing hotel operations and room rentals. Managed complete project planning, product and systems design review, configuration control, risk assessment, scheduling, budget development and controls including furniture, fixtures, and equipment purchasing, supply chain management, materials management, logistics, project team coordination, contract administration subcontractor management and quality assurance. Completed full renovation in 6 month window while continuing full hotel operations without incident nor cost or schedule overruns.

Special Projects Manager responsible for advertising, guest services, marketing plan and cash flow analysis for the Waikiki Royal Suites and Waikiki Grand Hotel.

**KPMG Peat Marwick (now BearingPoint), Newport, RI** (May 1986-April 1988)
Senior Management Consultant responsible for engagement management, systems development, market development, and business analysis; and extended client interface in an advisory capacity with KPMG Peat Marwick's Defense Management Consulting Practice. Managed and directed personnel and resources in support to major government R&D and commercial industry programs varying in worth from $18 million to $600 million. Areas of expertise in Program Management disciplines including:

- Program/Project planning and implementation
- Cost/Schedule development and control
- Identify & manage of Program/Project risk

- Product definition and contract selection
- Information systems development
- Cost estimating and cost reduction

Created, managed and maintained 225% growth in business practice area. Prepared successful business proposals and directed engagement work contributing to more than $2 million in revenue to firm.

**Sensormatic Electronics Corporation (now Tyco), Boca Raton, FL** (October 1983 –April 1986)
Project Engineer responsible for the identification, process analysis and control, supply chain management, work instructions, product and design review, configuration control, job order processing and successful implementation of first article production for Electronic Article and Video Surveillance equipment. Created and maintained project budget and schedules. Liaison with R&D, Purchasing, Production, Manufacturing Engineering, and Warehouse to ensure efficient produce-ability of new product manufacturing runs.

Lead Industrial Engineer responsible for training and supervision of IE technicians, methods and time study analyses of electronic assembly. Analyzed and improved manufacturing assembly process, material handling and quality control systems.

## EDUCATION

**Graduate work toward Master of Business Administration (completed 19 of 42 required hours)**
Florida Atlantic University, 1984-85

**Bachelor of Industrial Engineering**
Georgia Institute of Technology, 1983

EXHIBIT C



*Re-Engineering the Point of Activity*

## AFFILIATIONS/AWARDS/CERTIFICATIONS

**Former Secret Clearance**
'Ohi'a Productions, Inc. President, Board of Directors
Licensed Real Estate Associate, Honolulu Board of Realtors
2000 Aloha 'Aina Realtor Award, Outstanding Newcomer
Habitat for Humanity, Orlando, FL, Construction Mgr. For singlefamily residence 1991
Certified Toast Master
Honolulu Waldorf School, Parent Council Chair, 1999-2002

## REFERENCES

To be furnished upon request.

EXHIBIT C

# EXHIBIT "D"



10592 John Ayres Drive, Fairfax, VA 22032

31 December 2010

Lee Brightwell
787 Esperanza Place
Chula Vista, CA 91914

Dear Lee,

On behalf of all of us here at RF Logistics, LLC we appreciate the extra effort you've given us this year to make the SWALIS Project go smoothly.

Please accept this year-end bonus as a token of our appreciation for your service and leadership.

Happy New Year!! Let's go into 2011 with a clear focus on self-improvement, and continued positive contributions to move the company forward, diversify and grow together.

Thanks Again Lee.

Best Regards,

Brian O'Donnell
Managing Member
RF Logistics, LLC

*Thank you for taking partnership with me on SWALIS! It's good to not be alone at fifty.*

EXHIBIT D

# EXHIBIT "E"

**From:**       Brian O'Donnell <btod20@aol.com>
**Sent:**       Thursday, May 24, 2012 2:31 PM
**To:**         Brian O'Donnell
**Cc:**         Lee Brightwell; Lee Brightwell (RF); btod20@aol.com
**Subject:**    Re: Trying to Settle Your Heart...a Little

And yes...no pets.
Brian

Sent from my iPad

On May 24, 2012, at 2:29 PM, Brian O'Donnell <btod20@aol.com> wrote:

> Yes, I will need access for Sunday night and Monday.
> Thanks,
> Brian
>
> Sent from my iPad
>
> On May 24, 2012, at 1:53 PM, Lee Brightwell <notes4lee@hotmail.com> wrote:
>
>> Thank you sending this heartfelt plan. Some of it is acceptable, some of it is not.
>>
>> My head is too full of pressure today to adequately respond. I will give you a call concerning your immediate plans. I am glad to see you list the care for the home. Please confirm that no pets will be brought into the house.
>>
>> I do need to know if you are still planning to return on Sunday evening and if you need access to the house on Sunday or Monday. If you are planning to live here for the summer, I would expect yes.
>>
>> *Lee Brightwell*
>> *787 Esperanza Place*
>> *Chula Vista, CA 91914*
>> *703-955-6699*
>> *notes4lee@hotmail.com*
>>
>> *"A diamond is merely a lump of coal that did well under pressure."*
>> *Henry Kissinger*

---

To: notes4lee@hotmail.com
Subject: Trying to Settle Your Heart...a Little
From: btod20@aol.com
CC: BTOD20@aol.com
Date: Thu, 24 May 2012 15:12:13 -0400

1

**EXHIBIT E**

Lee,

You know I love you. And I know you love me. What is happening to us is devastating in so many ways. I hurt all the time...as I know you do as well. We are both on edge which keeps us seeing everything in the negative first. It sometimes takes time to see the good (any good) in what in the past were simple acts of kindness. I hurt every time you say you do not trust me. I write this letter in the hopes that you know you can trust me and the words I use here.

I don't have a complete, detailed master plan that I think is the best plan yet. What I do know is that the immediate challenges before me/us can be settled with the acceptance of your kind offer to allow me and the girls to stay at the Esperanza house for the summer. As you have said, it is the simplest plan and allows for additional time to arrive at the master plan. Thank you for this offer. I accept it. I, in turn offer to pay you $2500 per month plus the utilities, gardener and general upkeep expenses as they arise for as long as I am in the house. I understand that you intend to stay at the house at least until 8 June, or until the SWALIS 2.2 release. I understand you have yet to decide where you will go if you decide to leave San Diego. I ask that you let me know soonest if you intend to leave or stay and where you wish to go, so we can work out a plan to have you continue to work with RFL (if you desire). I will do my utmost best to make sure that as long as we are all under the same roof, we can live in harmony and civility. And I'll make sure the plants are watered and even the compost is turned once in a while.

Financially, I want (ask/agree) you stay at RFL (at your current salary) for the foreseeable future. We can both keep talking about this, and I believe this will be your decision to separate. I have no intention of asking you to leave unless we have unresolveable mutual disagreements or professional conduct issues. I will continue to run the company as I see fit in the best interest of RFL and the needs of all employees. In order to cover the salary, we both need to make sure you stay chargeable to projects under contract. We're only as good as the next contract. I would appreciate you staying involved in the SWALIS project to support system development and (if this is your destination) as the primary sustainment support for both Hawaii and Guam. I will support travel expenses for a 3-month period as follows: Round trip Airfare one time per month for three months; lodging of $1500 per month for three months; rental car at cost (with fuel reimbursement) based on a long-term rental agreement for intermediate sized car for three months; per diem at JTR rates for one month, then $500 per month for the last two months. I believe I will only be able to have the contract absorb one month of chargeable travel for the Hawaii effort. The remaining two months will be at RFL's expense. For travel to Guam in support of sustainment, travel will be paid in accordance with JTR. While in Guam, your Hawaii expenses will remain in effect with the exception of the per diem which will be paid at the Guam rates for those days. In addition, I offer you a severance in the sum of $100,000.00 which will be payable at the time of your separation from RFL. This is 2.67 times the industry standard of two weeks for every year employed. If you choose installments, we can work that out. In return, I ask that you enter into a non-compete agreement with RFL for a two year period.

I would like to keep the office in the house for the near-term. Yet, I understand that this is a great source of anxiety. If you agree, I will also commit that when you return there will be another office not in the house. If not, then I will need to find a suitable office space next week.

Emotionally, I want to do this in the most amicable way possible. I have always valued our friendship as the key to our relationship. None of this is easy on our hearts, minds, and bodies. I don't want to debate everything. I don't want to fight. I don't want to put innocent bystanders (friends, family, partners or coworkers) into our drama.

Hopefully, this email puts you at ease a little bit. You have asked for a plan. Here's mine. Thanks for your compassion and understanding...and your generosity in the offer of the house for a little while.

Brian

2

EXHIBIT E

# EXHIBIT "F"

From:             Lee Brightwell <notes4lee@hotmail.com>
Sent:             Wednesday, August 15, 2012 12:21 PM
To:               Brian at aol
Subject:          RE: June 15, 2012

Brian,

I can imagine that you are feeling uncomfortable with the situation. Much as I have been uncomfortable since May when you started changing the way we worked together.

Fighting is not the method for getting what you want. This will take cooperation and compromise from you to win. I want the best for you, for me, for the company, and for all of our employees. Look at the big picture and the end goal.

Please also know that it was very difficult for me to ask Liz to leave yesterday and she did not go without protest. I apologized for involving her, but there was no other way to get your attention on the seriousness of my perspective.

I know you can find the inner peace to see how to come out on top for all of us.

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA 91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

---

From: notes4lee@hotmail.com
To: btod20@aol.com
Subject: RE: June 15, 2012
Date: Wed, 15 Aug 2012 05:41:59 -1000

Brian,

I need you to listen to me and to hear what I am saying.

We both run this company. We both control its success or failure. We are both in charge.

Is that clear now?

And time is short to solve this.

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA 91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

1

**EXHIBIT F**

Date: Tue, 14 Aug 2012 18:44:25 -0700
Subject: RE: June 15, 2012
From: btod20@aol.com
To: notes4lee@hotmail.com

Lee,
What is your objective?  What is your goal?
Brian
Sent from my Verizon Wireless 4G LTE smartphone


Lee Brightwell wrote:

Brian,

I've locked up the house. You and Liz no longer have access.  I sent her home after a few hours today. No one is to acccess the house without me present. If you come onto the property, it will be considered trespassing.

When you want to be reasonable and discuss our business relationship, contact me.  I prefer talking in person, you can make an appointment to see me in LA or wait until I return.

I will return to San Diego around 10:00 AM on Friday but will not be available until later in the afternoon or evening.

It pains me to take this step. It is not easily done. I wish previous efforts to communicate had accomplished their goal.

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*


Subject: Re: June 15, 2012
From: btod20@aol.com
Date: Sun, 5 Aug 2012 01:03:42 -0700
To: notes4lee@hotmail.com

Lee,
I haven't had the luxury of looking at my aol email until tonight.  So, I'm just reading this now.  To answer your question, no I have not formulated my response yet.  And no, I don't think you still understand, nor have you heard me as late as that conversation from 4:15 to 5:30 Thursday morning.

I am asking you to cease and desist from any further public displays in the presence of any RFL employees or customers (in person, on the phone or in email) which disrespect me, minimize or challenge my authority, or any de-edification of my role as the sole owner and leader of RF Logistics, LLC.  I am asking you to accept that while you remain a VP in my company, you are not in charge, nor do you have direct management authority over any of the employees of RFL.  Your

2

EXHIBIT F

experience and understanding of SWALIS is recognized and appreciated by many, and certainly including me. Yes, you have played a large role in bringing RFL to where it is today. No, you didn't do it yourself...and no, you have not done more than me. Yes, your effort proved that my confidence in bringing you on was justified. And you are only in my company because I believed in you, even when you didn't believe in yourself. Yes, you are very valuable to the team, but you are not the team. I focus specifically on edifying all RFL and NTVI people to our SWALIS customers. For you to even question that tells me you really don't understand me or what makes us all successful. We have built this company based on team performance, not personal accolades. The difference between you and me in professional life is I don't bring our personal discussions into the workplace. I stay on topic and I edify. Whether you agree or not, I believe you have demonstrated many times recently that you do not separate personal relationship behavior from your professional relationship behavior. This is a major reason why you are at risk of being excluded from my inner circle with RFL. I cannot trust that you will consider what is best for RFL over wanting to be recognized continuously on a personal level. No one is challenging you as a contributor to the company's success. Does this come down to what is best for you personally? Are you threatening to degrade the confidence our customers have in RFL by what you write below? I hope not. I absolutely edify you to all our NSW customers, and to RFL's and NTVI's associates. I absolutely understand your contribution to our success. You are the highest paid RFL employee, which is edification in itself. But I expect a level of performance commensurate with that salary. And you deliver that performance. Where else would you earn such a salary, or have had the opportunity to earn that salary? So please stop believing you are not appreciated for your extraordinary effort. But you have not earned the right to challenge my authority as the owner of this company. Enough on that.

Personally, I am spending my last weekend with Hope moving because you insisted I be out of the house by your return on the 17th and I will be on travel next week. So, there is no other time. Why you think this is abrupt given your conditions insisted upon is very curious. And it all unfolded before the 2nd trip to Hawaii was planned. But, whatever the circumstances, it is the best action for me right now. And I am turning it into an adventure for my daughter. You seem to have locked into your head and heart that I'm the one that ended our personal relationship. Both you and I know that is not true at all. It took two of us to get the personal relationship down to this point.

I hope the college hunts and special time you are enjoying with Austin are going well. I'm glad you are taking this time for you and him.

Enjoy the rest of the weekend and next week.

Love,
Brian


Sent from my iPad

On Aug 2, 2012, at 11:38 PM, Lee Brightwell <notes4lee@hotmail.com> wrote:

> Brian,
>
> Have you completed the response you promised below? I have been patiently waiting for this, as I believe you have some good thoughts to share.
>
> In our early morning discussion, you stated again that for you, you can not separate our personal relationship from our business relationship. That it is all one for you. You say you cannot do what I do, and just keep our relationship professional.
>
> I think I finally heard what you are telling me. Please confirm if I have this right:
>
> Since for you its all connected, the personal relationship and the work relationship is all one, and as the personal relationship has ended, you are struggling to remain professional and to include me as a partner as you did for 5 years. As you are disconnecting on a personal level, and pulling back or away, eliminating me from your everyday activities and thoughts, then so too this explains why you are pulling back at work and not including me in all the decision making and business operations as you once did. I didn't get this before. Since I separate my personal relationship behavior from my business relationship behavior, and carry no expectations that my work success will result in personal relationship success, I

3

EXHIBIT F

thought you did the same.  Now what I am begining to understand, is that your denial of excluding me from so much of the information that you had shared daily and regularly with me, is a result of your need to protect yourself personally, and that the pulling back emotionally, is the same for you pulling back in the business.  You truly can't separate your behavior, and committment.

Unfortunately, if this is true, you are willing to damage the good we have a achieved as partners.  If you leave me out of full company knowledge, then the reputation and reliance on me from our most important clients - Captain Jones, Mike Warmbier, Joe Peth, Pat Brown, Mike Van Nordheim, Tony Roper and Gloria Kelley will begin to decay and you will not have the full back up on site when you are on travel.  My customer service, and full knowledge base of all our business and at anytime current status had made us excell in the customers eyes for the last 3 years.  Do you see the cost of your pulling back and changing the role I play?  I have the best relationship with these clients, next to you. That can continue, or it can be damaged permanently, and you hold the ability to set us up to succeed by maintaining the business relationship we have had for 5 years.

I have absorbed your vision, your view of SWALIS and BizFlow, your method of communicating with NSW, your desired rules and posturing more fully than anyone else who works for RFL. I have been the number one go to person, next to you.  It is in your best interest, reputation wise, and profitablity, to continue in a manner that has succeeded for years.

This is not direction from me.  It is consideration.  You have chosen business success over our personal relationship success  - with the words and accusations you have screamed at me - APSR, March 14.  If your goal is to increase profitablity, then use the formula that already works.  Edify me as you always have.  I do that for you at NSW regularly.  It has served you well.

What do you think?

*Lee Brightwell*
*787 Esperanza Place*
*Chula Vista, CA  91914*
*703-955-6699*
*notes4lee@hotmail.com*

*"A diamond is merely a lump of coal that did well under pressure."*
*Henry Kissinger*

---

CC: brian.odonnell@rflogistics.com; notes4lee@hotmail.com; lee.brightwell@rflogistics.com
From: btod20@aol.com
Subject: Re: June 15, 2012
Date: Sat, 16 Jun 2012 09:23:03 -0700
To: L.Brightwell.ctr@navsoc.socom.mil

Lee,
Thank you for sharing your thoughts and feelings with me.  Yes, we have done much together with RFL.  And I am truly appreciative.  Clearly there is much for me to read over and absorb here.  And I want to give you a much deserved, well thought out reply.  As you know, I have always tied it all together...life, work, personal.

Let me think more, try to reach more for what else to say to you.  I will reply in full.
Love,
Brian

Sent from my iPad

EXHIBIT F

On Jun 15, 2012, at 8:03 PM, "Brightwell, L L Ms CTR USSOCOM NAVSOC"
<L.Brightwell.ctr@navsoc.socom.mil> wrote:

Brian,

I was talking about us today, and our original dream, and it occurred to me that it was 5 years ago today, that I made good on my promise to make it to San Diego on the 15th of June. I at least left that night on a plane and landed in the morning.

5 years ago. So many expectations and promises and hopes. So much accomplished. I found a list of goals we had talked about together. It included growing the business to 2 million. We did. And we did it together. Though it hasn't ended as we expected, and I guess, I mean we didn't expect it to end, it took two of us to get RFL to the beginnings of success. It has much farther to go, and that it will go. But what a great beginning, with a good team of people to carry it on.

If you had stayed in VA, and I had stayed in HI, you would probably still be working by yourself. I would be in Hawaii, though I don't know what I would be doing....still wondering if I can make something work for me here.

You have worked hard, and you built the trusted advisor status that earned you the reputation, and the confidence of NSW to want to work as directly with RFL as possible. And, as I know you'll acknowledge, you were not of a mind to build a business with many employees, nor leave the relationship with AMSEC without a lot of help and encouragement from me. I gave you the help in the business, the confidence in yourself, the comfort of two pursuing the same dream instead of one by himself, the technical skills, the interpersonal relationships when uniforms changed, the stability of a home. You were freed up to use the experience and skills you have with contracts to pursue additional work, all while the cash cow of our existence, SWALIS, was supported, managed, and overseen by my watchful eye. You could travel and have the confidence that I had the home front and the WARCOM customer interface, maintaining the impression that the project was well managed and had constant vigilance.

This last year has brought many more opportunities, and you've chosen wisely to bring Brendan on to manage the Business Development. While it has increased your workload 200%, you wouldn't want it any other way. Luckily Brendan has the SOW and contract experience to pursue new work at the same level you do. I didn't have that experience or skills, and with the Sustainment and design work, did not have the time to divert to learning it. But we each applied our unique skills and effort and it has paid off tremendously. I too have earned trusted advisor status with some of our most important clients. That is a great benefit to RFL.

The work I have done to establish RFL as a 'big' company – versus a mom and pop shop- such as finding a payroll service so Fred could receive checks every two weeks versus the once a month check I had been receiving during 2008, finding health care so Fred could have benefits, and luckily then, we could too. Finding Liz to manage QuickBooks and invoicing and compile your expenses when you finally realized it was too much to do every month and run the contracts. Working through, side by side with you when the contract shifted and we had to work out the numbers with NTVI. Deciding who to pursue from the old contract to become our employees. Getting them set up with payroll. Providing $52,000 to help RFL make payroll during the first few months of the contract – September/October 2010, so the employees would have confidence in RFL and believe we were a 'big' company. Working as the FSO with JPAS. Helping us survive a security visit eval. Attending a seminar on GSA and joining you in selecting a consultant to develop the GSA application. Taking on the Contract Administration for GSA. Identifying and contracting with Frances Larios as an HR consultant to finalize our company Handbook. Getting the handbook into final form and ensuring the edits were corrected just before the company meeting. Helping plan and encourage you to hold a companywide meeting in SD and ensuring it all came off with success, working with Liz, while you travelled. I have always been there to count on, have enhanced every part of the business, and supported you in the business, with long hours, constant vigilance and an insatiable need to learn all aspects of our business. You are where you are today, because of the people who have helped you. But though my tax position in the company was as an employee, at Susan's suggestion, my role has been as partner, with your concurrence, encouragement, and expectation. And I have sacrificed and dedicated myself as any partner, with the same goals of success, would do.

EXHIBIT F

The time and energy I am putting into the work at LOGSU3 is typical of the natural devotion I have to this business. It is hard to turn off the dedication and the work ethic, even when the personal relationship has not only ended, but is in so much pain, that it clouds your view of my goodness. I continue to take action everyday that will benefit you the rest of your life. Can you say the same for me? No, you take action every day that benefits you for the rest of your life. I am asking you to recognize the enormous contribution that 5 years of my life has made to the success of your life. We may never benefit by the emotional connection we once had, and expected to enjoy into our old age, but you will be left with the legacy of my unique and unusual ability to catapult people to success.

Yes, your belief in my abilities has helped me too. You gave me the opportunity to come into the working world at full steam and full salary despite the 14 years as a stay at home Mom. However, from the beginning, we doubled the gross proceeds of RFL. I was able to learn quickly and increase the status of RFL. Everything you paid me, you got back threefold, professionally and personally. I was able to scrub the rust off my brain, and begin to fulfill my dream of living and working with someone I loved. We shared everything. We helped each other. We worked together and we played together. And we worked a lot.

You are more successful now, than you have ever been in business. You are poised to be more successful because of the work we accomplished in the last 5 years. Alone, you did not make the gains you have made with my partnership.

I am more successful now than I have ever been in business. I know things about today's technology that I would never have learned staying in Hawaii. I work with people I enjoy, and I get to solve problems and make people happy and I love that.

I just can't make you happy. And since our relationship was key to my dreams, this work is more painful than happy, since it continues to be a gift to someone who thinks badly of me more often than goodly of me. Seems inconceivable after all the years of devotion and dedication. And that you have prospered from my devotion and dedication so exponentially.

This is what is in my head and heart these days. Certainly it is my perspective of our 5 years together. I left out all the conflicts, because we've not only covered that so many times before, but we agree they are not resolvable, and we tell a different tale, and it just locks in the hate, discontent and disappointment.

I'd like to hear what's in your heart and head.

Love,

Lee

L. Lee Brightwell
SWALIS Team
RF Logistics, LLC
787 Esperanza Place
Chula Vista, CA  91914
619-537-1989 wk
703-955-6699 cell
lee.brightwell@rflogistics.com
l.brightwell.ctr@navsoc.socom.mil

EXHIBIT F

# EXHIBIT "G"



*10592 John Ayres Drive, Fairfax VA 22032*

August 18, 2012

Ms. Lee Brightwell
787 Esperanza Place
Chula Vista, CA 91914

Dear Ms. Brightwell,

Regretfully, I am informing you that your employment with RF Logistics, LLC is terminated for cause effective immediately this date of August 18, 2012. You are not authorized to perform any travel, work or communications representing RFL from this point forward.

I ask that you surrender your Government Common Access Card (CAC) and all Naval Special Warfare access badges (including WARCOM, NSWG-1 and NSWG-2) to an RFL employee immediately. Please also return any Government Furnished Property (GFP) and Government Furnished Material (GFM) which is in your possession.

In addition, please immediately surrender all working papers to an RFL employee. Working papers consist of documents, paper files, electronic files, and files stored on electronic media.

Please immediately surrender your RFL Laptop and accessories at the same time to an RFL employee.

Payment of any and all remaining funds due to you will be withheld until all items are received, inventoried and accounted for by the company.

Sincerely,

Brian O'Donnell
Managing Member and Owner

Cc:     Brendan O'Donnell
        Liz Hendrix

**EXHIBIT G**

# EXHIBIT "H"



*10592 John Ayres Drive, Fairfax VA 22032*

August 17, 2012

MEMO TO FILE:  Official Record to be held indefinitely as part of Lee Brightwell's Company Record

As of August 17, 2012, Lee Brightwell has been demoted from her role as Vice-President to Senior Business Process Analyst. Ms. Brightwell no longer has any management authority for any decisions related to RF Logistics, LLC.

Ms. Brightwell's actions this week—and in the past—have demonstrated an insubordinate behavior and trend that indicates she is not acting in the best interest of the company and its associates.  Impeding other RFL associates' ability to perform their duties was the last unacceptable act that I will tolerate.

In addition, Ms. Brightwell unilaterally chose to present herself as an officer of RF Logistics, LLC, approve her own request for electronic credential and submitted an unauthorized access request to the US Government's GSA website.  Ms. Brightwell has never been, nor is she now an officer of this company.

Per the RFL Employee Handbook, "The Company reserves the right to discipline or discharge any employee for violating any company policy, practice or rule of conduct. The following list is intended to give you notice of our expectations and standards. However, it does not include every type of unacceptable behavior that can or will result in disciplinary action. Be aware that RF Logistics retains the discretion to determine the nature and extent of any discipline based upon the circumstances of each individual case."  Also, "Employees may also be disciplined up to and including termination for *misconduct*, including, but not limited to the following:
• Falsifying an employment application or any other company records or documents, including timesheets
• Insubordination or other refusal to perform

The above incidents indicate Ms. Brightwell is in clear violation of RFL's company standards of conduct.  This is her final warning.  Any further action will be grounds for immediate dismissal.

Sincerely,

Brian O'Donnell
Managing Member and Owner


Cc:  Ms. Lee Brightwell

**EXHIBIT H**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: | 330 West Broadway |
| MAILING ADDRESS: | 330 West Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7071 |

PLAINTIFF(S) / PETITIONER(S):      L Lee Brightwell

DEFENDANT(S) / RESPONDENT(S): RF Logistics LLC et.al.

BRIGHTWELL VS. RF LOGISTICS LLC

| NOTICE OF CASE ASSIGNMENT and CASE MANAGEMENT CONFERENCE | CASE NUMBER:<br>37-2013-00046163-CU-BC-CTL |
|---|---|

## CASE ASSIGNMENT

Judge:  Ronald S. Prager                                    Department: C-71

**COMPLAINT/PETITION FILED: 04/25/2013**

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 10/11/2013 | 01:00 pm | C-71 | Ronald S. Prager |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants, and a Certificate of Service (SDSC form #CIV-345) filed within 60 days of filing.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, each party demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) for each party on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

## Superior Court of California
## County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order 010313 at www.sdcourt.ca.gov for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.

This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

# Please refer to the General Order - Imaging located on the San Diego Superior Court website at:

http://www.sdcourt.ca.gov/CivilImagingGeneralOrder



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION**

CASE NUMBER: 37-2013-00046163-CU-BC-CTL   CASE TITLE:
Brightwell vs. RF Logistics LLC

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
        (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
        (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), **and**
        (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

**Potential Advantages and Disadvantages of ADR**
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

**Most Common Types of ADR**
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COU.   Y OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS:        330 West Broadway | |
| MAILING ADDRESS:     330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME:          Central | |

| PLAINTIFF(S):    L Lee Brightwell | |
|---|---|
| DEFENDANT(S): RF Logistics LLC et.al. | FEB 28 '14 PM 3:22 |
| SHORT TITLE:    BRIGHTWELL VS. RF LOGISTICS LLC | |

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2013-00046163-CU-BC-CTL |
|---|---|

Judge: Ronald S. Prager                                    Department: C-71

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)          ☐ Non-binding private arbitration

☐ Mediation (private)                          ☐ Binding private arbitration

☐ Voluntary settlement conference (private)    ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)            ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____          Date: _____

Name of Plaintiff                                         Name of Defendant

Signature                                                   Signature

Name of Plaintiff's Attorney                          Name of Defendant's Attorney

Signature                                                   Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

IT IS SO ORDERED.

Dated:  04/26/2013 _____

                                              JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 12-10)          **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**          Page: 1

3

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | | | | *for court use only* |
|---|---|---|---|---|
| Attorney(s) Name and Address<br>JOSHUA D. GRUENBERG (163281) / COREY P. HANARAHAN (256835)<br>BENJAMIN S. SILVER (284741)<br>LAW OFFICE OF JOSHUA D. GRUENBERG<br>2169 First Ave, San Diego, CA 92101 | | | | FEB 28 '14 PM 3:21 |
| Name of Case (abbreviated)<br>BRIGHTWELL V. RF LOGISTICS, ET AL. | | | | |
| Attorney(s) For | Telephone | Hearing Date | Time | Case Number |
| Plaintiff | (619) 230-1234 | | | 37-2013-00046163-CU-BC-CTL |

## PROOF OF SERVICE

I, the undersigned, declare that I am over the age of 18 years and not a party to this action; I am employed in the County of San Diego, State of California, within which County the subject mailing occurred; my business address is 2169 First Avenue, San Diego, CA 92101.

On February 28, 2014, I served the following document(s):

1.   **PLAINTIFF'S FIRST AMENDED COMPLAINT.**


[ X ]   **Service By Mail**   I am familiar with attorney JOSHUA D. GRUENBERG'S practice for collection and processing correspondence for mailing with the United States Postal Service the same day in the ordinary course of business. By placing a true copy of each document in a separate envelope addressed to each addressee. By placing each for deposit in the United States Postal Service, this same day,   following ordinary business practices.

Daniel R. Friedenthal, Esq.
Jay D. Brown, Esq.
FRIEDENTHAL HEFFERNAN
& KLEIN, LLP.
155 North Lake Avenue, Suite 430
Pasadena, CA 91101
Fax: (626) 628-2828

Harvey C. Berger, Esq.
Stephanie Reynolds, Esq.
POPE BERGER & WILLIAMS, LLP.
3555 Fifth Avenue, Suite 300
San Diego, CA 92103
Fax: (619) 236-9677


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed on February 28, 2014, at San Diego, California.

*Julie A. Cosner*

JULIE A. COSNER

# Exhibit

# E

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**CENTRAL**

**MINUTE ORDER**

DATE: 07/02/2015        TIME: 01:30:00 PM       DEPT: C-72

JUDICIAL OFFICER PRESIDING: Timothy Taylor
CLERK: Kelly Breckenridge
REPORTER/ERM: Not Reported
BAILIFF/COURT ATTENDANT: O. Godoy

CASE NO: **37-2013-00046163-CU-BC-CTL**   CASE INIT.DATE: 04/25/2013
CASE TITLE: **Brightwell vs. RF Logistics LLC [IMAGED]**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

---

**EVENT TYPE**: Motion Hearing (Civil)

---

**APPEARANCES**
Scott A McMillan, counsel, present for Cross - Defendant,Plaintiff(s).
Kevin N Heffernan, counsel, present for Defendant,Cross - Complainant(s).
Harvey C Berger, counsel, present for Defendant,Cross - Complainant(s).
Stephanie Reynolds, counsel, present for Defendant.

---

The Court hears argument by counsel on the filed Motions in Limine.

**Rulings on Motions *in Limine*; Other Trial Orders**

*Brightwell v. RF Logistics*, Case No. 2013-46163

Trial Call: October 2, 2015, 8:30 a.m., Dept. 72

**1. <u>Overview and Procedural Posture</u>.**

This case began in April of 2013 as an employment case. It was assigned to Judge Prager. Plaintiff asserts that she was a "partner" at defendant RF Logistics, LLC; that she was wrongfully and fraudulently forced out of the business without being given her "ownership share" of the business; that, alternatively, she was wrongfully terminated from employment by defendant RF Logistics and Brian O'Donnell; and that she was sexually harassed by Mr. O'Donnell. ROA 57. There is a cross-action for breach of loyalty and other claims. ROA 22. It is undisputed that the parties had an intimate, cohabitation relationship.

Judge Prager held several hearings, mostly on his *ex parte* calendar, and made several rulings and orders. ROA 18, 32, 54, 61, 75, 89, 108, 115, 123, 130. The parties answered ready at the continued TRC in March of 2015. ROA 132-134. Further delays not attributable to the court resulted in a situation

---

in which the continued trial call coincided with Judge Prager's secundment to the Court of Appeal.  The case then sat on the civil wheel for some time due to its anticipated duration and other factors.  Plaintiff filed a challenge to Judge Prager's successor, Judge Pollack (ROA 211), and defendant challenged Judge Schall; the case was then assigned to Judge Nevitt.  Judge Nevitt then decided to retire, and as a result of his anticipated unavailability, the case was assigned to the Supervising Department for a Status Conference.  ROA 222.  At that time, the parties asked the Supervising Judge to assign the case to himself, and asked for early rulings on the motions *in limine*.  The court agreed to both requests, and the case was assigned to Dept. 72 for trial.  ROA 226, 227.

Presently, plaintiff has filed eight motions *in limine* and defendant has filed 20.  ROA 135-163.  Oppositions have likewise been filed.  ROA 164-189.  The court reviewed the briefs as promised at the May 29 Status Conference, and sent out tentative rulings on June 9, 2015.  ROA 230-231.  The court heard argument on July 2, 2015, and now makes its rulings.

## 2. **Applicable Standards.**

"*In limine* motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial.  'The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party.  A typical order *in limine* excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial.' [Citation.]  'The advantage of such motions is to avoid the obviously futile attempt to unring the bell in the event a motion to strike is granted in the proceedings before the jury.'"  *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1594, italics omitted.

Motions *in limine* are of limited if any utility in a bench trial.  *See United States v. Heller* (9th Cir. 2009) 551 F.3d 1108, 1112.

Recent appellate cases have been critical of trial courts which have allowed parties to utilize motions *in limine* as disguised motions for summary judgment or premature nonsuit motions.  *See, e.g.*, *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460; *Amtower v. Photon Dynamics, Inc.*, *supra*, 158 Cal.App.4th at p. 1595; *R&B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 371.

When the court grants a motion *in limine* excluding evidence, it thereby instructs counsel not to raise the excluded matter in opening statement, the questioning of witnesses, or closing argument.  It also thereby instructs counsel to instruct witnesses not to volunteer or otherwise mention the excluded matter.  No reference to the filing or granting of the motion is permitted.

The court's rulings are the result of its careful review of the parties' briefing, its increasing familiarity with the case and the arguments of counsel; the rulings are subject to revision as the trial progresses, as foundations are laid, and as the court becomes more acquainted with the details of the evidence.  *See Kelly v. New West Fed. Savings* (1996) 49 Cal.App.4th 659.  Rulings on *in limine* motions are by their nature tentative.  *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1430.

## 3. **Discussion and Rulings.**

**PMIL No. 1:**  To preclude evidence regarding affirmative defenses within plaintiff's case-in-chief.  Denied.  To grant this motion would potentially place improper fetters on defendants' rights of cross-examination.

CASE TITLE: Brightwell vs. RF Logistics LLC [IMAGED]    CASE NO: **37-2013-00046163-CU-BC-CTL**

**PMIL No. 2:** To exclude "documents, information, or testimony of any person not previously disclosed by Defendants, or withheld on the basis of privilege." Denied, as the motion fails to establish the specific "documents, information, or testimony" sought to be precluded. Although the motion establishes that a motion to compel was filed and evidently granted by Judge Prager, it does not establish that the ensuing order was disobeyed. Plaintiff's counsel should have readily available his discovery requests and the discovery order from Judge Prager, so that if this issue arises during trial with respect to a specific document, it can be readily resolved without undue jury waiting time.

**PMIL No. 3:** To exclude "evidence of alleged bad acts" (mortgage fraud) by plaintiff. It appears to the court that the excerpt from Exhibit 2029 quoted at page 3, lines 15-17 may very well be admissible. Denied to that extent. The court cannot at this point rule on the remainder of the motion, as defendant has not produced a loan application signed under penalty of perjury. Defendants should not expect this trial to become a sideshow in which an unpled "mortgage fraud" theory will be presented to the jury. Evid. Code § 352.

**PMIL No. 4:** To exclude evidence of defendant's interest in Chula Vista house. Denied. The court believes this evidence is potentially probative of the parties' relationship, and may conceivably give rise to an offset claim. Had the parties been married, this would surely be true. *See Marriage of Epstein*, 24 Cal. 3d 76, 84 (1979). Evidence of the sharing of payments is admissible; defendant does not seek an ownership interest in the house.

**PMIL No. 5:** To exclude documents subpoenaed from Pacific Access Mortgage. This matter was before Judge Prager on March 3, 2015. He ruled as follows: "This is a request for out of State Commission for Trial Subpoena. Court will issue commission subject to *in limine* motion at time of trial." ROA 130. The subpoenaed documents are in the Dept. 72 chambers (actually from Central Pacific Bank). Inasmuch as plaintiff has now known about this issue for several months, and does not identify a specific document or documents that are invasive of her privacy, the motion is denied.

**PMIL No. 6:** To exclude DEFS 04944-04945. Granted in part. All personal identifying information is to be redacted. The employment information on the top half of DEFS 04945 is, however, relevant and potentially admissible.

**PMIL No. 7:** To exclude plaintiff's private emails. Denied. It appears to the court plaintiff sought the production of these materials with a document demand in 2013. Further, inasmuch as the email account used was that of RF Logistics, plaintiff had a diminished expectation of privacy when a private Yahoo or Hotmail account was presumably available to her at all times. *See TBG Ins. Services v. Superior Court* (2002) 96 Cal. App. 4th 443, 450-52. The court is not ruling that the challenged emails are necessarily admissible; just that wholesale exclusion as the result of the email account is not warranted.

**PMIL No. 8:** To exclude plaintiff's prior sexual conduct. Unopposed, and granted.

\*\*\*

**DMIL No. 1:** To bifurcate liability and damages issues. The motion is deemed timely in light of the delay in the trial date. It is nevertheless denied. The court is simply not persuaded that a savings of trial time will result from bifurcation. *See* Code of Civil Procedure § 589.

**DMIL No. 2:** A so-called "*Kennemur*" motion. *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, upon which the motion is based, does <u>not</u> stand for the proposition that an expert cannot utter

CASE TITLE: Brightwell vs. RF Logistics LLC [IMAGED]  CASE NO.: **37-2013-00046163-CU-BC-CTL**

words or sentences not disclosed during his or her deposition. Rather, the overarching principle in *Kennemur,* and its progeny, is clear:  An expert should be precluded from testifying differently at trial only *if* the opposing party has no notice the expert will offer new opinions, or *if* notice of the new opinions comes at a time when re-deposing the expert is unreasonably difficult. *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 781 (emphasis original).  A motion *in limine* to exclude an expert's "new" testimony must make a specific showing of the following:

- What opinions the expert gave at deposition;
- That the expert was "closed out";
- The new opinions the expert is expected to give at trial; and
- That the new opinions were not disclosed sufficiently in advance of trial.

*Kelly*, *supra*, 49 Cal.App.4th at 670-671.

The court is of the view that the defendants have not yet made the required showing.  Specifically, there is no showing that defendants have a good faith belief that plaintiff's experts have any intention of going beyond the opinions they stated at deposition. Plaintiffs deny having any such intention. Therefore, the motion is denied without prejudice.  If there is a trial objection along these lines, the objecting lawyer must be prepared to immediately make this showing by page and line reference to the deposition of the witness in question.  This will minimize the disruption caused by the objection, which must of course result in the jury being made to wait.

**DMIL No. 3:**  To exclude evidence of residual physical injury.  Granted in a very narrow sense.  Plaintiff is stuck with the testimony that she had no residual physical problems at 170:12-14 of her deposition. The photographs are, however, potentially admissible to prove the battery claim.

**DMIL No. 4:**  To exclude evidence that plaintiff was a contractual employee.  Denied.  This is not a proper motion *in limine*.  The court agrees with plaintiff this is an effort to summarily adjudicate a claim without any of the procedural protections afforded to litigants for such motions.  Moreover, on the merits, the motion fails because at a minimum, plaintiff had some sort of a verbal at-will employment contract.

**DMIL No. 5:**  To bifurcate punitive damages.  Unopposed.  Granted.  Counsel must prepare CACI 3941 and 3942, and prepare the special verdicts accordingly.

**DMIL No. 6:**  To exclude evidence of consensual sexual activity between the parties.  Denied.  It appears to the court the parties' personal and business/employment relationship is inextricably intertwined, and it is impossible to sanitize the testimony as the motion seeks to do.  Plaintiff has just as much of an interest as defendant in approaching these matters in the most professional manner possible, but she is entitled to suggest to the jury that her inability to get documentation of her ownership interest was related in some manner to private consensual sexual activity.

**DMIL No. 7:**  To exclude evidence of damages to real property.  Denied for the several reasons stated in the opposition.

**DMIL No. 8:**  To exclude evidence of prior violent acts.  Denied for many of the same reasons enunciated in the ruling on DMIL No. 6.  It seems the evidence may be admissible under Evid. Code section 1101(b).  Defense counsel should prepare a limiting instruction if desired.

**DMIL No. 9:** To exclude evidence of loans by plaintiff to RF Logistics, LLC.  Denied.  It appears to the

CASE TITLE: Brightwell vs. RF Logistics LLC [IMAGED]  CASE NO: **37-2013-00046163-CU-BC-CTL**

court the plaintiff's capital contributions to RF Logistics, LLC are potentially relevant to plaintiff's breach of contract, fraud, and breach of fiduciary duty causes of action.  Plaintiff is entitled to suggest to the jury that she reasonably believed that she had an ownership stake in the business.  Repayment of the loans (or cash infusions that saved the company, according to plaintiff) does not necessarily make the initial payments irrelevant.

**DMIL No. 10:** To exclude evidence from plaintiff's expert regarding breach of fiduciary duty.  Another so-called "*Kennemur*" motion.  The court is of the view that the defendants have made the required showing here.  Specifically, defendants have shown a good faith belief that plaintiffs' expert plans to testify beyond the opinions he stated at deposition by offering an opinion as to the breach of fiduciary duty cause of action.  The opposition does not suggest that plaintiff gave the sort of notice contemplated by the *Kennemur* line of cases after Brinig had considered the Yip deposition.  Therefore, the motion is granted in that regard.  However, plaintiff's expert may testify about defendants' books and RFL's management of RFL funds.

**DMIL No. 11:** To exclude evidence of prior "yelling" and/or "bullying" by Mr. O'Connell.  Denied as it applies to the plaintiff.  This evidence is potentially relevant to plaintiff's IIED, NIED, and sexual harassment causes of action.  Defendants have not shown that the probative value is outweighed by the prejudice to them.

**DMIL No. 12:** To exclude evidence that "Liz Hendrix felt or feels 'threatened' by Brian O'Donnell, or that Brian O'Donnell accused Ms. Hendrix of aiding plaintiff in an 'assault' on RF Logistics, LLC."  Denied.  The court agrees with plaintiff that this is a premature motion.  If Ms. Hendrix testifies, plaintiff may be able to bring this statement in as a prior inconsistent statement or to show witness bias.  Moreover, if Ms. Hendrix's statement is not being used for the truth of the matter asserted, it may be admissible.  However, outside of that context, this statement is inadmissible hearsay.

The evidence, specifically the email provided by plaintiff (Ex. 398), pertaining to Mr. O'Donnell's belief that Ms. Hendrix aided the plaintiff is admissible as a statement by a party opponent.  And Ms. Hendrix may certainly be called to testify about what she heard or saw if it is otherwise relevant.

**DMIL No. 13:** To exclude defendants' tax return information.  Granted.  Tax return information is privileged.  However, the privilege is not absolute.  It may give way where the "gravamen of [the] lawsuit is so inconsistent with the continued assertion of the taxpayer's privilege as to compel the conclusion that the privilege has in fact been waived [or] a public policy greater than that of confidentiality of tax returns is involved."  *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 721.  Here, the lawsuit is not so intertwined with the tax return information that privilege must be waived.  Further, defendants' underlying records and data (e.g., checkbooks, journals, ledgers, etc.) are not protected by the privilege, allowing plaintiff alternative ways to demonstrate her right to reimbursement.  This includes expert opinions derived from the tax returns.  The public policy exception is narrowly construed, and plaintiff has not satisfactorily argued that there is a public interest at play here that would require the court to destroy the privilege.

**DMIL No. 14:** To exclude evidence about sexual harassment.  Denied.  This is not a proper motion *in limine*.  The court agrees with plaintiff this is an effort to summarily adjudicate a claim without any of the procedural protections afforded to litigants for such motions.  Moreover, the motion fails because plaintiff's first amended complaint relates back to her original complaint, and she received a second right to sue letter, so her cause of action is not barred.  This motion may reiterated as a non-suit motion at the appropriate time.

CASE TITLE: Brightwell vs. RF Logistics LLC [IMAGED]   CASE NO.: **37-2013-00046163-CU-BC-CTL**

---

**DMIL No. 15:** To exclude any and all evidence or reference to The Hartford paying for defendants' retained expert. Granted. The opposition reflects a backdoor effort to introduce evidence of insurance. The court will give CACI 105. While the fact that Yip has been paid is appropriately the subject of cross examination as to bias, the source of the payment is not. Counsel is instructed to steer well clear of this area.

**DMIL No. 16:** To exclude evidence of liability insurance. Granted. The court will give CACI 105. Counsel is instructed to steer well clear of this area.

**DMIL No. 17:** To exclude evidence of or reference to settlement negotiations. Granted. This motion is superfluous in light of Local Rule 2.1.18D.

**DMIL No. 18:** To exclude evidence of Mr. O'Donnell's alleged visits to prostitutes. Granted as to prostitutes, as it appears from the opposition that plaintiff concedes there is no evidence of same. Otherwise denied, as it appears to the court the defendants' use of company funds is quite relevant to the breach of fiduciary duty cause of action, and it is impossible to sanitize the testimony as the motion seeks to do. Plaintiff has just as much of an interest as defendant in approaching these matters in the most professional manner possible, but she is entitled to suggest to the jury that defendants' use of company funds in some way constituted a breach of fiduciary duty.

**DMIL No. 19:** To exclude evidence of extramarital affairs. Granted as to relationships other than the one between the parties. As to the parties' own relationship, it is simply not possible for the testimony and evidence to be sanitized as the defendants suggest. The date on which the parties began their relationship will inevitably come into evidence.

**DMIL No. 20:** To exclude evidence of violation of Labor Code section 1102.5. Denied. This is not a proper motion *in limine*. The court agrees with plaintiff this is an effort to summarily adjudicate a claim without any of the procedural protections afforded to litigants for such motions. Defendants may certainly reiterate the motion as one for a nonsuit and/or for JNOV; by then, perhaps the uncertainty in the law will have been cleared up.

**4.  Other Trial-Related Matters.**

A.  The court hereby sets Friday October 2, 2015 at 8:30 a.m. for trial call in this matter. Counsel are to meet and confer regarding the jury questionnaire as stated in the court reporter's transcript. It is to be the subject of an *ex parte* appearance not less than one week before trial.

B.  The court, having read the briefs, finds that 60 minutes per side for opening statements should be sufficient.

C.  Typical morning trial start times are 9:00 due to the regular 8:30 *ex parte* calendar, except as counsel may be notified otherwise. During trial, court is in recess between noon and 1:30 p.m., and typically recesses for the day promptly at 4:30 p.m. by the Dept. 72 clock. Factoring in one 15 minute recess in the morning session and one 15 minute recess in the afternoon session, this means there are, at most, 5.5 hours in a trial day. Be on time. Plan your presentation of the evidence. Parties running out of witnesses will be deemed to have rested. The trial will be dark on Fridays for regular law and motion/case management calendars. The court will expect counsel to present the case within the 12 days previously estimated (which seems like an ample time to put this case on). See *Calif. Crane*

---

CASE TITLE: Brightwell vs. RF Logistics LLC [IMAGED]     CASE NO: **37-2013-00046163-CU-BC-CTL**

School v. NCCO, 226 Cal. App. 4th 12 (2014)(affirming trial court's imposition of time limits on trial counsel).

D.  On the trial date, plaintiff's counsel must bring three (3) copies of the joint witness list; by submitting the witness list, counsel are representing that the names of all witnesses are correctly spelled.

E.  On the trial date, plaintiff's counsel must bring three (3) copies of the joint exhibit list.  The latter must match the exhibits in the exhibit volumes exactly.   It is not permissible to list, for example, "Dr. Smith's file" as Exhibit XX; each document within the file must be given a discrete number, <u>and that number must appear on the joint exhibit list with a proper description</u>.  Photographs must likewise be individually numbered, and must coincide with a proper description on the Exhibit List.  By way of example, eleven photographs all labeled "photo of plaintiff" will not suffice.  Each photo must have a distinct description.  By submitting the exhibit list, counsel are representing that the description of the document or other item is accurate.  Refer to the article attached to the Dept. 72 ATRO.

F.  The court expects a complete set of jury instructions and agreed forms of special verdict(s) to be presented on the first day of trial.  Counsel must meet <u>in person</u> for this purpose.

**IT IS SO ORDERED.**

_____
 Judge Timothy  Taylor